## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK SYRACUSE DIVISION

**JENNIFER VITSAXAKI**,

*Plaintiff,*

v.

**SKANEATELES CENTRAL SCHOOL DISTRICT**; **SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION**,

*Defendants.*

No. ___5:24-cv-00155 (DNH/ ML)___

**VERIFIED COMPLAINT**

## INTRODUCTION

1.      Jennifer Vitsaxaki trusted that the counselors, teachers, and other employees of the Skaneateles Central School District would share with her any information she needed to help her daughter Jane,[1] then 12 years old, to thrive. So Mrs. Vitsaxaki quickly turned to them when her daughter began struggling with anxiety and depression related to school—at times, even refusing to leave home. Again and again, she asked School District employees whether they had noticed anything troubling about her daughter during the school day. Perhaps there was a bullying problem? Perhaps an academic cause? But everyone with whom Mrs. Vitsaxaki spoke reassured her. No one had noticed a bullying problem, nor anything else worrying about her daughter.

2.      Those repeated reassurances concealed the truth. While school officials kept telling Mrs. Vitsaxaki that there was nothing to report, a school counselor was regularly meeting with her daughter and her peers to address ongoing bullying suffered by Mrs. Vitsaxaki's daughter, Jane, and other girls in the group. But worse than

---

[1] Mrs. Vitsaxaki's daughter's name has been changed to Jane in this Complaint to protect her privacy.

that, the School District began treating her as if she were a boy, without telling her mother, just as it had done with several other girls in her grade. The same counselor instructed school staff to treat Mrs. Vitsaxaki's daughter as though she were a boy by referring to her with a boy's name and the third-person plural pronouns "they" and "them"—part of a controversial psychosocial intervention often called "social transition." Then, a school psychologist, who told school staff to keep their actions secret from Mrs. Vitsaxaki, began meeting with Jane regularly without Mrs. Vitsaxaki's knowledge. Yet no one informed Mrs. Vitsaxaki that the School District had made any of these decisions about and taken all of these actions toward her daughter.

3.      Not one School District employee notified Mrs. Vitsaxaki or sought her consent before socially transitioning her daughter. Worse, although those employees knew about the School District's actions, they told Mrs. Vitsaxaki nothing. School staff carefully used Jane's given name and female pronouns when speaking with Mrs. Vitsaxaki, and they repeatedly said everything was fine, all the while treating Jane as a boy and sending her resources for medical transition behind Mrs. Vitsaxaki's back.

4.      For months, School District employees concealed this information about the well-being of Mrs. Vitsaxaki's daughter—sensitive information about the girl's struggles with gender. And for months, Jane's mental condition got worse. She resisted going to school. She was anxious. She became increasingly negative, especially when speaking about herself. At one point, and at her daughter's request, Mrs. Vitsaxaki even took a job as a bus driver to learn more about what could be causing her daughter's distress. By concealing from Mrs. Vitsaxaki this important information about her daughter, the School District betrayed Mrs. Vitsaxaki's trust. It also violated the U.S. Constitution.

5.      Eventually, one staff member could no longer stomach the School District's deception of Mrs. Vitsaxaki and urged the principal to come clean. When he

finally did, Mrs. Vitsaxaki was shocked. She and her husband, Jane's father, met with the School District. They directed the School District to stop taking any further action without their consent and sought open communication with the teachers to understand what had happened. But the principal told them School District policy required employees to deceive them, and despite assurances to the contrary, the deception continued. Left with no other options, Mrs. Vitsaxaki withdrew her daughter from the School District.

6.     Like all parents, Mrs. Vitsaxaki has a fundamental right to direct the upbringing, education, and healthcare of her children. It is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). And that right is inconsistent with the deceptive, heavy-handed, and disruptive intervention that the School District perpetrated against Mrs. Vitsaxaki's daughter—an intervention that gravely interfered with her ability to raise her daughter and contradicted her religious beliefs.

7.     Ultimately, parents—not school employees or other government officials—ought to decide how to resolve a child's questions about sensitive topics like identity and gender confusion. Parents like Mrs. Vitsaxaki know their children better than anyone else. And parents, not school employees, will be there for a child in the long run, when the consequences of these decisions become fully apparent.

8.     By violating these principles, the School District violated Mrs. Vitsaxaki's constitutional rights. Therefore, she brings this civil-rights lawsuit for damages and declaratory relief to vindicate those rights.

## PARTIES

9.     Plaintiff Jennifer Vitsaxaki is the mother of three children, including Jane, who attended schools in the Skaneateles Central School District from 2017–2021.

10.     Mrs. Vitsaxaki and Jane are U.S. citizens who reside in Skaneateles, New York.

11.     Michael Vitsaxakis, Jane's father and Mrs. Vitsaxaki's husband, currently resides in Greece for work-related reasons and is not a plaintiff in this case, although he shares Mrs. Vitsaxaki's concerns about Jane and objects to the School District's decision to secretly transition her without their consent or knowledge.

12.     Defendant Skaneateles Central School District (also called Skaneateles Central Schools, and hereinafter, "the School District") is a central school district organized according to the provisions of New York Education Law Article 37. *See* N.Y. Educ. Law § 1801 *et seq.*; Skaneateles Cent. Sch. Dist. Policy Manual 1110, http://go.boarddocs.com/ny/skan/Board.nsf/goto?open&id=BHFM7T59BED7.

13.     The School District operates four schools, including Skaneateles Middle School.

14.     Under New York law, the School District is a "public corporation" capable of suing or being sued. N.Y. Const. art. X, § 5; *Woods v. Rondout Valley Cent. Sch. Dist. Bd. Of Educ.*, 466 F.3d 232, 239–40 (2d Cir. 2006) (clarifying that a New York central school district is capable of being sued).

15.     Defendant Skaneateles Central Schools' Board of Education (hereinafter, "the School Board") is the Board of Education for the School District and organized according to the laws of the state of New York. *See* N.Y. Educ. Law § 1804 (establishing duties of board of education for a central school district).

16.     Under New York law, the School Board is a "body corporate," capable of suing or being sued. N.Y. Educ. Law § 1701; *Woods*, 466 F.3d at 240, 251.

17.     The School District and the School Board are political subdivisions of the State of New York.

18.     Mrs. Vitsaxaki and Jane reside within the geographic boundaries served by the School District's schools.

4

19.    Jane was enrolled in schools operated by the School District from the 2017–2018 school year, when she was in the fourth grade, until the end of the 2020–2021 school year, when she was in the seventh grade, after which Mrs. Vitsaxaki withdrew her from Skaneateles Middle School.

20.    While Jane was a student at Skaneateles Middle School, School District employees acted, pursuant to School District policy, practice, usage, and custom, to treat Jane as a boy by referring to her with a masculine name and the third-person plural pronouns "they" and "them."

21.    School District employees treated Jane as a boy without first seeking consent to do so from Mrs. Vitsaxaki—or even notifying Mrs. Vitsaxaki of these actions—and took steps to conceal these actions.

22.    When School District employees failed to notify Mrs. Vitsaxaki or seek her consent, and when they took steps to conceal their actions, they acted pursuant to School District policy, practice, usage, and custom.

## JURISDICTION AND VENUE

23.    This civil-rights action raises federal questions under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

24.    This Court has original subject-matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1343.

25.    Venue is proper in this District Court and Division, because the parties reside in this Division, 28 U.S.C. § 1391(b)(1), (c)(2); and because the events giving rise to Mrs. Vitsaxaki's claims occurred within this Division, *id.* § 1391(b)(2). *See* N.D.N.Y. L.R. 3.3.

26.    Those same facts grant this Court personal jurisdiction over Defendants. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163–64 (2d Cir. 2010).

27.     This Court has authority to award declaratory relief, 28 U.S.C. § 2201–02; *see* Fed. R. Civ. P. 57; damages, 28 U.S.C. § 1343; and costs and attorneys' fees, 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54.

