UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JENNIFER VITSAXAKI,

                              Plaintiff,

          v.

SKANEATELES CENTRAL SCHOOL DISTRICT;
SKANEATELES CENTRAL SCHOOLS' BOARD OF
EDUCATION,

                              Defendants.

Civil Action No.:
5:24-cv-00155 (DNH/ML)

# Memorandum of Law in Support of Defendants' Motion to Dismiss

**BOND, SCHOENECK & KING, PLLC**
Suzanne M. Messer
Kate I. Reid
Jeremy M. Sher
One Lincoln Center
Syracuse, New York 13202-1355
(315) 218-8000
messers@bsk.com
kreid@bsk.com
jsher@bsk.com

*Attorneys for Defendants*

## Table Of Contents

Page

Preliminary Statement ................................................................................. 1

Factual Background..................................................................................... 3

A.   The District's Student Gender Identity Policy ................................. 3

B.   Jane Requests That the District Use a Different Name and Pronouns .......................... 5

C.   Jane's Gender Support Plan .............................................................. 6

D.   Plaintiff Becomes Aware of the District's
     Use of Jane's Chosen Name and Pronouns.................................... 8

E.   Plaintiff Withdraws Jane from the District.................................... 10

F.   Plaintiff's Section 1983 Claims .................................................... 10

Standard of Review .................................................................................. 11

The *Monell* Requirement ......................................................................... 12

Argument................................................................................................... 13

1.   Plaintiff Lacks Standing to Seek Declaratory Relief..................... 14

2.   Plaintiff Fails to State a Free Exercise Claim ............................... 15

     2.1.   Plaintiff Fails to Allege the Policy
            Substantially Burdens Her Religious Beliefs.................... 15

     2.2.   Rational Basis Review Applies to the Policy .................... 16

            2.2.1.   The Student Gender Identity Policy Is Neutral ....................... 17

            2.2.2.   The Student Gender Identity Policy Is Generally Applicable .................. 18

     2.3.   The Student Gender Identity Policy Satisfies Rational Basis Review ................ 21

3.   Plaintiff Fails to State a Substantive Due Process Claim............................ 22

4.   Plaintiff Fails to State a Procedural Due Process Claim.............................. 25

Conclusion................................................................................................. 25

i

## Table of Authorities

**Page(s)**

**Cases**

*A.S. v. City Sch. Dist.*,
   585 F. Supp. 3d 246 (N.D.N.Y. 2022)..........................................................25

*An v. City of New York*,
   230 F. Supp. 3d 224 (S.D.N.Y. 2017)..........................................................14

*Aurecchione v. Schoolman Transp. Sys., Inc.*,
   426 F.3d 635 (2d Cir. 2005) ......................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................12

*Benacquista v. Spratt*,
   217 F. Supp. 3d 588 (N.D.N.Y. 2016)....................................................1, 12

*Ciraolo v. City of New York*,
   216 F.3d 236 (2d Cir. 2000) ......................................................................12

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..................................................................................21

*Cody VV. v. Brandi VV.*,
   --- N.Y.S.3d ---, No. CV-23-0596,
   2024 WL 716144 (3d Dep't Feb. 22, 2024) ...........................................1, 21

*Davis v. FEC*,
   554 U.S. 724 (2008)..................................................................................14

*Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*,
   No. 24-00107 (GC) (JBD), 2024 WL 706797 (D.N.J. Feb. 21, 2024) ............... 22, 24, 25

*Egbuna v. Syracuse City Sch. Dist.*,
   No. 05-CV-0112, 2005 WL 8171086 (N.D.N.Y. Nov. 15, 2005) ..................12

*Employment Div. v. Smith*,
   494 U.S. 872 (1990)............................................................................ 16, 17

*Faiaz v. Colgate Univ.*,
   64 F. Supp. 3d 336 (N.D.N.Y. 2014) .......................................................... 3

*Foote v. Town of Ludlow*,
   No. 22-30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022)............... 22, 24, 25

*Ford v. Reynolds*,
  326 F. Supp. 2d 392 (E.D.N.Y. 2004),
  *aff'd*, 167 Fed. Appx. 248 (2d Cir. 2006) .................................................................15

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) .......................................................................................... 17, 19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ...................................................................................25

*Immaculate Heart Cent. Sch. v. N.Y. State Pub. High Sch. Athletic Ass'n*,
  797 F. Supp. 2d 204 (N.D.N.Y. 2011)......................................................................25

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
  622 F. Supp. 3d 118 (D. Md. 2022),
  *rev'd for lack of standing*, 78 F.4th 622 (4th Cir. 2023)......................................22

*Knicrumah v. Albany City Sch. Dist.*,
  241 F. Supp. 2d 199 (N.D.N.Y. 2003).......................................................................12

*Koeller v. Numrich Gun Parts Corp.*,
  675 F. Supp. 3d 260 (N.D.N.Y. 2023).......................................................................12

*Leebaert v. Harrington*,
  332 F.3d 134 (2d Cir. 2003) .................................................................................. 23, 24

*Mahmoud v. McKnight*,
  No. CV DLB-23-1380, 2023 WL 5487218 (D. Md. Aug. 24, 2023) .............................16

*Marcavage v. City of New York*,
  689 F.3d 98 (2d Cir. 2012) .......................................................................................15

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
  138 S. Ct. 1719 (2018) ...............................................................................................17

*Matter of M.M.H.*,
  No. 814380/2020, 2020 WL 7689659 (Sup. Ct. Erie Cnty. Dec. 17, 2020) ................... 1

*Monell v. Dep't of Social Servs.*,
  436 U.S. 658 (1978) ............................................................................................ 12, 13

*New York v. Ferber*,
  458 U.S. 747 (1982).....................................................................................................21

*Parents for Privacy v. Barr*,
  949 F.3d 1210 (9th Cir. 2020) .............................................................................. 18, 20

*Parker v. Hurley,*
    514 F.3d 87 (1st Cir. 2008) ...................................................................16

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)..................................................................... 23, 24

*Regino v. Staley,*
    No. 2:23-cv-00032-JAM-DMC,
    2023 WL 4464845 (E.D. Cal. July 11, 2023).................................... 20, 22, 25

*Roberts v. Fleury,*
    No. 6:22-CV-0918, 2024 WL 1242231 (N.D.N.Y. Mar. 22, 2024) ..............................21

*Roe v. City of Waterbury,*
    542 F.3d 31 (2d Cir. 2008) ........................................................... 1

*Skoros v. City of New York,*
    437 F.3d 1 (2d Cir. 2006)........................................................ 15, 23