## FACTUAL BACKGROUND

### I.     After years living in Greece, the Vitsaxaki family relocates to upstate New York.

28.     Jennifer Vitsaxaki grew up in New Jersey, and she met her husband, Michael Vitsaxakis, a Greek citizen, while they were both attending colleges in Rhode Island.

29.     After finishing college, Jennifer and Michael decided to move back to Greece where they were married and began raising their family, which eventually grew to three daughters.

30.     Jane spent the first nine years of her life in Greece, where her primary language was Greek—both at home and in school—and she was deeply connected to her Greek family and community.

31.     The Vitsaxakis intended to stay and continue raising their daughters in Greece, but when the Greek economy collapsed everything changed for them.

32.     The Vitsaxakis realized they could not continue to raise their children in Greece.

33.     In 2017, because Mrs. Vitsaxaki and their three girls were U.S. citizens, they came to live with her parents in Skaneateles, New York, while Mr. Vitsaxakis continued to live and work in Greece.

34.     The Vitsaxakis family's unforeseen return to the United States—necessary as it was—disrupted life for the entire family.

35.     The girls had to adapt to a new culture, including learning to go through each day speaking primarily English instead of Greek.

36.     Mr. Vitsaxakis's employment required him to travel frequently in Asia and Europe. The family hoped to ride out the economic crisis and reconnect, but in the meantime, Mr. Vitsaxakis made frequent, extended trips to be with the family in Skaneateles.

37.     The COVID-19 pandemic and associated lockdowns led the family to be separated for longer periods than anticipated, and Mr. Vitsaxakis, due to work, continues to live and work primarily in Greece with trips to visit his family.

38.     The family's circumstances left Mrs. Vitsaxaki as the primary contact with the School District when concerns about Jane arose.

## II.     Mrs. Vitsaxaki's daughter, struggling to adapt to her new life, begins to meet with an elementary school counselor to address her anxiety.

39.     In August 2017, after relocating to Skaneateles, the Vitsaxakis enrolled Jane into the Skaneateles Central School District, where she was a fourth grader at State Street Elementary School.

40.     During that first year, Mrs. Vitsaxaki noticed that Jane was having difficulty adapting to her new school.

41.     In particular, English was a second language for Jane, and Mrs. Vitsaxaki worried about her English proficiency, which appeared to affect Jane's ability to integrate into her new life in the United States, including at school.

42.     Mrs. Vitsaxaki saw Jane struggling to relate to her classmates in English, and classes that she had previously excelled in suddenly became a challenge.

43.     Jane loved school in Greece, but in America she was far less enthusiastic about school.

44.     To help Jane adapt to her American school, Mrs. Vitsaxaki worked closely with Jane's fourth-grade teacher.

45.     Mrs. Vitsaxaki found a variety of ways to support Jane.

46.     For example, Mrs. Vitsaxaki began coaching Jane's team for "Odyssey of the Mind"—an international program that hosts an academic competition focused on creative problem-solving—so she could see first-hand how Jane was doing at school and provide support.

47.     Little by little, Jane began to adapt to fourth-grade life at State Street Elementary.

48.     But the transition to fifth grade brought renewed challenges.

49.      Jane found herself in an entirely new class with a new teacher and new classmates.

50.     Jane's established friendships evaporated.

51.     And Jane's new teacher had to learn how to navigate the cultural differences Jane was experiencing.

52.     As the year progressed, Mrs. Vitsaxaki watched her daughter's struggles intensify, including struggles with anxiety and panic attacks—eventually, even resistance to attending school at all.

53.     Again, Mrs. Vitsaxaki reached out to Jane's school, speaking with her teacher and principal about Jane's well-being.

54.     Around this same time, Mrs. Vitsaxaki also started working with the school counselor, who began seeing Jane regularly and providing her with coping mechanisms like breathing exercises and notes for her locker to reduce her anxiety.

55.     Despite the counselor's support, many of Jane's struggles persisted, and her anxiety never fully subsided throughout fifth grade.

### III.   A middle-school counselor does not disclose to Mrs. Vitsaxaki important details about her daughter's school experience, including regular meetings with Jane and her classmates.

56.   When Jane entered sixth grade at Skaneateles Middle School in August 2019, Mrs. Vitsaxaki worried that Jane would experience a repeat of fifth grade and again struggle to incorporate into a new class and now a new school.

57.   Before school started, therefore, Mrs. Vitsaxaki spoke with the middle-school guidance counselor, Christopher Viggiano, and the school psychologist, Vicky Powers, to share her concerns about Jane's anxiety and academic struggles.

58.   Mr. Viggiano and Ms. Powers assured her that they would keep an eye on Jane and provide support to Jane as needed in coordination with Mrs. Vitsaxaki.

59.   Despite Mrs. Vitsaxaki's efforts, Jane's condition deteriorated even further as a sixth grader.

60.   Jane suffered increased anxiety and depression, gained weight, became withdrawn, and began referring to herself with demeaning adjectives.

61.   Jane continued to resist going to school in the morning, to the point that some days it was almost impossible for Mrs. Vitsaxaki to get Jane to go to school.

62.   Mrs. Vitsaxaki suspected bullying, so she raised that suspicion with school staff, including Mr. Viggiano, Ms. Powers, and Michael Caraccio, the middle-school principal.

63.   Each time Mrs. Vitsaxaki raised Jane's social anxiety or her own bullying concerns, school staff assured her not to worry—that Jane was doing just fine at school and with her classmates.

64.   Meanwhile, despite these assurances from Mr. Viggiano and others, Jane was being bullied, and at least Mr. Viggiano was aware of it because he was meeting frequently with Jane and fellow students about conflict with her peers.

65.     Throughout sixth grade, Mr. Viggiano regularly removed Jane from lunch, activity periods, and occasionally classes, to discuss conflict and bullying with her peers—unbeknownst to Mrs. Vitsaxaki.

66.     Mr. Viggiano met with other students in the group as well to try to resolve conflict among the girls, and he regularly made the students apologize to each other.

67.     Mr. Viggiano's frequent meetings with Jane and her peers did not resolve ongoing bullying issues that continued to fester within the group, yet Mr. Viggiano still did not disclose these issues or his frequent meetings to Mrs. Vitsaxaki.

68.     During this time period, Mrs. Vitsaxaki continued to ask Mr. Viggiano and others about Jane's well-being at school, including direct questions to Mr. Viggiano about whether Jane was experiencing bullying and whether he was talking with Jane about any conflicts with her peers.

69.     Mrs. Vitsaxaki also shared with Mr. Viggiano stories that Jane was telling her about concerning incidents and behavioral issues among her peers.

70.     Despite Mrs. Vitsaxaki's direct questions about bullying from or conflict with Jane's peers, Mr. Viggiano never disclosed to Mrs. Vitsaxaki that he met regularly with Jane and her peers to address ongoing social issues.

71.     Mrs. Vitsaxaki didn't learn until much later that Mr. Viggiano was regularly meeting with Jane and her peers during this time, and that she had been right all along: Jane *was* being bullied.

72.     Having been assured that bullying was not happening at school, Mrs. Vitsaxaki thought if there was no social cause for Jane's attitude and behavior, including her resistance to going to school, then maybe the cause was developmental.

73.     Consequently, in late 2019, Mrs. Vitsaxaki requested a formal evaluation of Jane by the middle school to look for any educational or developmental issues impacting her academics and behavior.

74.     Mr. Viggiano and Ms. Powers participated in this evaluation along with other middle-school staff members.

75.     As part of the process, Mrs. Vitsaxaki spoke with Ms. Powers several times, providing detailed, private information about Jane's behavior as well as her own concerns about her daughter.

76.     When the evaluation wrapped up in January 2020, school staff told Mrs. Vitsaxaki that they had concluded Jane did not have any educational or developmental issues and issued a report confirming this conclusion.

77.     The School District informed Mrs. Vitsaxaki that her daughter was not eligible for any academic support.

78.     The conflict and bullying with Jane's peers continued through the end of the sixth-grade school year—as did Mr. Viggiano's meetings with the students—unbeknownst to Mrs. Vitsaxaki.