*Staboleski v. City of New York,*
    No. 19-CV-8834 (LJL), 2021 WL 796616 (S.D.N.Y. Mar. 1, 2021) ..................... 15, 16

*Troxel v. Granville,*
    530 U.S. 57 (2000) .........................................................................23

*Vesely v. Ill. Sch. Dist. 45,*
    669 F. Supp. 3d 706 (N.D. Ill. 2023) ...............................................22

*Wang v. Bethlehem Cent. Sch. Dist.,*
    No. 1:21-CV-1023, 2022 WL 3154142 (N.D.N.Y. Aug. 8, 2022) .................... 12, 14, 15

*We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.,*
    76 F.4th 130 (2d Cir. 2023).................................................... *passim*

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) (per curiam) .................................................17

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,*
    127 F. Supp. 3d 156 (S.D.N.Y. 2015).......................................... 2

## Rules and Statutes

42 U.S.C. § 1983 ....................................................................... 1, 12, 13

Educ. Law § 12(1) ...................................................................... 1

Exec. Law § 296 ........................................................................ 1

Fed. R. Civ. P. 12(b)(1).................................................................................................1, 11

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 11, 12

Defendants Skaneateles Central School District (the "District") and Skaneateles Central Schools' Board of Education submit this Memorandum of Law in support of their motion to dismiss the Complaint of Plaintiff Jennifer Vitsaxaki pursuant to Federal Rules 12(b)(1) and 12(b)(6). Defendants move to dismiss Plaintiff's claim for a declaratory judgment due to lack of standing, and all of Plaintiff's claims for relief under 42 U.S.C. § 1983 for failure to state a plausible claim that Defendants' "official policy" caused Plaintiff to incur a "constitutional injury." *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599 (N.D.N.Y. 2016) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)).

## Preliminary Statement

Protecting transgender and gender nonconforming students' rights is a bedrock principle of public policy in New York State. The Dignity for All Students Act ("DASA") prohibits bullying, harassment, and discrimination in schools based on students' "actual or perceived" gender or sex. Educ. Law § 12(1). Similarly, the Gender Expression Non-Discrimination Act amended the State Human Rights Law to add gender identity and expression as protected categories, *see* Exec. Law § 296, and thus "reinforced and clarified the public policy of New York State of concern for the welfare and safety of [transgender and gender nonconforming] individuals," *Matter of M.M.H.*, No. 814380/2020, 2020 WL 7689659, at *2 (Sup. Ct. Erie Cnty. Dec. 17, 2020). This policy is necessary because "risk to one's safety is always present upon public disclosure of one's status as transgender or otherwise gender nonconforming," and "[t]here is no doubt that violence and discrimination against transgender and nonbinary individuals continue to permeate our society at alarming rates." *Cody VV. v. Brandi VV.*, --- N.Y.S.3d ---, No. CV-23-0596, 2024 WL 716144, at *2 (3d Dep't Feb. 22, 2024).

In this regard, New York State Education Department ("SED") guidance makes clear that New York law, including DASA, and federal law require schools to use transgender and gender nonconforming students' chosen names and pronouns, as well as to maintain the confidentiality of students' transgender or gender nonconforming status. SED Guidance to Sch. Dists. (July 20, 2015), at 7-9; SED and N.Y. Att'y Gen. Letter (Feb. 28, 2018), at 2; "Creating a Safe, Supportive and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices" (June 12, 2023), at 19-21, 26, 30 ("2023 Legal Update").[1] SED states that it is students who should ultimately decide whether school districts may inform parents and caregivers about students' chosen names and pronouns:

> Schools will want to work closely with the student and their parents/guardians, *if given permission by the student* to involve them in the planning, in devising an appropriate plan regarding the confidentiality of the student's TGE [transgender and gender expansive] status. . . .

> *Only the student knows whether it is safe to share their identity with caregivers*, and schools should be mindful that some TGE students do not want or cannot have their parents/guardians know about their transgender status. The paramount consideration in those situations is protecting the health and safety of the student, assuring that the student's gender identity is affirmed and that their privacy and confidentiality are safely maintained.

2023 Legal Update at 15-16 (emphasis added).

Plaintiff's Complaint is a test case in New York that, while superficially purporting to champion civil rights, in reality seeks to eviscerate them. Plaintiff asks the Court to disregard

---

[1] The 2015 guidance is available at https://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf (last visited Mar. 27, 2024). The 2018 guidance is available at https://www.nysed.gov/sites/default/files/nysed-oag-joint-guidance-letter-2-28-18.pdf (last visited Mar. 27, 2024). The 2023 guidance is available at https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf (last visited Mar. 27, 2024). The Court may take judicial notice of these publicly-available guidance documents. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

Second Circuit precedent and recognize constitutional parental rights that supersede the rights of every transgender and gender nonconforming student in the District, and potentially the State. Plaintiff has no constitutional entitlement to override the District's and State's policy of safeguarding the health and well-being of transgender and gender nonconforming students.

## Factual Background

In providing the facts relevant to this motion, Defendants rely on the Complaint's factual allegations, which Defendants assume to be true on this motion, and the Complaint's exhibits. *See Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014).

### A. The District's Student Gender Identity Policy

At the heart of this action is "Policy 7552, adopted by the School District in 2018 and entitled 'Student Gender Identity.'" (Compl. ¶ 197, Doc. No. 1). Plaintiff attaches a copy of the Student Gender Identity Policy (the "Policy"), taken from the District Policy Manual, to the Complaint. (*Id.* & Ex. 5, Doc. No. 1-5.) Plaintiff alleges that "District staff acted pursuant to" the Policy when they engaged in the conduct Plaintiff complains of: the District's use of a masculine name and they/them pronouns for Plaintiff's child without Plaintiff's knowledge or consent. (*Id.* ¶ 197; *see id.* ¶ 204.)

The Policy begins with this summary:

> All students need a safe and supportive education environment to progress academically and developmentally. The District is committed to fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender nonconformity, and gender expression. In accordance with applicable law, regulations, and guidelines, the District will ensure that students have equal access to all school programs, facilities, and activities. The District will assess and address the specific needs of each student on a case-by-case basis. . . .

> Generally, District personnel should use the language that individual students are using to describe their own gender identity, appearance, or behavior.

(Policy at 1.)

The Policy contains the following "key terms" relevant to this action:

Gender: actual or perceived sex, typically with reference to social and cultural differences rather than physiological ones.

Gender expression: the ways a person conveys their gender identity to others, such as through behavior, appearance, clothing, hairstyle, activities, voice, and mannerisms.