79.     Around this time—also unbeknownst to Mrs. Vitsaxaki—various classmates of Jane, as well as other students in the school and Jane's grade, began experimenting with new "gender identities," including identities associated with names and pronouns that were different than their legal names and did not correspond to their biological sex.

80.     Mrs. Vitsaxaki was not aware that Jane's peers were experimenting with new gender identities or that Jane was exposed to the topic at the time.

81.     By spring, a number of Jane's peers, including at least two of Jane's classmates, had adopted new names, pronouns, and gender identities at school.

82.     When these students formally asked school staff to refer to them at school by different names and incorrect pronouns—ones not associated with their biological sex—the school quickly agreed. Mrs. Vitsaxaki was unaware this was happening to Jane's peers at the time.

83.     In later conversations, Mrs. Vitsaxaki discovered that the School District did not inform other parents before beginning to refer to their children at school by incorrect names and pronouns.

84.     In fact, School District policy prohibited school staff from disclosing information about students' use of incorrect names and pronouns at school unless the parents already knew or the student requested that their parents be told.

85.     Then in March 2020, the middle school shut down because of the COVID-19 pandemic, and Jane began taking virtual classes at home until the end of the school year in May 2020.

86.     While Jane was taking classes at home, Mrs. Vitsaxaki watched her demeanor change for the better.

87.     She noticed that Jane's anxiety and depression subsided, and she seemed to have a much better outlook and appeared happier outside of the school environment.

88.     Mrs. Vitsaxaki was relieved to see this change in her daughter. Unfortunately, it did not last.

## IV.     Despite Mrs. Vitsaxaki's repeated requests for information, School District employees do not inform her when they begin to refer to her daughter with a masculine name and plural pronouns.

89.     In September 2020, Jane returned to in-person seventh-grade classes at the middle school, and her anxiety, resistance to going to school, and other struggles returned with in-person schooling; indeed, they got worse as the year went on.

90.     Around this time, Jane, who was now 12 years old, asked Mrs. Vitsaxaki to become a bus driver so that Mrs. Vitsaxaki could take her to school.

91.     Increasingly concerned about her daughter's well-being, Mrs. Vitsaxaki agreed and began the School District's bus driver training.

92.   Mrs. Vitsaxaki hoped that driving the school bus would give her an added opportunity to connect with her daughter, while providing added support to Jane on her trips to school.

93.   Meanwhile, Mr. Viggiano and Ms. Powers were pulling Jane from lunch and from classes for counseling sessions to talk about conflict with her peers and, eventually, about experimentation with new gender identities.

94.   Jane also began regularly meeting with Vicky Wolfganger, the school nurse.

95.   School staff did not ask Mrs. Vitsaxaki's permission for these counseling sessions or nurse visits with her daughter, and they did not tell Mrs. Vitsaxaki about any of these meetings at the time the meetings were occurring.

96.   As seventh grade continued, Jane learned more about gender identity and watched peers ask the School District to refer to them by different names and incorrect pronouns, which school officials quickly did.

97.   Mrs. Vitsaxaki later found out that as more and more of Jane's peers were exploring new gender identities, Jane also began to view online content about different gender identities and watch YouTube videos about the topic.

98.   In early 2021, as some of her peers had already done, Jane went to Mr. Viggiano—without Mrs. Vitsaxaki's knowledge—and asked that staff at the middle school refer to her by a different name and pronouns based on a new gender identity.

99.   After that request, Mr. Viggiano, Ms. Powers, and the school social worker, Michele Rogala, met with Jane to discuss the request and her embrace of a new gender identity.

100.   These School District staff members encouraged and facilitated Jane's use of different names and pronouns at school without giving any notice to Mrs. Vitsaxaki—let alone seeking her consent.

101.   In fact, School District staff told Jane that her parents did not need to be notified, and the school would only disclose the information to the people Jane asked them to tell.

102.   During this time, Mrs. Vitsaxaki noticed that in addition to Jane's recurring struggles, she was experiencing several physical ailments including insomnia and stomach pains.

103.   Mrs. Vitsaxaki also noticed that Jane had gained more weight; was continuing to refer to herself in very negative, unkind terms; and was extremely reluctant to go to school.

104.   Mrs. Vitsaxaki repeatedly spoke with Jane's school counselors and teachers, asking whether they were seeing anything at school that could be causing or contributing to Jane's worsening struggles.

105.   The consistent answer was, "No."

106.   School District staff, including Mr. Viggiano and Ms. Powers, told Mrs. Vitsaxaki that they saw no struggles at school or anything that could explain what Mrs. Vitsaxaki was observing in Jane at home.

107.   On February 10, 2021, after a counseling session with Jane, Mr. Viggiano emailed several staff members at the middle school to inform them that they should call Jane a different name (a typically masculine name with the same initial as her correct, legal name), and use the third-person plural pronouns "they" and "them" rather than the female pronouns "she" and "her."

108.   In that February 10 email, Mr. Viggiano wrote:

[masculine name] has already talked with their [sic] close friends about it. Michele [Rogala] and I will follow up with her after break to see what the plan is for discussing this change with their [sic] parents.

Ex. 1.

14

109. After that email, middle-school staff consistently referred to Jane with the masculine name and the third-person plural pronouns "they" and "them" without telling Mrs. Vitsaxaki or obtaining her consent. In fact, they hid it from her.

110. The same School District staff, which included Mr. Viggiano, Ms. Powers, Ms. Rogala, Principal Caraccio, and Jane's teachers, all carefully referred to Jane by her given name and female pronouns whenever they spoke with Mrs. Vitsaxaki, while calling Jane by a masculine name and incorrect pronouns at school.

111. This went on for months and over numerous conversations with Mrs. Vitsaxaki as Mrs. Vitsaxaki continued to ask Jane's teachers, Mr. Viggiano, Ms. Powers, and other school staff about her daughter's well-being, academics, and anxiety.

## V. Still telling Mrs. Vitsaxaki nothing, School District employees increase the time they spend discussing gender with her daughter.

112. After changing Jane's name and pronouns at school, Ms. Powers and Ms. Rogala increased the frequency of their meetings with Jane to two or three times a week, both alone and in group sessions including other students with whom they would discuss their new gender identities.

113. Jane became frustrated with the frequency of these sessions, both because their purpose was often unclear and because they required her to frequently miss lunch or even classroom instruction, and she felt as though she could not decline to attend them.

114. During these sessions, School District staff encouraged Jane and her peers in their new gender identities.

115. Around this same time, Ms. Rogala, the school social worker, also started an "LGBTQ club" at lunch, which she encouraged Jane and others to attend.

116. Ms. Rogala used the LGBTQ club to encourage Jane and other students to "socially transition," a controversial practice that can include, among other actions, changing how a person dresses or grooms herself or which private facilities she uses

(like restrooms or locker rooms), along with adopting names and pronouns other than those associated with a person's sex.

117.    For example, Jane was told that her biological sex was something that she could choose to change as a solution to difficulties that she was facing.

118.    In addition to encouraging Jane and other club members to "socially transition"—including to change their names and pronouns at school—Ms. Rogala gave Jane resources on "medical transition" that included information and details on clinics she could contact in the area that offered medical interventions with the goal of "medically transitioning." *See* Ex. 2.

119.    The resources included contact information for counselors, pediatricians, surgeons, a nearby gender clinic, as well as information on where to obtain "breast binders" and other medical devices associated with "medical transition" for gender dysphoric youth.

120.    The resources also introduced Jane and other students to "The Q Center," an LGBT resource hub run by ACR Health that encourages and connects youth to resources aimed at advancing medical transition, with or without parental consent or knowledge.

121.    Neither Ms. Rogala nor any other School District staff informed Mrs. Vitsaxaki about Jane's participation in this LGBTQ club or the information about medical transition that she was receiving there.

122.    Neither Ms. Rogala nor any other School District staff informed Mrs. Vitsaxaki or sought her consent to give Jane resources and contact information for doctors to pursue a "medical transition."

123.    At one point, a friend asked Jane to purchase a "chest binder" that the friend could use to hide the prominence of her breasts and make her appear more masculine.