Gender identity: a person's inner sense or psychological knowledge of being male, female, neither, or both.

Gender nonconforming (GNC): describes someone whose gender identity does not conform to social or stereotypical expectations of a person with that gender assigned at birth. . . .

(*Id.*)

The Policy contains the following language regarding the District's communications with gender nonconforming students and their parents. Emphasis in this language is taken from quotations in the Complaint.

**Records**

As required by law, the District will maintain the confidentiality of student information and records . . . .

If a transgender or GNC student has not officially changed his or her name, but wishes to be referred to by a different name that corresponds to their gender identity, the District may create or change unofficial records to reflect the name and gender identity that the student consistently asserts at school. . . . Any student identification cards *will be issued with the name reflecting the gender identity* the student consistently asserts at school. The District *will maintain records with the student's assigned birth name and gender in a separate, confidential file*.

**Names and Pronouns**

When apprised of a student's transgender or GNC status, the District will endeavor to engage the student and his or her parents or guardians, as appropriate, in an effort to agree upon a plan that will accommodate the student's individual needs at school. Transgender and GNC students have the right to discuss and convey their gender identity and expression openly and to decide *when, with whom, and how much to share* this confidential information. The plan may

4

therefore include when and how to initiate the student's preferred name and associated pronoun use and if, and when, and how this is communicated to others. District staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school.

(*Id.* at 2 (*quoted in* Compl. ¶¶ 199-201).)

Thus, the Policy states that District staff will follow a student's wishes with respect to the name and pronouns that staff use to describe the student at school. The Policy treats students' gender nonconforming status as confidential and affords students the right to determine whether to reveal that status to others. The Policy "expresses a desire that School District employees 'endeavor to engage the student and his or her parents or guardians, as appropriate, in an effort to agree upon a plan that will accommodate the student's individual needs at school'" in this regard. (Compl. ¶ 200 (quoting the Policy at 2).)

The Policy does not state that District staff should encourage students to adopt or express a gender nonconforming status, but instead directs staff on how to respond "[w]hen apprised of a student's transgender or GNC status." (Policy at 2.) The Policy does not mention religion or provide any factors for determining whether to inform parents of a student's chosen name and pronouns other than the student's wishes.

**B. Jane Requests That the District Use a Different Name and Pronouns**

The Complaint concerns Plaintiff's daughter Jane (a pseudonym used to protect her privacy), who was twelve years old and a seventh-grade student at Skaneateles Middle School, which the District operates, during the relevant time period. (Compl. ¶¶ 1, 13, 19.)[2]

"In early 2021," Jane went to her guidance counselor, Christopher Viggiano, "and asked that staff at the middle school refer to her by a different name and pronouns based on a new

---

[2] Because the Complaint consistently refers to Jane as female, Defendants will do the same in this motion.

5

gender identity." (*Id.* ¶ 98; *see id.* ¶ 57.) Jane did this without Plaintiff's knowledge. (*Id.* ¶ 98.) Viggiano, school psychologist Vicky Powers, and school social worker Michele Rogala then "met with Jane to discuss the request and her embrace of a new gender identity." (*Id.* ¶ 99; *see id.* ¶ 57.) "School District staff told Jane that her parents did not need to be notified, and the school would only disclose the information to the people Jane asked them to tell." (*Id.* ¶ 101.)

On February 10, 2021, Viggiano "emailed several staff members at the middle school to inform them" that they should call Jane by a particular "typically masculine name" and refer to Jane with they/them pronouns. (*Id.* ¶ 107.) "After that email, middle-school staff consistently referred to Jane with the masculine name" and they/them pronouns "without telling Ms. Vitsaxaki or obtaining her consent." (*Id.* ¶ 109.)[3] When speaking with Plaintiff, District staff "referred to Jane by her given name and female pronouns." (*Id.* ¶ 110.)

The Complaint alleges that the District's agreement to Jane's request to use a masculine name and they/them pronouns was "a psychosocial intervention for gender dysphoria sometimes called 'social transition.'" (*Id.* ¶ 205.) The Complaint does not allege that Jane suffered from gender dysphoria or that the District diagnosed Jane with or gave medical treatment to Jane for gender dysphoria.

**C. Jane's Gender Support Plan**

"In April 2021, Ms. Powers completed a 'Gender Support Plan' for Jane that was consistent with Mr. Viggiano's February 10 email informing School District staff that they should

---

[3] Because the Complaint does not disclose the name Jane requested and redacts that name when it appears in an exhibit, Defendants assume in this motion that Jane asked the District to call her by a "masculine name." (Compl. ¶ 109.) For ease of reference and for the purpose of this motion, Defendants refer to Jane's chosen name at school as the "masculine name." Bracketed references to the "masculine name" in quotations in this motion are taken from the Complaint and its redacted exhibits.

use a masculine name and [they/them] pronouns for Jane." (*Id.* ¶ 141.) Plaintiff attaches a copy of Jane's Gender Support Plan, dated April 23, 2021 (the "Plan"), to the Complaint. (*Id.* ¶ 142 & Ex. 3, Doc. No. 1-3.) The Plan included the "masculine name" as Jane's preferred name, gave "they/them" as Jane's pronouns, and stated "no gender" for Jane's gender. (Plan; *see* Compl. ¶ 142(c).)

The Plan stated that Jane's family, except Jane's cousin, was not "aware" and Jane was "not ready to tell family." (Plan.) In response to the question "Is there a plan to come out to them [i.e., family]," the Plan stated: "no solid plan @ this time." (*Id.*) Further, the Plan specified that the District should use the name Jane "when speaking with guardians," and checked a box corresponding to "Discussed risk of accidentally outing student at home." (*Id.*) The Plan checked "Legal Name" for the name that would appear in Jane's yearbook entry. (*Id.*) In response to the question "How can we support?", the Plan answered: "calling me [by the "masculine name"]/they/them." (*Id.*; *see* Compl. ¶ 142(c).)