16

124.    Jane used the resources Ms. Rogala provided to investigate such a purchase, but she ultimately did not make the purchase.

## VI.   Mrs. Vitsaxaki brings her persistent concerns to some of her daughter's teachers, who don't inform her of the School District's actions.

125.    During this time, Jane's grades in several of her classes suffered because her focus was directed away from schoolwork, and she missed class as a result of counseling meetings—meetings that Jane felt unable to decline and that Mrs. Vitsaxaki still didn't know about.

126.    Jane also made frequent visits to the school nurse, Ms. Wolfganger, without Mrs. Vitsaxaki's knowledge or consent, complaining of tiredness.

127.    Even without knowledge of the counseling sessions or nurse visits, Mrs. Vitsaxaki's concerns about her daughter continued to increase as Jane became increasingly anxious, sad, and resistant to going to school.

128.    Mrs. Vitsaxaki continued to discuss her concerns with school staff, including Mr. Viggiano and Ms. Powers, and with Jane's teachers, including her English teacher, Lauren Pohl, and her math teacher, Keith Lamphere.

129.    Despite Mrs. Vitsaxaki's questions, Jane's teachers and counselors still did not tell her that they had facilitated a social transition for Jane at school or that they were regularly addressing Jane by an incorrect, masculine name, and by the third-person plural pronouns "they" and "them."

130.    For example, in April 2021, Mrs. Vitsaxaki had specific conversations with Ms. Pohl regarding Ms. Pohl's concern that Jane had cheated on an assignment.

131.    Mrs. Vitsaxaki's older daughter had previously been in Ms. Pohl's class, so Mrs. Vitsaxaki and Ms. Pohl knew each other well.

132.    During their discussion, Mrs. Vitsaxaki asked Ms. Pohl about Jane's well-being at school: Was Ms. Pohl seeing anything unusual about Jane because cheating seemed so out of character?

133.   Ms. Pohl did not disclose to Mrs. Vitsaxaki any of Jane's identity struggles, how the School District had changed the name and pronouns it used for Jane, or Jane's frequent meetings with the counselors.

134.   Ms. Pohl was aware of these events, because she was a recipient of Mr. Viggiano's February 10, 2021, email telling School District staff to use a different name and pronouns for Jane.

135.   Instead of disclosing any of this, Ms. Pohl reassured Mrs. Vitsaxaki that she did not share Mrs. Vitsaxaki's concerns about Jane, and Ms. Pohl used Jane's given name and female pronouns when speaking with Mrs. Vitsaxaki.

136.   Mrs. Vitsaxaki also had specific, extended conversations with Jane's math teacher, Mr. Lamphere, during which she asked him about Jane's well-being, including whether he had observed any signs of Jane's struggles at school.

137.   Like Ms. Pohl, Mr. Lamphere also received Mr. Viggiano's February 10 email.

138.   Yet like Ms. Pohl, Mr. Lamphere also brushed aside Mrs. Vitsaxaki's concerns.

139.   Mr. Lamphere referred to Jane by her given name and female pronouns and did not tell Mrs. Vitsaxaki that, all this time, her daughter's teachers had been referring to her by a masculine name and third-person plural pronouns.

140.   For several months, Jane's teachers continued to use Jane's given name and female pronouns when speaking about Jane to Mrs. Vitsaxaki, while they were simultaneously using the masculine name and third-person plural pronouns when speaking with Jane.

**VII.   The School District finally reveals to Mrs. Vitsaxaki that it has re-
ferred to her daughter with a masculine name and third-person plural
pronouns for months without her knowledge.**

141.   In April 2021, Ms. Powers completed a "Gender Support Plan" for Jane
that was consistent with Mr. Viggiano's February 10 email informing School District
staff they should use a masculine name and third-person plural pronouns for Jane.

142.   The final plan is dated April 23, 2021, and notes in relevant part that:

(a)   Family were not considered supportive, and Jane was "not ready to tell
family";

(b)   There was "no solid plan" to "come out" to family;

(c)   Staff were asked to use "[masculine name]/they/them" when speaking to
her, but use Jane's legal name when speaking with family;

(d)   There was a discussion of the "risk of accidentally outing student at
home";

(e)   Friends were considered supportive and aware of the name and pronoun
changes;

(f)   All middle-school staff were to be informed, including substitutes, cafe-
teria staff, and physical education teachers;

(g)   The name that was to appear in the yearbook (and be seen by the
Vitsaxakis) was to be Jane's legal name;

(h)   "GSA support" was discussed as an option for Jane.

Ex. 3.

143.   In other words, the School District's use of a masculine name and third-
person plural pronouns for Jane was publicly known to most of the school community,
with a notable exception: the Vitsaxakis.

144.   On May 11, Michael Caraccio, the principal at Jane's school, called Mrs.
Vitsaxaki to discuss Jane.

145.   Unbeknownst to Mrs. Vitsaxaki, Mr. Caraccio had her on speakerphone, with Jane listening in to the conversation. Mr. Caraccio did not initially tell Mrs. Vitsaxaki that Jane was in the room.

146.   Mr. Caraccio proceeded to inform Mrs. Vitsaxaki that the School District had begun to socially transition Jane and created a staff team to facilitate that transition.

147.   This included creating a Gender Support Plan for Jane and changing Jane's name and pronouns at school, Mr. Caraccio told Mrs. Vitsaxaki.

148.   Mr. Caraccio made clear that School District employees took all of these actions in accordance with School District policy.

149.   Initially, Mrs. Vitsaxaki objected in strong terms to the School District's actions and corrected Mr. Caraccio when he referred to Jane using the incorrect masculine name and third-person plural pronouns "they" and "them."

150.   But Mrs. Vitsaxaki eventually realized that Jane was listening to the conversation and was caught off-guard and alarmed that Mr. Caraccio had not informed her that Jane was listening in as they discussed Jane's situation.

151.   When she realized Jane was listening, Mrs. Vitsaxaki sought to console her daughter before ending the call.

152.   Mr. Caraccio's call was the first time Mrs. Vitsaxaki had ever heard anyone raise questions about Jane's gender. Jane had never indicated to her parents any gender incongruence or confusion about her gender.

153.   Mrs. Vitsaxaki had been in close contact with Jane's school counselors and teachers since fourth grade, and they had never mentioned any questions about Jane's gender.

154.   After ending the call, Mrs. Vitsaxaki emailed Mr. Caraccio and asked for another phone call to talk with him without Jane present.

155.    Jane continued attending the middle school in person for the next few days before switching to online schooling from May 17, 2021, through the end of the school year.

156.    In the last few days of in-person attendance before switching to online schooling, school staff continued to meet with Jane without the knowledge of Mrs. Vitsaxaki.

## VIII.  Mrs. Vitsaxaki approaches School District staff after discovering their deception, asking them to explain their actions.

157.    On May 12, 2021, after Mr. Caraccio's conversation with Mrs. Vitsaxaki, Ms. Powers emailed several staff members at the Middle School to update them about Jane.

158.    In the email, Ms. Powers wrote, using the masculine name for Jane instead of the girl's correct name:

> I wanted to reach out re: [masculine name]. As you know, [masculine name] had not come "out" to they's [sic] family as of yesterday. A lot transpired this week that pushed the issue along. [masculine name]'s mother was communicating with some of you, Chris Viggiano and me. It was getting increasingly difficult to balance [masculine name]'s readiness and privacy with [masculine name]'s mother's right to know what has been going on here at school with [masculine name]'s name and pronoun changes. We have consulted with a school attorney along the way to help us navigate the most appropriate and safe approach to these disclosures … . In a nutshell, it came to a head yesterday following conversations with [masculine name] and her mother. Mike, with [masculine name], called [masculine name]'s mother and disclosed what was going on. It has offered some relief in that [masculine name] does not have to dance around the issue or avoid altogether, as well as, we at school do not have to any longer either.

Ex. 4.

159.    In the following days, Mr. Caraccio sent Mrs. Vitsaxaki a copy of the Gender Support Plan that the School District had created for Jane and suggested in

a follow-up telephone conversation that Mrs. Vitsaxaki meet with Jane's "gender support team" to provide her with further information.