The Plan checked "yes" to the questions of whether Jane's friends and peers were "aware" and "supportive," stating "Friend group knows of name preference @ this time and pronouns." (Plan.) In response to the question "How can we support" regarding friends and peers, the Plan answered: "same way." (*Id.*)

In a section involving teachers and staff, the Plan stated that "[masculine name] wishes to direct all 'outings' @ this time," the Plan was a "Student led plan," and "student wanted to inform teachers" as well as all middle school staff, substitute and PE teachers, and cafeteria staff. (*Id.*) The Plan checked "no" for "Bathroom / Locker facilities – Special Considerations / changes." (*Id.*) The Plan concluded as follows: "Talked about GSA Support. Offered

continued support as [masculine name] navigates this process for self. [Masculine name] did not want to move forward @ this time." (*Id.*)[4]

## D. Plaintiff Becomes Aware of the District's Use of Jane's Chosen Name and Pronouns

On May 11, 2021, Plaintiff learned during a phone call with Jane's principal, Michael Caraccio, that the District had created a Gender Support Plan for Jane and was using Jane's chosen name and pronouns at school, "in accordance with School District Policy." (Compl. ¶ 148; *see id.* ¶¶ 144, 147.) The call was on speakerphone "with Jane listening in to the conversation. Mr. Caraccio did not initially tell Mrs. Vitsaxaki that Jane was in the room." (*Id.* ¶ 145.) Plaintiff "objected in strong terms" to the District's use of Jane's chosen name and pronouns until "she realized Jane was listening," at which point she "sought to console her daughter before ending the call." (*Id.* ¶¶ 149, 151.)

The following day, Powers "emailed several staff members at the Middle School to update them about Jane." (*Id.* ¶ 157.) The email, attached to the Complaint, stated that Caraccio, with Jane present, had disclosed "what was going on" regarding Jane's chosen name and pronouns to Plaintiff. (*Id.* ¶ 158 & Ex. 4, Doc. No. 1-4.) Powers wrote: "As you know, [masculine name] had not come 'out' to they's family as of yesterday. . . . It has offered some relief in that [masculine name] does not have to dance around the issue or avoid altogether, as well as, we at school do not have to any longer either." (*Id.* Ex. 4.)

"In the following days, Mr. Caraccio sent Ms. Vitsaxaki a copy of the Gender Support Plan . . . and suggested in a follow-up telephone conversation that Mrs. Vitsaxaki meet with

---

[4] The Complaint does not allege what "GSA support" means. (*See* Compl. ¶ 141(h).) While the meaning of the term "GSA" is not relevant to this motion, it is presumably a reference to a school Gender & Sexualities Alliance organization. *See* "What is a GSA club?", *available at* gsanetwork.org/what-is-a-gsa/, last accessed Mar. 27, 2024.

Jane's 'gender support team' to provide her with further information." (*Id.* ¶ 159.)

On May 17, 2021 and continuing to the end of the school year, Jane switched to online schooling. (*Id.* ¶ 155.) "In the last few days of in-person attendance before switching to online schooling, school staff continued to meet with Jane without the knowledge of Mrs. Vitsaxaki." (*Id.* ¶ 156.)

On May 18, 2021, Jane's parents met with Viggiano, Powers, Rogala, Caraccio, and school nurse Vicky Wolfganger, where they "learned for the first time that Jane had regularly met with a number of school staff members and discussed gender identity issues, during which meetings she felt pushed towards using a different name and incorrect pronouns." (*Id.* ¶ 162; *see id.* ¶ 94.) There are no allegations in the Complaint describing how the District "pushed" Jane "towards using a different name" and pronouns. (*Id.* ¶ 162.)

"In the meeting, Mrs. Vitsaxaki asked the School District to stop referring to Jane by any names or pronouns [sic] while she worked to better understand the situation with her daughter." (*Id.* ¶ 166.) Caraccio agreed to Plaintiff's request. (*Id.* ¶ 168.) However, Plaintiff believed from other discussions with District staff and teachers' references to Jane during online schooling that the District would continue to use Jane's chosen name and pronouns against Plaintiff's wishes. (*Id.* ¶¶ 183-84.)

On June 16, 2021, Plaintiff "met with the School District's superintendent, Eric Knuth, and its attorney, Randy Ray." (*Id.* ¶ 173.) Knuth and Ray "confirmed that middle-school staff and administrators had correctly followed School District policy in their handling of Jane's situation, including in their decision not to inform Mrs. Vitsaxaki or seek her consent prior to" using Jane's chosen name and pronouns. (*Id.* ¶ 175.)

### E. Plaintiff Withdraws Jane from the District

"For the 2021-2022 school year, Mrs. Vitsaxaki enrolled Jane into a private school in Syracuse where she repeated the seventh grade." (*Id.* ¶ 186.) Since withdrawing from the District, "Jane has not expressed any desire to have a masculine name or to use pronouns other than those that align with her biological sex." (*Id.* ¶ 193.)

Taking Jane to the private school "requires additional transportation and scheduling." (*Id.* ¶ 189.) The school charges tuition that is currently $12,660/year. (*Id.* ¶ 190.)

### F. Plaintiff's Section 1983 Claims

Relevant to her first count for violation of her First Amendment free exercise rights, Plaintiff's Greek Orthodox faith instills her with the beliefs that "God created two sexes, male and female" and "each of us is born with a fixed biological sex that is a gift from God; it is not an arbitrary imposition subject to change." (*Id.* ¶¶ 242-43; *see id.* ¶¶ 233-34.) Plaintiff's religious beliefs "prevent her from personally affirming or communicating views about human nature and gender identity that are contrary to her beliefs." (*Id.* ¶ 244.) Plaintiff alleges that the District's actions "substantially burdened Mrs. Vitsaxaki's ability to exercise her religion" because the District "subjected her daughter to a social transition that directly violates her beliefs and concealed these actions from her." (*Id.* ¶¶ 263-64.) She further alleges that the District's actions "were neither neutral towards religion nor generally applicable" because the Policy "required [the District] to take Mrs. Vitsaxaki's individualized circumstances into consideration when deciding to notify her that Defendants were referring to Jane by a masculine name and [they/them] pronouns." (*Id.* ¶¶ 269, 271.) Plaintiff does not allege that the District knew about or considered her religious beliefs in making that decision.

For her second count, Plaintiff alleges that the District's use of Jane's chosen name and pronouns without Plaintiff's knowledge or consent "interfered with Mrs. Vitsaxaki's fundamental right" under the Fourteenth Amendment Due Process Clause "to direct the upbringing, education, and healthcare of Jane, because she lacked the knowledge necessary to exercise her right to choose to educate Jane in an environment that would not have undermined her religious beliefs." (Compl. ¶ 292; *see id.* ¶¶ 278-81.) Plaintiff also alleges that "Defendants denied Mrs. Vitsaxaki her fundamental right to direct her daughter's healthcare related to the important topic of gender confusion or gender dysphoria." (*Id.* ¶ 296.)