160.   Mr. Vitsaxakis shared Mrs. Vitsaxaki's concerns about what had been happening to Jane at school and arranged to be present for meetings with the school.

161.   On May 18, both Mr. and Mrs. Vitsaxakis met with that "gender support team," comprised of Mr. Viggiano, Ms. Powers, Ms. Rogala, Ms. Wolfganger, and Mr. Caraccio.

162.   During the meeting, the Vitsaxakis learned for the first time that Jane had regularly met with a number of school staff members and discussed gender identity issues, during which meetings she felt pushed towards using a different name and incorrect pronouns.

163.   While the "gender support team" apologized about the situation, they explained to the Vitsaxakis that they had consulted with the school attorney and acted in accordance with School District policy in concealing all the information about Jane's situation from the Vitsaxakis.

164.   The Vitsaxakis also learned during that meeting that Mr. Caraccio chose to finally disclose the School District's social transition of Jane only after one of her teachers had pressured him to inform her parents.

165.   This teacher, Jane's English teacher Ms. Pohl, had told Mr. Caraccio that she was uncomfortable with how the School District was forcing her to deceive Mrs. Vitsaxaki about Jane's circumstances.

166.   In the meeting, Mrs. Vitsaxaki asked the School District to stop referring to Jane by any names or pronouns while she worked to better understand the situation with her daughter.

167.   Both Mr. and Mrs. Vitsaxakis were concerned about Jane's medical condition in light of Mr. Caraccio's revelations and wanted to understand if there was any medical issue (such as a hormone imbalance) that needed attention.

22

168.    Despite Mr. Caraccio saying that the school would stop using any names or pronouns for Jane, some school staff continued to use the masculine name for Jane while she was enrolled in online schooling.

169.    After meeting with the "gender support team," Mrs. Vitsaxaki sought to speak with several of Jane's teachers about Jane's academic struggles and what had transpired over the past few months.

170.    Many of Jane's teachers did not respond to Mrs. Vitsaxaki's requests to speak, and those who did were evasive and provided little to no insights.

171.    Mrs. Vitsaxaki later learned that middle-school staff had been instructed to involve Mr. Caraccio in the conversations if they were uncomfortable with the school's position.

172.    Mrs. Vitsaxaki did have one short conversation on June 9, 2021, with Mr. Lamphere, Jane's math teacher, who was very apologetic about the situation but said he and Jane's other teachers were simply following the instructions of the middle-school administration.

173.    On June 16, Mrs. Vitsaxaki met with the School District's superintendent, Eric Knuth, and its attorney, Randy Ray.

174.    During that meeting, Mr. Knuth and Mr. Ray defended the actions of the middle-school staff and administration and denied that there had been any wrongdoing by them.

175.    Instead, Mr. Knuth and Mr. Ray confirmed that middle-school staff and administrators had correctly followed School District policy in their handling of Jane's situation, including in their decision not to inform Mrs. Vitsaxaki or seek her consent prior to treating her daughter as a boy by referring to her by an incorrect name and pronouns.

176.    Mr. Knuth and Mr. Ray did not offer any alternative solutions for Jane, despite Mrs. Vitsaxaki's requests for alternatives both at the time and later in writing.

177.    Eventually, Mrs. Vitsaxaki was told that no one from the School District would respond to her requests for further information on the instructions of the School District attorney.

## IX.    Mrs. Vitsaxaki withdraws her daughter from the School District and enrolls her in private school, where things begin to improve.

178.    It took some time before Jane began to speak with Mrs. Vitsaxaki about what had happened.

179.    Notably, Jane would only talk to Mrs. Vitsaxaki about gender-identity issues in English, as opposed to Greek, which indicated to Mrs. Vitsaxaki that Jane was not using her own words to describe the issue.

180.    Jane told Mrs. Vitsaxaki there were many other girls in her grade who had experienced similar struggles over their identity—around seven of them were in the group counseling sessions.

181.    For three of these girls, the School District had similarly begun to use different names and pronouns at school without any notice to or consent from their parents.

182.    Jane also revealed to Mrs. Vitsaxaki that when the School District began to use a different name and pronouns for her, she suffered severe harassment and ostracization from other students, which compounded her difficulties.

183.    Mrs. Vitsaxaki understood from her discussions with School District staff that, in accordance with School District policy, they would continue to refer to Jane by an incorrect, masculine name and third-person plural pronouns, regardless of Mrs. Vitsaxaki's wishes or direction.

184.    Illustrating this, notwithstanding Mrs. Vitsaxaki's request that School District staff stop using the masculine name and the third-person plural pronouns, some staff continued to use that name and those pronouns for Jane during online classes after she stopped attending school in person.

185.    Over the summer of 2021, Mrs. Vitsaxaki arranged for Jane to return to Greece to be with Mr. Vitsaxakis, who shared Mrs. Vitsaxaki's concerns about Jane, and made arrangements for their daughter to see a therapist while she was there.

186.    For the 2021–2022 school year, Mrs. Vitsaxaki enrolled Jane into a private school in Syracuse where she repeated the seventh grade.

187.    As time went on, Mrs. Vitsaxaki saw a noticeable improvement in Jane's demeanor and physical health.

188.    Jane's enrollment in the private school has had logistical and financial ramifications for Mrs. Vitsaxaki.

189.    The private school is 25 miles away from the Vitsaxaki home, which requires additional transportation and scheduling. This regularly requires four trips to and from school each day, which is a 3–4 hour time commitment, plus any additional transport for extra-curricular activities.

190.    Moreover, the tuition fees for the private school vary year-to-year but are currently $12,660/year.

191.    The costs of travel to and tuition for this private school are among the financial harms that the School District's actions caused to Mrs. Vitsaxaki.

192.    Since Mrs. Vitsaxaki withdrew Jane from the School District, she has seen marked and continued overall improvement in Jane's morale, outlook, health, and well-being as she integrated into a new school environment.

193.    Notably, Jane has not expressed any desire to have a masculine name or to use pronouns other than those that align with her biological sex.

194.   Jane still continues to work through the School District's treatment of her and her mother, which had a traumatic effect on her.

195.   Jane's grades have improved, and she is involved in basketball and orchestra as a cellist.

196.   Mrs. Vitsaxaki's relationship with her daughter continues to improve, but the School District's actions permanently altered their family dynamic.

## X.   When School District staff violated Mrs. Vitsaxaki's constitutional rights, they acted pursuant to School District policy.

197.   In socially transitioning Jane without Mrs. Vitsaxaki's knowledge or consent, School District staff acted pursuant to Policy 7552, adopted by the School District in 2018 and entitled "Student Gender Identity" (the "Policy"). *See* Ex. 5.

198.   The Policy states that "the District will maintain the confidentiality of student information and records."

199.   As relevant here, the Policy first describes how the School District will maintain records for students whom it socially transitions at school:

> If a transgender or GNC [*i.e.*, "[g]ender nonconforming"] student has not officially changed his or her name, but wishes to be referred to by a different name that corresponds to their gender identity, the District may create or change unofficial records to reflect the name and gender identity that the student consistently asserts at school. On state standardized tests, certain reports to the New York State Education Department, and when necessary to ensure appropriate and coordinated medical care, however, the District will use the student's legal name and gender. Any student identification cards *will be issued with the name reflecting the gender identity* the student consistently asserts at school. The District *will maintain records with the student's assigned birth name and gender in a separate, confidential file.*

*Id.* at 1–2 (emphasis added).

200.   Although the Policy expresses a desire that School District employees "endeavor to engage the student and his or her parents or guardians, as appropriate, in an effort to agree upon a plan that will accommodate the student's individual needs

at school," the Policy makes clear that the School District will, in certain circumstances, conceal information from parents like Mrs. Vitsaxaki:

> Transgender and GNC students have the right to discuss and convey their gender identity and expression openly and to decide *when, with whom, and how much to share* this confidential information. The plan may therefore include when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others.