For her third count, Plaintiff alleges that the same conduct by the District violated Plaintiff's right to procedural due process under the Fourteenth Amendment because its "actions were sufficiently invasive to trigger procedural safeguards" that the District failed to provide to Plaintiff. (*Id.* ¶ 311; *see id.* ¶¶ 303-05.) Plaintiff alleges that the District's use of Jane's chosen name and pronouns without Plaintiff's knowledge or consent "deprived Mrs. Vitsaxaki of a cognizable liberty interest" without "any possibility of process before or during the deprivation of her liberty interest." (*Id.* ¶¶ 309, 315.)

Plaintiff seeks "[a] declaration that the School District's policy facially and as applied to Mrs. Vitsaxaki violates her First and Fourteenth Amendment rights under the U.S. Constitution." (*Id.* Prayer for Relief A.) Plaintiff also seeks, among other things, "the cost of Jane's private school tuition" and "transportation to that school." (*Id.* ¶¶ 276, 301, 318.)

## Standard of Review

On this motion pursuant to Rules 12(b)(1) and 12(b)(6), the Court must accept the Complaint's non-conclusory allegations as true and draw all reasonable inferences in Plaintiff's

favor. *See Wang v. Bethlehem Cent. Sch. Dist.*, No. 1:21-CV-1023 (LEK/DJS), 2022 WL 3154142, at *3 (N.D.N.Y. Aug. 8, 2022).

In addressing subject matter jurisdiction, the Court must determine whether it "lacks the statutory or constitutional power to adjudicate" each claim. *Koeller v. Numrich Gun Parts Corp.*, 675 F. Supp. 3d 260, 266 (N.D.N.Y. 2023). Plaintiff "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Id.* (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).

With respect to whether Plaintiff states a claim under Rule 12(b)(6):

> To survive [the] motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation. So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."

*Koeller*, 675 F. Supp. 3d at 266 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### The *Monell* Requirement

As "political subdivisions of the State of New York" (Compl. ¶ 17), Defendants are "shielded by the . . . policy, practice, or custom requirement imposed by the Supreme Court in *Monell v. Department of Social Services*." *Benacquista*, 217 F. Supp. 3d at 599 (citing *Monell*, 436 U.S. 658 (1978)). "'Municipal liability under § 1983 occurs, if at all, on the level of policymaking,' and therefore may not be imposed vicariously or through a theory of respondeat superior." *Knicrumah v. Albany City Sch. Dist.*, 241 F. Supp. 2d 199, 206 (N.D.N.Y. 2003) (quoting *Ciraolo v. City of New York*, 216 F.3d 236, 242 (2d Cir. 2000)). Thus, Defendants "can only be held liable if [their] 'policy or custom . . . inflicts the injury.'" *Egbuna v. Syracuse City Sch. Dist.*, No. 05-CV-0112 (NAM/GHL), 2005 WL 8171086, at *5 (N.D.N.Y. Nov. 15, 2005) (quoting *Monell*, 436 U.S. at 694).

The Complaint, which does not name any individual defendants, alleges that the Student Gender Identity Policy is the "policy" at issue for *Monell* purposes. (Compl. ¶¶ 197, 204.) As a result, the Policy is central to whether Plaintiff states a plausible § 1983 claim.

<div align="center">

**Argument**

</div>

The crux of the Complaint is Plaintiff's allegation that, "[p]ursuant to School District policy, practices, customs, and usages, Defendants socially transitioned Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki." (Compl. ¶ 255.) The Complaint uses the term "social transition" to mean "using a masculine name and incorrect pronouns [i.e., they/them] for Jane." (*Id.* ¶ 205.) Thus, the Complaint alleges that the District violated Plaintiff's constitutional free exercise and due process rights when, pursuant to the Student Gender Identity Policy, its staff respected Jane's wishes to be called by a masculine name and they/them pronouns at school without Plaintiff's knowledge or consent over an approximately three-month period. (*Id.* ¶¶ 197, 204, 266.) The question on this motion is whether Defendants' alleged conduct pursuant to the Policy plausibly rises to the level of a constitutional injury.

The Second Circuit Court of Appeals effectively answered this question in Defendants' favor by dismissing free exercise and due process claims directed to a Connecticut act (the "Repeal Act") that eliminated religious exemptions "from its vaccination requirements for students." *We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 135 (2d Cir. 2023). The parent plaintiffs in *We The Patriots* "object[ed] to vaccination on religious grounds," including by objecting "to the use of 'cell lines descended from aborted fetuses' in the research, development, testing, and production of vaccines." *Id.* at 142. Addressing the same free exercise and substantive due process arguments that Plaintiff raises in the

Complaint, the Court of Appeals concluded that the plaintiffs failed to state a claim that the Repeal Act violated their free exercise or due process rights.

The Student Gender Identity Policy poses an easier question on a motion to dismiss than the Repeal Act. The Policy does not mention religion at all, let alone condition application on religious belief. Instead, consistent with State law and policy, it informs parents and students that District staff will refer to students by their chosen names and pronouns and respect students' rights to determine how and when to reveal their chosen names and pronouns to their parents. (Policy at 2.) A school district's respect for a student's desired name, desired pronouns, and willingness to alert parents to the use of their desired name and pronouns does not violate the Free Exercise Clause or any fundamental right protected by the Due Process Clause. Like the parents in *We The Patriots*, Plaintiff cannot plausibly allege that the Policy violates her constitutional rights and her Complaint should be dismissed.

For these reasons, and because Plaintiff cannot allege continued injury from the Policy, the Court should dismiss Plaintiff's declaratory judgment claim for lack of standing (Point 1, *infra*), and dismiss Plaintiff's claims that the Student Gender Identity Policy violates Plaintiff's constitutional free exercise (Point 2, *infra*), substantive due process (Point 3, *infra*), and procedural due process rights (Point 4, *infra*) for failure to state a claim.

## 1.  Plaintiff Lacks Standing to Seek Declaratory Relief

To establish subject matter jurisdiction "as contemplated in Article III of the Constitution," *Wang*, 2022 WL 3154142, at *4, Plaintiff "must demonstrate standing for each claim [she] seeks to press and for each form of relief that is sought," *id.* (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). Standing for declaratory relief "requires a plaintiff to show 'a sufficient likelihood that [the plaintiff] *will again* be wronged in a similar way.'" *An v. City of New York*,

230 F. Supp. 3d 224, 231 (S.D.N.Y. 2017) (emphasis added) (quoting *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012)).