*Id.* at 2 (emphasis added).

201.   Finally, the Policy states that "District staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." *Id.* at 2.

202.   Nothing in the Policy requires parental consent—or even notification—before socially transitioning a student by using a name and pronouns that are not associated with the student's biological sex.

203.   To the contrary, the Policy requires School District staff to determine, as part of developing a Gender Support Plan for a student, whether to inform that student's parents or seek their consent.

204.   When School District employees treated Jane as a boy by using a masculine name and third-person plural pronouns without informing Mrs. Vitsaxaki or seeking her consent, and when concealing those actions from her, they acted pursuant to the Policy and School District customs, practices, and usages.

## XI.   The School District recklessly attempted to "socially transition" Mrs. Vitsaxaki's daughter without her knowledge or consent.

205.   By using a masculine name and incorrect pronouns for Jane, the School District and its employees engaged in a psychosocial intervention for gender dysphoria sometimes called "social transition." *See Mirabelli v. Olson*, No. 3:23-CV-00768, 2023 WL 5976992, at *5–7 (S.D. Cal. Sept. 14, 2023) (describing nature of social

transition and summarizing evidence supporting cautious approach to it, particularly without parental involvement).

206.   Gender dysphoria is a health diagnosis defined in the DSM-5, requiring multiple criteria for adolescents including clinically significant distress and other "strong" symptoms sustained for at least six months.[2]

207.   Diagnosis is complex, and children or adolescents presenting for diagnosis very commonly suffer from other clinical mental health conditions, such as anxiety and depression, which may lead to misdiagnosis.[3]

208.   Professional organizations generally agree that a thorough psychiatric evaluation by a qualified mental health professional is essential for accurate diagnosis.[4]

209.   Professional organizations also generally agree that other mental health conditions should be addressed before any decision is made about transition.[5]

210.   Gender dysphoria has historically been a very rare phenomenon, impacting almost exclusively small numbers of prepubertal boys and adult men.[6]

211.   In recent years, a very different phenomenon has exploded, with very large numbers of adolescents—the majority girls—asserting that they suffer from gender dysphoria, which is referred to as "adolescent onset" or "rapid onset" gender dysphoria.[7]

---

[2] Am. Psychiatric Ass'n, *Diagnostic and statistical manual of mental disorders* (5th ed. 2013) at 452–53, https://doi.org/10.1176/appi.books.9780890425596.

[3] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. of Clinical Endocrinology & Metabolism (2017) 102(11), at 3876; Levine et al., *Reconsideration of Informed Consent for Transidentified Children, Adolescents, and Young Adults*, J. Sex & Marital Therapy (2022) at 3, 5.

[4] Hembree et al., (2017) at 3876.

[5] *Id.*

[6] Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, Archives of Sexual Behavior (2019) at 1–2.

[7] Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLoS ONE, 13(8) e0202330 (2018) at 3–5.

212.   The cause of this new trend is unknown. Many experts believe that social influences including social media and peer group pressure are playing an important role in leading girls to identify as the opposite sex.[8]

213.   Increasing numbers of young women who were transitioned during adolescence are now regretting those decisions, detransitioning (that is, identifying as female once again), and speaking out to say that they were misled, misdiagnosed, and harmed by those adults who encouraged and assisted them to identify as male.[9]

214.   School staff who lack appropriate training are not qualified to diagnose gender dysphoria.

215.   There is no agreed "standard of care" for treating prepubertal children or adolescents who suffer from gender dysphoria, and there is large disagreement among doctors and mental health professionals in the United States and Europe on this question.[10]

216.   Children who struggle with gender dysphoria often seek professional intervention, including assistance with social transition, which typically includes changes in the use of names and pronouns.[11]

217.   Absent parental consent, school staff are not authorized to treat either gender dysphoria or comorbid mental health conditions in children.

218.   Indeed, school staff are not authorized to provide even the most basic healthcare, such as providing aspirin to children, without express parental consent.

---

[8] *Id.*; Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health,* Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

[9] *See generally* Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, Archives of Sexual Behavior (2021).

[10] Levine & Abbruzzese, *Current Concerns About Gender-Affirming Therapy in Adolescents*, Current Sexual Health Reports (2023) at 6.

[11] Zucker, *Different strokes for different folks*, Child & Adolescent Mental Health, (2020) 25(1), at 1.

219.   The involvement of parents is essential for obtaining a thorough psychiatric evaluation of a child, obtaining and supporting treatment of potential preexisting mental health conditions, and treating gender dysphoria.[12]

220.   Leading a child or adolescent to conceal important life changes from his or her parents, and to lead a "double life" presenting different identities at home and at school, imposes a serious risk of worsening the mental health of the child, as occurred here.[13]

221.   No medical organization recommends subjecting children or adolescents to social transition without the knowledge of their parents.

222.   All studies that have claimed to show any improvement in mental health following social transition suffer severe methodological defects, and an independent and thorough systematic review commissioned by the English National Health Service determined that all such studies are of "very low quality."[14]

223.   A new and far more thorough study of all patients treated for gender dysphoria in Denmark since 2000 found no improvement in mental health following the beginning of social transition for gender dysphoria.[15]

224.   There is no evidence that social transition is lifesaving. While adolescents who suffer from gender dysphoria also suffer from a range of other serious

---

[12] World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People* (Version 8) at S58, https://www.tandfonline.com/doi/pdf/10. 1080/ 26895269.2022.2100644.S58.

[13] Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health*, Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

[14] Nat'l Inst. for Health & Care Excellence, *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (2021) at 4, https://arms.nice.org.uk/resources/hub/1070905/attachment; Nat'l Inst. for Health & Care Excellence, *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria* (2021) at 4, https://arms.nice.org.uk/resources/hub/1070871/attachment.

[15] Glintborg et al., *Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study,* European J. of Endocrinology (2023) 189, at 342–43.

mental health conditions and high rates of suicidal thoughts, no study has found that any form of transition—whether social or medical—reduces the rate of suicide in these young people.[16]

225.   It is well known that among prepubertal children who suffer gender dysphoria, the vast majority will desist from suffering dysphoria and become comfortable with their biological sex by adulthood *but only if they do not socially transition*.[17]

226.   Experts who disagree on many things agree that social transition is a powerful psychosocial intervention that greatly reduces the chances that the young person will cease experiencing gender dysphoria and become comfortable with his or her biological sex.[18]

227.   In other words, some evidence shows that social transition "locks" the child into discomfort with his or her biological sex (that is, entrenches rather than cures gender dysphoria), and greatly increases the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both.[19]

228.   As a result, social transition puts the child on a difficult-to-escape pathway to medicalized transition that will expose the young person to risks of serious harms that are either known to exist or are well recognized as potential risks but have not been meaningfully studied. These risks of harm include lifelong sterility, failure to develop and be able to enjoy healthy sexual responses and relationships, impaired brain development, weakened bones, increased risk of cardiovascular

---

[16] Levine (2023) at 3–4.

[17] Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19:2 Int'l J. of Transgenderism (2018) 231, at 7.

[18] Zucker (2020) at 2; Hembree et al. (2017) at 3879.

[19] Cass, *Independent review of gender identity services for children and young people: Interim report* (2022) at 38, https://cass.independent-review.uk/publications/interim-report/.

illness, broken family relationships and social isolation in adult life, dependence on regular hormone shots, and more.[20]

229.   Instead of benefits, studies that have tracked individuals into life after transition—life a decade or more later—have found strikingly high rates of mental illness, suicide, and mortality from a variety of causes.[21]

230.   The School District's policy and its actions here contravene the evidence showing the need to include parents when adolescents are struggling with gender confusion or gender dysphoria.

231.   By using a masculine name and third-person plural pronouns for Jane, the School District was recklessly engaging in a psychosocial intervention that increased the odds Jane would continue to struggle with gender confusion.

## XII.   The School District's actions violated Mrs. Vitsaxaki's sincerely held religious beliefs and her parental rights.

232.   Mrs. Vitsaxaki's Christian faith and religious beliefs are central to the way she lives her life and raises her family.