Plaintiff lacks standing to seek a declaration that the Student Gender Identity Policy violates her constitutional rights because she withdrew Jane from the District. (Compl. Prayer for Relief A; *id.* ¶ 186.) As Jane is no longer subject to the Policy, "the Complaint does not contain allegations from which the Court could reasonably infer a future, recurring, or continuing harm to [Plaintiff] that would be addressed by [declaratory] relief." *Wang*, 2022 WL 3154142, at *8; *accord Ford v. Reynolds*, 326 F. Supp. 2d 392, 406 (E.D.N.Y. 2004) (finding that student plaintiffs lacked standing to seek declaratory relief on free speech claims against a college because the students had "since graduated"), *aff'd*, 167 Fed. Appx. 248 (2d Cir. 2006). Thus, the Court should dismiss Plaintiff's declaratory judgment claim for lack of standing.

## 2. Plaintiff Fails to State a Free Exercise Claim

In evaluating Plaintiff's free exercise claim, the Court must first determine whether Plaintiff plausibly alleges that the Policy "placed 'a substantial burden on the observation of a central religious belief.'" *Staboleski v. City of New York*, No. 19-CV-8834 (LJL), 2021 WL 796616, at *2 (S.D.N.Y. Mar. 1, 2021) (quoting *Skoros v. City of New York*, 437 F.3d 1, 39 (2d Cir. 2006)). If so, the Court determines whether to apply strict scrutiny or rational basis review to the Policy. *See We The Patriots*, 76 F.4th at 144. The court then assesses whether the Complaint states "a plausible claim that the [Policy] offends the Free Exercise Clause" under the applicable standard of review. *Id.* at 156.

### 2.1. Plaintiff Fails to Allege the Policy Substantially Burdens Her Religious Beliefs

Plaintiff alleges that Defendants, acting pursuant to the Policy, substantially burdened her religious beliefs by using Jane's chosen name and pronouns without Plaintiff's knowledge or

consent, and concealing that usage from Plaintiff. (Compl. ¶¶ 263-64, 275.) These allegations cannot establish a substantial burden because the Policy neither "demonstrate[s] an objective to impugn [Plaintiff's] religious practices" nor deprives Plaintiff of her ability to practice her religion. *Staboleski*, 2021 WL 796616, at \*3. In particular, "[t]he *sine qua non* of a free exercise claim is coercion," and the Policy does not coerce students or parents "to violate or change their religious beliefs." *Mahmoud v. McKnight*, No. CV DLB-23-1380, 2023 WL 5487218, at \*22 (D. Md. Aug. 24, 2023). Whether or not she knew of Jane's chosen name and pronouns, Plaintiff remained free to "instruct [Jane] on [Plaintiff's] religious beliefs regarding sexuality . . . and gender, and . . . place contrary views in [Plaintiff's] religious context." *Id.*; *see also Parker v. Hurley*, 514 F.3d 87, 90, 106 (1st Cir. 2008) (finding that a second-grade teacher's in-class reading of "a book that depicts and celebrates a gay marriage" without notice to parents or an opportunity to opt out "was not instruction in religion or religious beliefs" that could support a free exercise claim).[5]

Thus, Plaintiff fails to allege a substantial burden and her free exercise claim must be dismissed.

### 2.2.    Rational Basis Review Applies to the Policy

If the Policy substantially burdens Plaintiff's religious beliefs, it is subject to rational basis review because it "is neutral and generally applicable." *We The Patriots*, 76 F.4th at 144 (citing *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990) ("*Smith*")).

---

[5] While the Complaint occasionally implies that the District somehow interposed itself into Jane's request to use a different name and pronouns and not tell Plaintiff (*see, e.g.*, Compl. ¶¶ 162, 179), the Complaint does not allege any facts to support such an implication, let alone that the Policy led the District to coerce Plaintiff or Jane "to violate or change their religious beliefs." *Mahmoud*, 2023 WL 5487218, at \*22.

16

### 2.2.1. The Student Gender Identity Policy Is Neutral

"A law is not neutral under *Smith* if the government 'proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.'" *Id.* at 145 (quoting *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021)). This may occur where a law "explicitly singles out a religious practice" or "targets religious conduct for distinctive treatment." *Id.* (quoting *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021) (per curiam)). Crucially, "[t]o fail the neutrality prong, it is not enough for a law to simply *affect* religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion," even if that hostility is "subtle." *Id.* (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1729, 1731 (2018)). "Hostility" requires a "subjective state of mind on a government actor's part, not the mere fact that government action has affected religious practice." *Id.* at 149 (citing *Masterpiece Cakeshop*, 138 S. Ct. at 1731). "To determine whether the government has acted neutrally, courts look to factors such as the background of the challenged decision, the sequence of events leading to its enactment, and the legislative or administrative history." *Id.* at 145 (citing *Masterpiece Cakeshop*, 138 S. Ct. at 1731).

In *We The Patriots*, the Court of Appeals found that the Repeal Act was neutral with respect to religion even though it was expressly directed to religious belief. The court first noted that the Repeal Act's legislative history "does not contain evidence of hostility to religious believers, even when read with an eye toward 'subtle departures from neutrality' or 'slight suspicion' of 'animosity to religion or distrust of its practices.'" *Id.* at 147 (quoting *Masterpiece Cakeshop*, 138 S. Ct. at 1731). The court then rejected the argument "that repealing any existing religious exemption is hostile to religion per se." *Id.* at 149. Among other reasons, the

court based this conclusion on the absence of "animus" toward religion in the legislative history and consideration of the repeal law "as a whole." *Id.*

Here, Plaintiff does not allege that Defendants adopted the Policy or applied it to Jane and Plaintiff out of animus toward religion. Instead, Plaintiff only alleges that "Defendants consider whether to notify parents of a social transition on a case-by-case basis" and considered Plaintiff's "individualized circumstances" in deciding whether to inform her of Jane's chosen name and pronouns. (Compl. ¶¶ 270-71.) These allegations do not factor into a neutrality analysis, and are further defeated by the facts that the Policy does not mention religion, let alone hostility toward religious belief. Read as a whole, the Policy's goal is "fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender nonconformity, and gender expression" in accordance with New York and federal law, not restricting religious practice. (Policy at 1.) Finally, the Complaint and Jane's Gender Support Plan state that the only reason that the District did not inform Plaintiff of Jane's chosen name and pronouns was that Jane directed it not to. (Compl. ¶ 142(a)-(d), (g) (quoting the Plan).) Because neither the Complaint nor the Policy itself can establish that Defendants adopted or applied the Policy out of hostility toward religion, the Policy "is neutral for purposes of analyzing the free exercise claim." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020) (rejecting free exercise challenge to policy governing bathroom and locker room use by transgender students).