233.   Mrs. Vitsaxaki was raised in a Catholic household, but after marrying Mr. Vitsaxakis, joined the Greek Orthodox Church.

234.   On marrying Mr. Vitsaxakis, Mrs. Vitsaxaki committed to raising her children in the Greek Orthodox faith, a weighty commitment that Mrs. Vitsaxaki took seriously.

235.   Mrs. Vitsaxaki's beliefs are founded on the Bible and the teachings of Jesus Christ.

236.   Mrs. Vitsaxaki strives to live out her Christian faith daily by incorporating it into her work, home, and family life.

---

[20] Cass (2022) at 36–38; Levine, *Informed Consent for Transgendered Patients*, J. Sex & Marital Therapy (2018) at 5–9.

[21] Levine (2023) at 1; Glintborg et. al. (2023) at 342–43.

237.    While Mrs. Vitsaxaki does not impose her Christian beliefs on anyone, her faith informs her sincerely held religious beliefs that shape and govern her views about human nature, childrearing and the parent-child relationship, sexuality, and gender identity, among other topics.

238.    Mrs. Vitsaxaki believes that God created the family and charged parents with the primary responsibility of raising, guiding, and caring for their children.

239.    Mrs. Vitsaxaki believes that parents and family play an essential role in maintaining a child's physical and mental health and well-being.

240.    Mrs. Vitsaxaki believes that she has a God-given responsibility to provide for and participate in all aspects of her children's upbringing and in a way that is consistent with her faith.

241.    This responsibility extends not just to spiritual growth and training, but also to education and physical, mental, and emotional health.

242.    Mrs. Vitsaxaki's faith also teaches that God created two sexes, male and female, and that these two sexes are a core part of God's intended design for humanity.

243.    Mrs. Vitsaxaki believes that each of us is born with a fixed biological sex that is a gift from God; it is not an arbitrary imposition subject to change.

244.    Mrs. Vitsaxaki's sincerely held religious beliefs prevent her from personally affirming or communicating views about human nature and gender identity that are contrary to her beliefs.

245.    Mrs. Vitsaxaki also believes that referring to a child using pronouns that are inconsistent with the child's biological sex is harmful to the child because to do so communicates a message to and about the child that is untrue and can impact the child's future physical and emotional health.

246. Mrs. Vitsaxaki's faith also dictates the advice and guidance she believes she must provide to her children on any number of difficult or potentially life-altering decisions, in whatever arenas those difficulties or challenges may arise.

247. Mrs. Vitsaxaki believes that, because of children's inexperience and immaturity, they often do not appreciate the long-term consequences of their actions and consequently need the advice and counsel of their parents to reach sound decisions.

248. Mrs. Vitsaxaki believes that she must protect her children from making potentially irreversible and life-changing decisions that her children may later regret.

249. Mrs. Vitsaxaki believes that children should not be encouraged to undertake "social transition" because of the complexity of the issues involved and children's inability to thoroughly assess the long-term consequences of such actions.

250. Mrs. Vitsaxaki will not encourage any of her children on a path that distances the child from her biological sex, including the use of incorrect pronouns, which would communicate that the child's sex is subject to change.

251. Instead, Mrs. Vitsaxaki believes that the best approach to resolve any discomfort with biological sex is to get her child the noninvasive therapeutic support necessary to identify and address the underlying cause of the discomfort, while continually affirming: (a) that her child is "fearfully and wonderfully made," *Psalm* 139:14; (b) that God's love for her child is unfailing and never-ending; and (c) that Mrs. Vitsaxaki's love for her child is unfailing and never-ending.

252. As a parent, Mrs. Vitsaxaki believes she is called to walk with her children through any struggles, reminding her children that they are loved.

253. Regardless of her children's feelings, beliefs, or actions about their sex or gender, Mrs. Vitsaxaki will never stop loving her children, nor love them any less.

## CAUSES OF ACTION

254. All the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of law.

255. Pursuant to School District policy, practices, customs, and usages, Defendants socially transitioned Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki.

256. The policies, practices, customs, and usages that led Defendants to socially transition Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki remain in full force and effect.

257. The actions Defendants took to socially transition Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki are not narrowly tailored to a compelling governmental interest.

258. The actions Defendants took to socially transition Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki are not rationally related to a legitimate government purpose.

259. By failing to grant any process to Mrs. Vitsaxaki before socially transitioning Jane, Defendants denied Mrs. Vitsaxaki due process of law.

## FIRST CAUSE OF ACTION
### Free Exercise of Religion
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

260. Mrs. Vitsaxaki repeats and realleges each of the allegations in paragraphs 1–259 of this Complaint.

261. The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const., amend. I; *see id.*, amend. XIV.

262. Mrs. Vitsaxaki's free-exercise rights include the right to raise her children in accordance with her religious beliefs and the right to direct her children's

35

education and upbringing consistent with her religious beliefs, including on identity, sex, gender, and fundamental questions of existence like how her children should identify themselves. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 881–82 (1990); *Parham v. J.R.*, 442 U.S. 584, 590 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 518 (1925).

263.   By referring to Jane with a masculine name and incorrect pronouns without notifying Mrs. Vitsaxaki or seeking her consent and by concealing these actions from Mrs. Vitsaxaki, Defendants substantially burdened Mrs. Vitsaxaki's ability to exercise her religion.

264.   Mrs. Vitsaxaki was substantially burdened in the exercise of her religion because Defendants subjected her daughter to a social transition that directly violates her beliefs and concealed these actions from her.

265.   Mrs. Vitsaxaki was substantially burdened in the exercise of her religion because Defendants' concealment of their social transition of Jane interfered with her ability to counteract Defendants' message that people can change their sex.

266.   During the three-month (at a minimum) period that Defendants were concealing from Mrs. Vitsaxaki the actions taken to socially transition Jane, Mrs. Vitsaxaki was unable to exercise her religion by choosing to educate Jane in an environment that would not have undermined her religious beliefs.

267.   The First Amendment bars application of even a neutral, generally applicable law to religiously motivated action when that action implicates parents' right to direct the upbringing and education of their children.

268.   Because Defendants have substantially burdened Mrs. Vitsaxaki's right to exercise her religion by directing her daughter's upbringing and education, Defendants' actions receive strict scrutiny.

36

269.   Defendants' actions also receive strict scrutiny because they were neither neutral towards religion nor generally applicable.

270.   Defendants consider whether to notify parents of a social transition on a case-by-case basis.

271.   Applying that instruction to Mrs. Vitsaxaki required Defendants to take Mrs. Vitsaxaki's individualized circumstances into consideration when deciding whether to notify her that Defendants were referring to Jane by a masculine name and third-person plural pronouns.

272.   The discretionary nature of this inquiry renders Defendants' actions neither neutral nor generally applicable.

273.   Because Defendants' actions interfere with Mrs. Vitsaxaki's First Amendment right to direct her children's education and upbringing, and because those actions are neither neutral toward religion nor generally applicable, they receive strict scrutiny.

274.   Defendants' actions burdening Mrs. Vitsaxaki's First Amendment rights fail strict scrutiny because they are not narrowly tailored to any compelling interest—indeed, not even rationally related to a legitimate interest.

275.   Defendants performed their actions burdening Mrs. Vitsaxaki's First Amendment rights pursuant to School District policy.

276.   Defendants' violation of Mrs. Vitsaxaki's First Amendment rights has caused her to suffer damages, including but not limited to the cost of Jane's private school tuition, transportation to that school, and other damages.

## SECOND CAUSE OF ACTION
### Fundamental Right to Direct Child's
### Upbringing, Education, and Healthcare
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

277.   Mrs. Vitsaxaki repeats and realleges each of the allegations contained in paragraphs 1–259 of this Complaint.

278.   The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

279.   This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

280.   Among the fundamental rights and liberty interests the Constitution protects is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

281.   This includes parents' fundamental rights to establish a home and bring up children, including by directing their children's upbringing, education, and healthcare.