### 2.2.2. The Student Gender Identity Policy Is Generally Applicable

"A law is generally applicable when it treats similar conduct similarly, without regard to whether the conduct is religiously motivated." *We The Patriots*, 76 F.4th at 145; *see also Parents for Privacy*, 949 F.3d at 1235 ("The question of general applicability addresses whether a law

treats religious observers unequally."). A law is not generally applicable "in at least two cir-

cumstances: first, where it 'invites the government to consider the particular reasons for a

person's conduct by providing a mechanism for individualized exemptions,' and second,

where it 'prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way,'" which is known as substantial underinclu-

siveness. *We The Patriots*, 76 F.4th at 145 (quoting *Fulton*, 141 S. Ct. at 1877).

In *We The Patriots*, the Court of Appeals found the Repeal Act generally applicable. The

Court first concluded that the Repeal Act "does not give government officials discretion to

decide whether a particular individual's reasons for requesting exemption are meritorious,"

but instead presents "medical exemptions" that are "mandatory and framed in objective

terms." *We The Patriots*, 76 F.4th at 150. The court's substantial underinclusiveness analysis

boiled down to two findings: Connecticut consistently asserted that its interest in the Repeal

Act was to protect students' health and safety, *id.* at 151, and that "while the Act's medical

exemptions further Connecticut's interest, maintaining the repealed religious exemption

would not," *id.* at 152.

Here, the Student Gender Identity Policy is "does not give government officials discretion

to decide" whether to honor a student's decisions to use a different name and pronouns or

withhold their chosen name and pronouns from parents. *Id.* at 150. Instead, as the Complaint

emphasizes, the Policy leaves these decisions to the student: "Transgender and GNC students

have the right . . . to decide *when, with whom, and how much to share* this confidential infor-

mation. . . . District staff will use the name and pronoun that corresponds to the gender iden-

tity the student consistently asserts at school." (Compl. ¶¶ 200-01 (emphasis in original) (quot-

ing the Policy at 2).) While Plaintiff alleges that the Policy is not generally applicable because

19

"Defendants consider whether to notify parents . . . on a case-by-case basis" (Compl. ¶ 270), the Complaint does not allege that the District, as opposed to Jane, had any role in deciding not to notify Plaintiff of Jane's chosen name and pronouns. The Policy's "case-by-case" aspect is not whether District staff decide to inform parents about a student's chosen name and pronouns, but whether a student permits the District to divulge such information. In short, "the decision to openly express a [gender nonconforming] identity through the use of a different name and pronouns is made by the student, not the District." *Regino v. Staley*, No. 2:23-cv-00032-JAM-DMC, 2023 WL 4464845, at *4 (E.D. Cal. July 11, 2023).

Second, the Policy is not substantially underinclusive because, "in seeking to create a safe, non-discriminatory school environment for transgender [and gender nonconforming] students," the Policy does not "selectively impose[] certain conditions or restrictions only on religious conduct." *Parents for Privacy*, 949 F.3d at 1236. Under the Policy, if a student tells the District not to inform parents of the student's chosen name and pronouns because the student believes their parents will not be supportive, the District must respect the student's instruction regardless of whether the parents' perceived lack of support is religious or secular in nature. (*Cf.* Compl. ¶¶ 205-31 (alleging secular grounds for opposing the use of gender non-conforming names and pronouns at school without parental consent).) In fact, the Complaint does not allege, and the Policy and Jane's Gender Support Plan do not indicate, that the District ever considered whether Plaintiff held religious views or what they were. Because the Policy makes no distinction between "religious and non-religious conduct," it is not substantially underinclusive. *Parents for Privacy*, 949 F.3d at 1236.

Accordingly, the Policy is neutral and generally applicable. Therefore, it is subject to rational basis review even if it substantially burdens Plaintiff's religious beliefs. *See We The Patriots*, 76 F.4th at 144, 156.

### 2.3.    The Student Gender Identity Policy Satisfies Rational Basis Review

Under rational basis review, "a law is constitutionally flawed only if it was not 'rationally related to a legitimate state interest.'" *Roberts v. Fleury*, No. 6:22-CV-0918 (GTS/TWD), 2024 WL 1242231, at *9 (N.D.N.Y. Mar. 22, 2024) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). New York has a "compelling" interest in "protecting the physical and emotional well-being of youth," including students. *New York v. Ferber*, 458 U.S. 747, 757 (1982) (internal quotation marks omitted); *accord We The Patriots*, 76 F.4th at 156. This interest is especially compelling with respect to gender nonconforming students because of the increased risk of harm and discrimination they face. *See Cody VV.*, 2024 WL 716144, at *2. As described in SED's guidance (*see* Prelim. Stmt., *supra*), the Policy is rationally related to that legitimate interest by ensuring that the District respects the gender identity, gender expression, and privacy of transgender and gender nonconforming students while encouraging, but not mandating, parental inclusion. As a court held in evaluating a school's gender identity guidelines that were similar to the Policy, the Policy would satisfy even strict scrutiny analysis:

> The Guidelines [at issue] do not aim to exclude parents, but rather anticipate and encourage family involvement in establishing a gender support plan. . . . The Guidelines, on their face, are noncoercive, and serve primarily as a means of creating a support system and providing counseling to ensure that transgender children feel safe and well at school. And, importantly, they apply to each student on a case by case basis. By advising that school personnel keep a transgender or gender nonconforming student's gender identity confidential unless and until that student consents to disclosure, they both protect the student's privacy and create . . . a zone of protection ... in the hopefully rare circumstance when disclosure of [the student's] gender expression while at school could lead to serious conflict within the family, and even harm. If the Guidelines mandated parental disclosure as the Plaintiff Parents urge, their primary

purpose of providing transgender and gender nonconforming students with a safe and supportive school environment would be defeated. A transgender child could hardly feel safe in an environment where expressing their gender identity resulted in the automatic disclosure to their parents, regardless of their own wishes or the consequences of the disclosure.

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 138-39 (D. Md. 2022) (footnote, citations, and internal quotation marks omitted), *rev'd for lack of standing*, 78 F.4th 622 (4th Cir. 2023). Other courts have reached similar conclusions regarding school policies that honor students' wishes regarding names, pronouns, and whether to inform parents. *See Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*, No. 24-00107 (GC) (JBD), 2024 WL 706797, at *12 (D.N.J. Feb. 21, 2024); *Vesely v. Ill. Sch. Dist. 45*, 669 F. Supp. 3d 706, 714 (N.D. Ill. 2023); *Regino*, 2023 WL 4464845, at *4; *Foote v. Town of Ludlow*, No. 22-30041-MGM, 2022 WL 18356421, at *8 (D. Mass. Dec. 14, 2022). For the same reasons, the Policy satisfies rational basis review (or strict scrutiny) and cannot support a constitutional claim.