282.   The fundamental right of parents to direct the upbringing, education, and healthcare of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted); *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

283.   Fundamental parental rights have deep common-law roots. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* *446–53 (describing the rights of parents at common law in England), http://bit.ly/3leX7za; 2 James Kent,

38

*Commentaries on American Law* \*189–217 (10th ed. 1860) (same, in the United States), https://bit.ly/3ttTN79.

284.   Fundamental parental rights have long encompassed matters related to education that sweep beyond formal schooling, including parents' right to guide their children through difficult and potentially life-altering decisions, like how to address gender confusion or shape a child's core identity.

285.   Parents' fundamental right to guide their children's upbringing, education, and healthcare reaches its peak on matters of great importance.

286.   Questions about children's identity as male or female, what that identity means for their lives, and whether they can or should change that identity are important matters that fall within parents' right to counsel their children and direct their upbringing, education, and healthcare.

287.   Parental involvement is essential to adequately address the multifaceted nature of a child's gender confusion or gender dysphoria.

288.   The Constitution requires courts to presume that parents will act in the best interests of their children.

289.   Cutting parents out of decisions concerning these important issues is inconsistent with that presumption and deprives parents of the opportunity to counter influences on their children that they find inimical to their religious beliefs or the values they wish to instill in their children.

290.   By referring to Jane with a masculine name and third-person plural pronouns without notifying Mrs. Vitsaxaki or seeking her consent and while concealing these actions from Mrs. Vitsaxaki, Defendants interfered with and denied Mrs. Vitsaxaki's fundamental right to direct the upbringing, education, and healthcare of her daughter about important topics like her identity as a young woman.

291.   Defendants also interfered with and denied Mrs. Vitsaxaki her fundamental right to direct the upbringing, education, and healthcare of her daughter by

preventing her from counteracting Defendants' messages about sex and gender and from counseling her about important decisions like whether she should socially transition at school, receive therapy related to gender confusion, or take some other course of action.

292.   During the three-month (at a minimum) period that Defendants were actively concealing from Mrs. Vitsaxaki their actions to socially transition Jane, Defendants interfered with Mrs. Vitsaxaki's fundamental right to direct the upbringing, education, and healthcare of Jane, because she lacked the knowledge necessary to exercise her right to choose to educate Jane in an environment that would not have undermined her religious beliefs.

293.   Additionally, the Constitution generally requires parental consent to any decisions involving children's healthcare.

294.   Deciding how best to help a child struggling with gender confusion or gender dysphoria is the sort of decision for which the Fourteenth Amendment requires parental consent.

295.   When referring to Jane with a masculine name and third-person plural pronouns, Defendants engaged in so-called "social transition," which is a psychotherapeutic intervention for gender dysphoria that scientific evidence demonstrates has a powerful psychological effect on the development and outcomes of a child.

296.   By socially transitioning Jane without notifying Mrs. Vitsaxaki or seeking her consent, Defendants denied Mrs. Vitsaxaki her fundamental right to direct her daughter's healthcare related to the important topic of gender confusion or gender dysphoria.

297.   Additionally, because social transition makes it more likely that a child's gender confusion or gender dysphoria will persist into adulthood, Defendants' actions burdened Mrs. Vitsaxaki's exercise of her right to direct Jane's healthcare.

298.    Strict scrutiny applies to Defendants' violation of Mrs. Vitsaxaki's fundamental right to direct the upbringing, education, and healthcare of her daughter.

299.    Defendants' actions violating Mrs. Vitsaxaki's fundamental rights are neither narrowly tailored to any compelling interest nor rationally related to a legitimate interest.

300.    Defendants performed their actions violating Mrs. Vitsaxaki's fundamental rights pursuant to a policy, practice, custom, and usage of the School District.

301.    Defendants' violation of Mrs. Vitsaxaki's fundamental rights has caused her to suffer damages, including but not limited to the cost of Jane's private school tuition, transportation to that school, and other damages.

### THIRD CAUSE OF ACTION
### Deprivation of Liberty without Due Process
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

302.    Mrs. Vitsaxaki repeats and realleges each of the allegations contained in paragraphs 1–259 of this Complaint.

303.    The U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

304.    In general, procedural-due-process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests.

305.    To establish a procedural-due-process violation, Mrs. Vitsaxaki needs to show that she has been deprived of a liberty interest, and that such deprivation occurred without adequate procedural protections. *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

306.    The liberty interest of parents in "the care, custody, and control of their children … is perhaps the oldest of the fundamental liberty interests." *Troxel*, 530 U.S. at 65 (plurality op.).

41

307.    The parental right also encompasses the right to direct a child's healthcare, and therefore an infringement of that right can violate a parent's right to procedural due process. *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 375 (S.D.N.Y. 2012).

308.    Parents' procedural-due-process rights are violated if parental consent or a court authorization is not obtained before government conduct that can cause physical or psychological injury to a child, unless the child is in imminent danger.

309.    Defendants deprived Mrs. Vitsaxaki of a cognizable liberty interest when they referred to Jane by a masculine name and third-person plural pronouns without notifying Mrs. Vitsaxaki or seeking her consent and when they concealed those actions.

310.    Those actions attempted to "socially transition" Jane, a psychotherapeutic intervention that has a powerful psychological effect on the development of an adolescent.

311.    Defendants' actions were sufficiently invasive to trigger procedural safeguards.

312.    But Defendants failed to give, or even attempt to give, notice to Mrs. Vitsaxaki of their intent to "socially transition" Jane.

313.    Defendants also deprived Mrs. Vitsaxaki of a hearing or an opportunity to object to Defendants' actions towards her daughter.

314.    Defendants did not provide Mrs. Vitsaxaki with *any* procedural protection whatsoever before depriving her of a cognizable liberty interest.

315.    Instead, Defendants took steps to deceive Mrs. Vitsaxaki about their actions to socially transition Jane, which removed any possibility of process before or during the deprivation of her liberty interest.

316.    Defendants violated Mrs. Vitsaxaki's right to procedural due process.

317.   Defendants performed their actions violating Mrs. Vitsaxaki's proce-dural-due-process rights pursuant to a policy, practice, custom, and usage of the School District.

318.   Defendants' violation of Mrs. Vitsaxaki's procedural-due-process rights has caused her to suffer damages, including but not limited to the cost of Jane's private school tuition, transportation to that school, and other damages.

## PRAYER FOR RELIEF

Mrs. Vitsaxaki respectfully requests that this Court enter judgment against Defendants and provide her the following relief:

A.   A declaration that the School District's policy facially and as applied to Mrs. Vitsaxaki violates her First and Fourteenth Amendment rights under the United States Constitution;

B.   Nominal damages, compensatory damages, and such other damages to which Mrs. Vitsaxaki may be entitled;

C.   Mrs. Vitsaxaki's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

D.   All other further relief to which Mrs. Vitsaxaki may be entitled.


Dated: January 31, 2024                    Respectfully submitted,


                                           s/ David A. Cortman
Raymond J. Dague                           David A. Cortman
N.D.N.Y. Bar Roll No. 505622               N.D.N.Y. Bar Roll No. 502661
**Dague & Martin, P.C.**                   **Alliance Defending Freedom**
4874 Onondaga Rd.                          1000 Hurricane Shoals Road N.E.,
Syracuse, NY 13215                             Suite D1100
Tel:  (315) 422-2052                       Lawrenceville, Georgia 30043
Fax: (315) 474-4334                        Tel:  (770) 339-0774
raymond@daguelaw.com                       Fax: (770) 339-6744
                                           dcortman@ADFlegal.org

Katherine L. Anderson*
Arizona Bar No. 33104
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
Tel:  (480) 444-0020
Fax: (480) 444-0028
kanderson@ADFlegal.org

Vincent M. Wagner*
Virginia Bar No. 98663
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Tel:  (571) 707-4655
Fax: (571) 707-4656
vwagner@ADFlegal.org

*Attorneys for Plaintiff*

\* Motion for Limited Admission *Pro Hac Vice* forthcoming

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1–22, 28–204, 232–253 of the foregoing are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on January 30, 2024.

_____

Jennifer Vitsaxaki