### 3.  Plaintiff Fails to State a Substantive Due Process Claim

Plaintiff's substantive due process claim fails for the same reasons stated in *We The Patriots*, which rejected the argument that Connecticut's Repeal Act violated "the fundamental liberty interest in childrearing protected by the Fourteenth Amendment" by "completely interfer[ing] with [parents'] right to decide what is best for their children's health and to raise them according to their religious beliefs." *We The Patriots*, 76 F.4th at 159 (internal quotation marks omitted). Because Plaintiff cannot "assert [a] liberty interest in the rearing of [her] children that is not encompassed in [her] free exercise claim," Plaintiff's substantive due process count is a "hybrid rights" claim that is "coextensive with [her] Free Exercise Clause claim." *Id.* (internal quotation marks omitted). As a result, the dismissal of Plaintiff's free exercise claim likewise requires dismissal of her due process claim.

Citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000), Plaintiff alleges that, as a parent, she "has a fundamental right to direct the upbringing, education, and healthcare of her children" that the District violated. (Compl. ¶ 6.)[6] The Second Circuit, however, has "cautioned that the Supreme Court 'left the scope of that right undefined.'" *We The Patriots*, 76 F.4th at 159 (quoting *Leebaert v. Harrington*, 332 F.3d 134, 142 (2d Cir. 2003)). Crucially, "[i]n the educational context, [the Second Circuit has] joined other Circuits in holding there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child.'" *Id.* (quoting *Skoros*, 437 F.3d at 41). Considering that *We The Patriots* addressed school vaccination requirements, as opposed to school curricula, it is a prime example of how the Second Circuit does not recognize the existence of a parental right under the Due Process Clause to override school policies on religious, moral, or healthcare-related grounds. *See Skoros*, 437 F.3d at 41 ("Certainly, public school authorities cannot devise curricula or rules that violate the Establishment or Free Exercise Clauses but, where, as in this case, no such violation is established, a parent cannot invoke a separate 'fundamental right . . . to tell a public school what his or her child will and will not be taught.'" (quoting *Leebaert*, 332 F.3d at 141)).

*We The Patriots* also addressed a Supreme Court decision cited in the Complaint, *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (*cited in* Compl. ¶ 262), which held that "an Oregon statute requiring children to attend public school . . . 'unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control.'" *Leebaert*, 332 F.3d at 140 (quoting *Pierce*, 268 U.S. at 534-35). The Second Circuit found that *Pierce* "and [its] progeny do not begin to suggest the existence of a fundamental

---

[6] *Troxel* struck down a Washington statute governing child visitation rights. *Troxel*, 530 U.S. at 60, 75.

right of every parent to tell a public school what his or her child will and will not be taught," and that "recognition of such a fundamental right . . . would make it difficult or impossible for any public school authority to administer school curricula responsive to the overall educational needs of the community and its children." *Leebaert*, 332 F.3d at 141. Neither *Pierce* nor any other Supreme Court decision Plaintiff cites (Compl. ¶ 262) contradicts this conclusion, as reaffirmed in *We The Patriots*, 76 F.4th at 159.

Presumably to distinguish her substantive due process claim from the Second Circuit's rejection of such a claim in *We The Patriots*, Plaintiff devotes much of her Complaint to discussing gender dysphoria. The Complaint alleges that by using Jane's chosen name and pronouns, the District "engaged in a psychosocial intervention for gender dysphoria" (Compl. ¶ 205), that the District was not qualified or authorized to diagnose or treat students with respect to gender dysphoria, which requires a clinical diagnosis (*id.* ¶¶ 206-08, 214-18), that "social transition" is unhelpful or harmful to children (*id.* ¶¶ 220, 222-29), and that parents must be involved in "treating gender dysphoria" (*id.* ¶ 219; *see id.* ¶ 221).

However, the Student Gender Identity Policy and Jane's Gender Support Plan do not purport to diagnose or treat gender dysphoria. Similarly, the Complaint does not allege that Defendants diagnosed Jane with or gave Jane treatment for gender dysphoria, or that Jane ever had gender dysphoria. *See Doe*, 2024 WL 706797, at *11; *Foote*, 2022 WL 18356421, at *5. Instead, the Complaint claims that by using Jane's chosen "masculine name" and they/them pronouns, the District engaged in "social transition," which is a "psychosocial intervention for gender dysphoria." (Compl. ¶ 205 (internal quotation marks omitted).)

The Complaint's leap in logic—that using gender nonconforming names and pronouns is treatment for gender dysphoria—is impermissible, as a person's transgender or gender

24

nonconforming status does not necessarily mean that the person "[has] gender dysphoria." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020). Further, the Complaint does not allege "Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explain[] how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance." *Foote*, 2022 WL 18356421, at *5. To the contrary, "[a]ddressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civilized society generally." *Id.* Thus, Plaintiff cannot state a claim "that Defendants usurped [her] right to make medical and mental health treatment decisions" for Jane, *id.* or otherwise violated Plaintiff's "parental constitutional rights," *Doe*, 2024 WL 706797, at *11; *see Regino*, 2023 WL 4464845, at *4.

### 4. Plaintiff Fails to State a Procedural Due Process Claim

Plaintiff's procedural due process claim fails because, for the reasons stated above, Plaintiff cannot allege Defendants deprived her of a "liberty or property interest protected by the Due Process Clause." *Immaculate Heart Cent. Sch. v. N.Y. State Pub. High Sch. Athletic Ass'n*, 797 F. Supp. 2d 204, 217 (N.D.N.Y. 2011). In the absence of such a deprivation, "Plaintiff has no viable due process claim." *A.S. v. City Sch. Dist.*, 585 F. Supp. 3d 246, 280 (N.D.N.Y. 2022).

### Conclusion

The Court should dismiss the Complaint.

Dated:  March 27, 2024                BOND, SCHOENECK & KING, PLLC

                                      /s/ Jeremy M. Sher
                                      Suzanne M. Messer
                                      Kate I. Reid
                                      Jeremy M. Sher
                                      *Attorneys for Defendants*
                                      One Lincoln Center
                                      Syracuse, New York 13202-1355
                                      (315) 218-8000

25