# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF NEW YORK
### SYRACUSE DIVISION

**JENNIFER VITSAXAKI**,

       *Plaintiff,*

  v.

**SKANEATELES CENTRAL SCHOOL DISTRICT; SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION**,

       *Defendants.*

Case No. 5:24-cv-00155-DNH-ML

## RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

LEGAL STANDARD ................................................................................................. 6

ARGUMENT .............................................................................................................. 6

    I.   Mrs. Vitsaxaki has standing for her declaratory claims because she seeks damages for past injuries caused by the School District's Policy ...................................................................................................... 6

    II.  The complaint states a plausible claim that the School District violated the Free Exercise Clause. ................................................................. 7

        A.   Violating Mrs. Vitsaxaki's religious beliefs and conditioning access to public education on forgoing them, the School District's actions burdened her religious exercise. ........................................... 8

        B.   The School District must satisfy strict scrutiny. ......................................... 11

        C.   The School District fails strict scrutiny and even rational-basis review, particularly at the motion-to-dismiss stage. ................................... 13

    III.  The complaint states a plausible claim that the School District violated Mrs. Vitsaxaki's fundamental right to direct her daughter's upbringing, education, and healthcare. ......................................................... 17

        A.   Allegations that the School District made an important decision about Mrs. Vitsaxaki's daughter without parental consent and then concealed it state a fundamental-rights violation. ........................... 18

            1.   The complaint alleges that the School District treated Jane as a boy without Mrs. Vitsaxaki's consent. ......................................... 18

                i.   The School District needed to obtain Mrs. Vitsaxaki's consent but did not do so. .............................................................. 19

                ii.   None of the School District's arguments justify acting without Mrs. Vitsaxaki's consent. .................................................. 20

            2.   The complaint alleges the School District lied about its actions to Mrs. Vitsaxaki. ................................................................. 23

B. The School District's infringement of Mrs. Vitsaxaki's fundamental rights fails any applicable level of review. ........................... 24

IV. The complaint states a plausible procedural-due-process claim.................... 25

CONCLUSION .............................................................................................. 25

CERTIFICATE OF SERVICE....................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Alfonso v. Fernandez,*
    606 N.Y.S.2d 259 (N.Y. App. Div. 1993)............................................................ 23

*Bartell v. Lohiser,*
    215 F.3d 550 (6th Cir. 2000) ..................................................................... 25

*BD v. DeBuono,*
    130 F. Supp. 2d 401 (S.D.N.Y. 2000) ........................................................ 6, 7

*C.N. v. Ridgewood Board of Education,*
    430 F.3d 159 (3d Cir. 2005) ........................................................................ 18

*Carson ex rel. O.C. v. Makin,*
    596 U.S. 767 (2022) ......................................................................... 8, 9, 11

*Carter v. HealthPort Technologies, LLC,*
    822 F.3d 47 (2d Cir. 2016) ............................................................................ 6

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ..................................................................................... 11

*Community Health Care Association of New York v. DeParle,*
    69 F. Supp. 2d 463 (S.D.N.Y. 1999) ............................................................. 7

*Crue v. Aiken,*
    370 F.3d 668 (7th Cir. 2004) ..................................................................... 6, 7

*Deanda v. Becerra,*
    645 F. Supp. 3d 600 (N.D. Tex. 2022).......................................................... 23

*Deanda v. Becerra,*
    96 F.4th 750 (5th Cir. 2024) ......................................................................... 23

*Dias v. City & County of Denver,*
    567 F.3d 1169 (10th Cir. 2009) ................................................................ 6, 7

*Dobbs v. Jackson Women's Health Organization,*
    597 U.S. 215 (2022) ............................................................................. 13, 17

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ..................................................................................... 13

*Foote v. Town of Ludlow,*
    2022 WL 18356421 (D. Mass. Dec. 14, 2022)............................................. 21

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ............................................................................ 11, 12, 14

*Gruenke v. Seip,*
  225 F.3d 290 (3d Cir. 2000) ........................................................................ 23

*H.L. v. Matheson,*
  450 U.S. 398 (1981) ...................................................................................... 21

*Hodgson v. Minnesota,*
  497 U.S. 417 (1990) ...................................................................................... 23

*Jackson v. Peekskill City School District,*
  106 F. Supp. 3d 420 (S.D.N.Y. 2015) ...................................................... 20, 21

*Kane v. De Blasio,*
  19 F.4th 152 (2d Cir. 2021) .......................................................................... 11

*Kanuszewski v. Michigan Department of Health & Human Services,*
  927 F.3d 396 (6th Cir. 2019) ........................................................... 19, 20, 25

*Kennedy v. Bremerton School District,*
  597 U.S. 507 (2022) ........................................................................................ 8

*Kravitz v. Purcell,*
  87 F.4th 111 (2d Cir. 2023) ............................................................................ 8

*M.A. ex rel. H.R. v. Rockland County Department of Health,*
  53 F.4th 29 (2d Cir. 2022) ............................................................................ 13

*Mahmoud v. McKnight,*
  2023 WL 5487218 (D. Md. Aug. 24, 2023) ................................................ 9, 10

*Mahmoud v. McKnight,*
  2024 WL 2164882 (4th Cir. May 15, 2024) ...................................................... 9

*Meyer v. Nebraska,*
  262 U.S. 390 (1923) ................................................................................. 17, 19

*Mirabelli v. Olson,*
  2023 WL 5976992 (S.D. Cal. Sept. 14, 2023) ...................................... 14, 16, 22

*New Hope Family Services, Inc. v. Poole,*
  966 F.3d 145 (2d Cir. 2020) ........................................................................ 2, 6

*Parham v. J.R.,*
  442 U.S. 584 (1979) ....................................................................... 1, 17, 18, 19

*Parker v. Hurley,*
    514 F.3d 87 (1st Cir. 2008) ........................................................... 9, 10

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925) ..................................................................... 17, 19

*Ramos v. Town of Vernon,*
    353 F.3d 171 (2d Cir. 2003) ............................................................. 24

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .......................................................................... 13

*Regino v. Staley,*
    2023 WL 4464845 (E.D. Cal. July 11, 2023) ..................................... 22

*Ricard v. USD 475 Geary County School Board,*
    2022 WL 1471372 (D. Kan. May 9, 2022) ........................... 10, 15, 16

*Southerland v. City of New York,*
    680 F.3d 127 (2d Cir. 2012) ............................................................. 25

*T.F. v. Kettle Moraine School District,*
    2023 WL 6544917 (Wis. Cir. Ct. Oct. 3, 2023) ................................. 22

*Tatel v. Mt. Lebanon School District,*
    637 F. Supp. 3d 295 (W.D. Pa. 2022) .............................................. 23

*Tenenbaum v. Williams,*
    193 F.3d 581 (2d Cir. 1999) ............................................................ 20

*Thompson v. Renee,*
    2023 WL 2575222 (S.D.N.Y. Mar. 17, 2023) ..................................... 8

*Troxel v. Granville,*
    530 U.S. 57 (2000) ............................................................... 17, 23, 24

*United States v. Myers,*
    426 F.3d 117 (2d Cir. 2005) ............................................................. 17

*Van Emrik v. Chemung County Department of Social Services,*
    911 F.2d 863 (2d Cir. 1990) ....................................................... 20, 21

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................... 17, 24

*We The Patriots USA, Inc. v. Connecticut Office of Early Childhood
    Development*,
    76 F.4th 130 (2d Cir. 2023) ..................................................................... 12, 13, 21

*Willey v. Sweetwater County School District No. 1 Board of Trustees*,
    680 F. Supp. 3d 1250 (D. Wyo. 2023) ............................................................. 24

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................................. passim

## Statutes & Court Rules

28 U.S.C. § 2201 ......................................................................................... 6

Fed. R. Civ. P. 12 ....................................................................................... 6

Ala. Code § 26-26-5 ................................................................................... 16

Idaho Code § 33-6001 ................................................................................ 16

Ind. Code § 20-33-7.5-2 ............................................................................. 16

Iowa Code § 279.78 .................................................................................... 16

N.C. Gen. Stat. § 115C-76.45 ..................................................................... 16

N.D. Cent. Code § 15.1-06-21 .................................................................... 16

## Other Authorities

1 William Blackstone, *Commentaries on the Laws of England* ................................. 18

2 James Kent, *Commentaries on American Law* (10th ed. 1860) ............................. 18

## INTRODUCTION

When Jennifer Vitsaxaki's daughter began to suffer anxiety and depression about school, Mrs. Vitsaxaki naturally looked to the school for help. Time and again, she asked employees of Skaneateles Central School District if they had noticed anything troubling. Each time, they told her "no." But that was a lie. For over three months, the school treated her daughter as a boy—using a masculine name and third-person plural pronouns—without Mrs. Vitsaxaki's consent or knowledge and while actively hiding it from her. Employees carefully used the girl's correct name and female pronouns when communicating with Mrs. Vitsaxaki. And when asked, they denied noticing anything that could explain the girl's anxiety or depression. Eventually, one teacher pressured the principal to tell the truth.

The School District's concealment kept Mrs. Vitsaxaki from helping her daughter at a pivotal moment in the girl's life. Not only did that hurt her daughter, it also violated Mrs. Vitsaxaki's rights. The First and Fourteenth Amendments protect her right to make important decisions about the upbringing, education, and healthcare of her daughter. The School District violated that right. And it doubled down on this violation by lying to her about it.

At this initial stage, the Court must decide only that Mrs. Vitsaxaki's claims are plausible, which they certainly are. Across hundreds of detailed factual allegations, she describes how the School District upended the constitutional presumption that parents act in their children's best interest. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979). And the School District attempts to justify its concealment only with generic references to state policies—wholly disconnected from the complaint's specific allegations. That can't satisfy strict scrutiny, particularly on a motion to dismiss. So this Court should deny the School District's motion.

## FACTUAL BACKGROUND

In considering the School District's motion to dismiss, the Court accepts the facts alleged in Mrs. Vitsaxaki's complaint as true. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 160 (2d Cir. 2020). According to the complaint, Mrs. Vitsaxaki's daughter Jane spent the first nine years of her life in Greece. (Verified Compl., Doc. 1 ("Compl.") ¶ 30.)[1] After the Greek economy collapsed, Jane's parents decided that she, her mother, and her two sisters would move to New York. (*Id.* ¶¶ 31–33.) Because of work, Michael Vitsaxakis—Mrs. Vitsaxaki's husband and Jane's father—currently resides in Greece but supports this lawsuit. (*Id.* ¶¶ 11, 36–38.)

The complaint then explains how, when Mrs. Vitsaxaki and her daughters arrived in New York, Jane's difficulties began in her new elementary school. (*Id.* ¶¶ 39–55.) So before Jane entered sixth grade, Mrs. Vitsaxaki spoke with middle-school guidance counselor Christopher Viggiano and school psychologist Vicky Powers. (*Id.* ¶¶ 56–57.) Mr. Viggiano and Ms. Powers both said that they would watch Jane and support her in coordination with Mrs. Vitsaxaki. (*Id.* ¶ 58.) Even so, Jane suffered increased anxiety and depression, gained weight, and became withdrawn. (*Id.* ¶ 60.) Mrs. Vitsaxaki discussed her concerns about bullying with Mr. Viggiano, Ms. Powers, and Michael Caraccio, the middle-school principal. (*Id.* ¶ 62.)

Around this time, Mr. Viggiano began to meet regularly with Jane to discuss problems with issues like bullying. (*Id.* ¶¶ 64–67.) Although Mrs. Vitsaxaki asked Mr. Viggiano directly whether he met with Jane to discuss such issues at school (*id.* ¶ 68), Mr. Viggiano never disclosed his meetings with Jane. (*Id.* ¶ 70.) He and others told Mrs. Vitsaxaki not to worry—that Jane was doing well. (*Id.* ¶ 63.)

In early 2021, as the complaint alleges, the School District began a so-called "social transition" of Jane. (*See id.* ¶¶ 205, 216, 221, 225–28, 231 (alleging details

---

[1] As in the complaint, the name of Mrs. Vitsaxaki's daughter has been changed to "Jane" to protect her privacy. (Compl. ¶ 1 n.1.)

drawn from scientific literature about social transition).) District employees met with Jane to discuss how they would socially transition her, and they said that they didn't need to notify Jane's parents. (*Id.* ¶¶ 99, 101.) Mr. Viggiano emailed staff to inform them that they should call Jane by a typically masculine name and use third-person plural pronouns "they" and "them" to refer to Jane, rather than correctly refer to Jane by her actual name and female pronouns. (*Id.* ¶ 107.) After that email, school staff carefully referred to Jane by her given name and female pronouns when talking with Mrs. Vitsaxaki but used the masculine name and incorrect, third-person plural pronouns at school. (*Id.* ¶¶ 110, 129–40.) During this time, Mrs. Vitsaxaki repeatedly spoke with staff about whether they understood the causes of Jane's ongoing struggles with school. (*Id.* ¶ 104.) And they consistently told her "no." (*Id.* ¶ 105.) Yet, for months, they socially transitioned Jane without informing Mrs. Vitsaxaki—despite repeated requests for information about her daughter's struggles. (*Id.* ¶¶ 106–11.)

Mrs. Vitsaxaki alleges that, in April 2021, Ms. Powers created a "Gender Support Plan" for Jane consistent with Mr. Viggiano's earlier email. (*Id.* ¶ 141.) The plan required staff to socially transition Jane without telling Mrs. Vitsaxaki or seeking her consent. (*Id.* ¶ 142.) After beginning to socially transition Jane, Ms. Powers, the school's psychologist, and Michele Rogala, its social worker, increased the frequency of meetings with Jane to two or three times per week, according to the complaint. (*Id.* ¶ 112.) They encouraged Jane and her peers in their newly asserted gender identities. (*Id.* ¶ 114.) And Ms. Rogala started an "LGBTQ club" at lunch, encouraging Jane to attend. (*Id.* ¶ 115.) During these meetings, she encouraged Jane to socially transition. (*Id.* ¶ 116.) She also gave Jane resources on "medical transition," like contact information for counselors, surgeons, and a gender clinic, and information about where to obtain breast binders and other medical devices. (*Id.* ¶¶ 118, 119.)

The complaint's allegations show that one of Jane's teachers eventually pressured Mr. Caraccio to stop the deception. (*Id.* ¶¶ 164–65.) So on May 11, Mr. Caraccio

called Mrs. Vitsaxaki. (*Id.* ¶ 144.) During that call, he also had Jane on the phone but didn't tell Mrs. Vitsaxaki. (*Id.* ¶ 145.) He admitted the School District had socially transitioned Jane—and told Mrs. Vitsaxaki that School District policy required it. (*Id.* ¶¶ 146–48.) When she realized Jane was listening, Mrs. Vitsaxaki consoled her daughter and ended the call. (*Id.* ¶ 151.) About a week later, Mrs. Vitsaxaki and her husband met with school employees to discuss the decision to socially transition Jane and conceal that decision. (*Id.* ¶¶ 159–68.) During that meeting, Mrs. Vitsaxaki learned School District employees had met regularly with Jane to socially transition her, even while saying they had noticed no changes in Jane. (*Id.* ¶ 162.)

In the end, contrary to Mrs. Vitsaxaki's instructions, the School District reiterated that a policy required socially transitioning Jane and concealing it from Mrs. Vitsaxaki. (*Id.* ¶¶ 163, 166.) When Jane switched to online school around that time, School District employees persisted in socially transitioning her, despite Mrs. Vitsaxaki's instructions. (*Id.* ¶¶ 155, 168.) That fall, Jane began attending a private school, and while there, she hasn't expressed a desire to socially transition. (*Id.* ¶¶ 186, 192–93.)

School officials were acting pursuant to School District Policy 7552, "Student Gender Identity," which required staff to socially transition Jane without informing her mother or seeking her consent. (*Id.* ¶¶ 197–99.) It mandates that staff "use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." (*Id.* ¶ 201.) Under the Policy, "students have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information." (*Id.* ¶ 200.) A student's "Gender Support Plan" can "include … the student's preferred name and associated pronoun use and if, when, and how this is communicated to others"—including parents. (*Id.*) Nothing in the Policy requires informing parents or seeking their consent, instead requiring staff to determine whether and when to do so. (*Id.* ¶¶ 202–03.)

With citations to scientific literature, the complaint alleges that Policy 7552 requires the School District to engage in social transition, "a psychosocial intervention for gender dysphoria." (*Id.* ¶ 205.) According to the allegations, parents are "essential" for diagnosing and treating gender dysphoria. (*Id.* ¶ 219.) Conversely, encouraging a child "to lead a 'double life'" where he or she "conceal[s] important life changes from his or her parents … imposes a serious risk of worsening the mental health of the child." (*Id.* ¶ 220.) The complaint also discusses risks of social transition, including that it "'locks' the child into discomfort with his or her biological sex," thereby "increas[ing] the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both." (*Id.* ¶ 227.) And that carries risks of long-term harm, including "sterility," "failure to develop and be able to enjoy healthy sexual responses and relationships," "impaired brain development," "increased risk of cardiovascular illness," and "dependence on regular hormone shots," among other risks. (*Id.* ¶ 228.) Unsurprisingly, no medical organization recommends subjecting children or adolescents to social transition without their parents' knowledge. (*Id.* ¶ 221.)

This Court need not adjudicate the scientific evidence to deny the motion to dismiss because these portions of the complaint plausibly allege that the School District recklessly engaged in a psychosocial intervention that increased the odds Jane would struggle with gender confusion into adulthood. (*Id.* ¶ 231.) By doing this without notifying Mrs. Vitsaxaki or seeking her consent—indeed, while lying to her when she inquired about her daughter—the School District violated her right to direct the upbringing, education, and healthcare of her daughter. (*Id.* ¶¶ 277–301.)

Finally, the complaint also alleges that the School District's actions violated Mrs. Vitsaxaki's sincere religious beliefs. She is a Christian who believes that God has tasked her, as Jane's mother, to instill those same beliefs in her. (*Id.* ¶¶ 232–41.) That includes her beliefs about the unchangeability of every person's biological sex, which is contrary to the School District's treatment of Jane as a boy. (*Id.* ¶¶ 242–53.)

## LEGAL STANDARD

The School District challenges Mrs. Vitsaxaki's standing and the sufficiency of her complaint. *See* Fed. R. Civ. P. 12(b)(1), (6). (Mem. of Law in Supp. of Defs.' Mot. to Dismiss, Doc. 19-1 ("MTD Br.") at 1, 11–12.) Because its standing arguments are "based solely on the allegations of the complaint … and exhibits attached to it," it has brought a "facial" motion under Rule 12(b)(1). *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). And on a facial 12(b)(1) motion, "the plaintiff has no evidentiary burden," *id.*, notwithstanding the School District's statement to the contrary (MTD Br. 12). The Court must accept as true Mrs. Vitsaxaki's factual allegations and draw reasonable inferences in her favor. *Carter*, 822 F.3d at 56. To defeat the School District's 12(b)(1) motion, she need only "allege facts that affirmatively and plausibly suggest that [she] has standing to sue." *Id.* (cleaned up).

Similarly, to analyze the School District's arguments under Rule 12(b)(6), the Court must "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *New Hope*, 966 F.3d at 160 (cleaned up). Because the complaint "plausibly give[s] rise to an entitlement to relief"—to say the least—this Court should deny the motion to dismiss. *Id.* (citation omitted).

## ARGUMENT

**I.    Mrs. Vitsaxaki has standing for her declaratory claims because she seeks damages for past injuries caused by the School District's Policy.**

To attack Mrs. Vitsaxaki's standing, the School District elides the distinction between retrospective and prospective relief, both available under the Declaratory Judgment Act, 28 U.S.C. § 2201. "[P]ast conduct" confers standing on a plaintiff "asking for *retrospective* declaratory relief." *BD v. DeBuono*, 130 F. Supp. 2d 401, 430 (S.D.N.Y. 2000) (emphasis added). Thus even "[w]hen a claim for injunctive relief is barred … a declaratory judgment as a predicate to a damages award can survive." *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004); *accord Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). That describes the claims here.

Past conduct is what Mrs. Vitsaxaki challenges. She has plausibly alleged a constitutional injury to her First and Fourteenth Amendment rights from the School District's social transition of Jane under its Policy. (Compl. ¶¶ 260–318.) She has also plausibly alleged damages caused by that injury. (*E.g.*, *id.* ¶¶ 178–96.) And she seeks damages in this lawsuit. (*Id.* at 43, Prayer for Relief.) As a result, she has standing to seek "a declaratory judgment as a predicate to a damages award." *Crue*, 370 F.3d at 677; *see DeBuono*, 130 F. Supp. 2d at 429–30 (allowing plaintiffs to seek declaratory relief although they only had viable claims for damages).

Arguing that Mrs. Vitsaxaki has no likelihood of future injury, the School District misses the point. It cites cases discussing the rule for *prospective* declaratory relief, involving a claim of future injury. (MTD Br. 14–15.) But a declaratory judgment can also properly be *retrospective*, which requires no possible future injury. *See, e.g.*, *Dias*, 567 F.3d at 1176; *see also Cmty. Health Care Ass'n of N.Y. v. DeParle*, 69 F. Supp. 2d 463, 471–76 (S.D.N.Y. 1999) (recognizing that the Eleventh Amendment may bar a retrospective declaratory claim against *state* officials but finding that the plaintiff had stated a claim for retrospective declaratory relief against *county* officials). Because Mrs. Vitsaxaki seeks damages to remedy a past injury caused by the School District's Policy, she has standing to seek retrospective declaratory relief.

## II.    The complaint states a plausible claim that the School District violated the Free Exercise Clause.

The School District's decision to treat Jane as a boy—and its concealment of that decision—burdened Mrs. Vitsaxaki's sincerely held religious beliefs, including her right to direct her daughter's religious upbringing. *Wisconsin v. Yoder*, 406 U.S. 205, 231 (1972). And it burdened her beliefs by applying Policy 7552, which is not neutral or generally applicable. As a result, its actions receive strict scrutiny, which it can't satisfy, especially on a motion to dismiss.

**A.    Violating Mrs. Vitsaxaki's religious beliefs and conditioning access to public education on forgoing them, the School District's actions burdened her religious exercise.**

The complaint details how the School District burdened Mrs. Vitsaxaki's exercise of religion by thwarting her from instilling her faith in her daughter, which burdened her sincere religious beliefs. (Compl. ¶¶ 141–56, 232–53, 260–76.) The government triggers the Free Exercise Clause when it "burden[s]" a person's "sincere religious practice." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). That includes burdens caused by "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022) (cleaned up). And the Supreme Court has "repeatedly held" that the government cannot "exclude[] religious observers from otherwise available public benefits"—like public education. *Id.* According to the complaint, the School District burdened Mrs. Vitsaxaki's religion in all these ways.

As an initial matter, the School District argues for the wrong standard. It incorrectly argues that Mrs. Vitsaxaki must allege a "*substantial* burden on the observation of a *central* religious belief." (MTD Br. 15 (cleaned up) (emphasis added).) But the Second Circuit rejected that standard. It recently held the First Amendment doesn't require "that the governmental burden on religious beliefs was 'substantial.'" *Kravitz v. Purcell*, 87 F.4th 111, 125, 127 (2d Cir. 2023). Mrs. Vitsaxaki must allege only a burden on her beliefs that "are sincerely held and in [her] own scheme of things, religious." *Id.* at 123 (cleaned up). The School District doesn't challenge the sincerity of Mrs. Vitsaxaki's religious beliefs. Nor could it. This "highly fact-intensive inquiry" is inappropriate for a motion to dismiss. *Thompson v. Renee*, No. 21-CV-10371, 2023 WL 2575222, at *7 (S.D.N.Y. Mar. 17, 2023). In any event, the complaint expressly alleges that the School District violated beliefs "central to the way she lives her life and raises her family," which would suffice to allege a substantial burden. (Compl. ¶ 232.) *See Kravitz*, 87 F.4th at 122–23 (discussing "centrality" of belief).

8

In particular, the complaint alleges the School District subjected Jane to a social transition that violated Mrs. Vitsaxaki's sincere religious beliefs which is all that is necessary to defeat the motion to dismiss. Its decision to treat Jane as a boy contradicts Mrs. Vitsaxaki's religious belief "that each of us is born with a fixed biological sex that is a gift from God." (Compl. ¶ 243.) She also believes that she cannot "personally affirm[] or communicat[e] views about human nature and gender identity that are contrary to her beliefs" and that "referring to a child using pronouns that are inconsistent with the child's biological sex is harmful to the child." (*Id.* ¶¶ 244–45.) Yet the School District "subjected her daughter to a social transition that directly violates her beliefs and concealed these actions from her." (*Id.* ¶ 264.) Even after Mrs. Vitsaxaki instructed the School District to no longer use the masculine name and incorrect pronouns to refer to Jane, its employees persisted. (*Id.* ¶ 184.)

To argue that this raises no free-exercise concerns, the School District takes too narrow a view of the Free Exercise Clause, claiming that only direct coercion counts as a burden. (MTD Br. 16.) Yet the Supreme Court has not limited that clause to direct coercion. *Carson*, 596 U.S. at 778. And the School District's cited decisions do not support its novel limitation. Instead, those decisions discuss claims by plaintiffs challenging "mere exposure in public school[s] to ideas that contradict religious beliefs." *Mahmoud v. McKnight*, Civ. No. DLB-23-1380, 2023 WL 5487218, at *16 (D. Md. Aug. 24, 2023), *aff'd*, No. 23-1890, 2024 WL 2164882 (4th Cir. May 15, 2024); *see Parker v. Hurley*, 514 F.3d 87, 100 (1st Cir. 2008). Unlike those plaintiffs, Mrs. Vitsaxaki challenges actions performed by the School District on her daughter pursuant to an official Policy that violate her religious beliefs. (*E.g.*, Compl. ¶¶ 263–76.)

The complaint's allegations also show how the School District conditioned Mrs. Vitsaxaki's access to public school—an "otherwise available public benefit[]," *Carson*, 596 U.S. at 778—on her willingness to allow it to instill "moral standards" and "beliefs" in her daughter contrary to her own. *Yoder*, 406 U.S. at 233. She alleges the

School District's Policy requires employees to "use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." (Compl. ¶ 201.) And the Policy requires staff to "conceal information from parents like Mrs. Vitsaxaki." (*Id.* ¶ 200.) Thus, the complaint plausibly alleges that School District employees, pursuant to the Policy, interposed themselves by "recklessly engaging in" and intentionally concealing "a psychosocial intervention" that is directly contrary to Mrs. Vitsaxaki's sincerely held religious beliefs. (*Id.* ¶ 231.)

On a motion to dismiss, the School District can't avoid those allegations simply by denying them. (*See* MTD Br. 16 n.5 (denying that it "interposed itself into Jane's request").) As the School District's citations acknowledge, "conditions on receiving public benefits" establish "coercion." *Mahmoud*, 2023 WL 5487218, at *23; *see Parker*, 514 F.3d at 105. And that's exactly what Mrs. Vitsaxaki alleges: The School District conditioned access to a public education on socially transitioning Jane—a violation of Mrs. Vitsaxaki's faith. That's enough to plausibly allege a burden.

The complaint alleges one more burden on Mrs. Vitsaxaki's religious beliefs: the School District's concealment. *Cf. Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-CV-04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) ("It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns."). Hiding actions from parents is itself harmful, counteracts the parents' right to make important decisions, and leaves them unable to protect their child from it. Objecting parents might withdraw their child from a school in response to a policy that prompts the child to violate their parents' religious beliefs. But those same parents would have no such remedy if school employees concealed that policy. By socially transitioning Jane—and concealing it— the School District burdened Mrs. Vitsaxaki's religious beliefs.

**B.    The School District must satisfy strict scrutiny.**

Given all of the plausible allegations stating a free-exercise claim, the School District's actions trigger strict scrutiny for multiple reasons. First, as discussed above, by "conditioning the availability of benefits" on Mrs. Vitsaxaki's willingness to violate her faith, the School District "effectively penalize[d] the free exercise of religion" in a way demanding strict scrutiny. *Carson*, 596 U.S. at 780 (cleaned up).

Second, the complaint alleges that the School District's Policy is not neutral and generally applicable. A "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). In particular, the Policy requires school staff to determine whether to conceal information from parents "on a case-by-case basis." (Compl. ¶ 270; *see* Doc. 1-5 at 1–2 (reproducing Policy as exhibit, including "case-by-case" language).) It thus grants School District employees "substantial discretion" to determine whether to conceal a decision to socially transition a student from parents. *Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021). This amounts to an impermissible "mechanism for individualized exemptions" that triggers strict scrutiny. *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (cleaned up).

Even though these allegations are stated in the complaint—and taken from the Policy's precise text—the School District fights this conclusion. Yet it concedes that its Policy requires it to "assess and address the specific needs of each student on a case-by-case basis." (MTD Br. 3 (quoting Ex. 5, Doc. 1-5 at 1). *But see id.* at 19 (contending the Policy is not discretionary).) The Policy's text allows limitless discretion. It grants the School District the choice, informed by the student, of "when, with whom, and how much to share" information about the School District's social transition. (Compl. ¶ 200 (quoting Ex. 5, Doc. 1-5 at 2).) Though school staff may "endeavor to engage the student and his or her parents or guardians, as appropriate" (*id.*), nothing in the Policy requires parental involvement. Indeed, the Policy never defines

when it is "appropriate" to "engage" with parents. Nor does it provide factors informing "when, with whom, and how much" to share about a district-led social transition.

These aspects of the Policy distinguish this case from *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2d Cir. 2023), on which the School District almost exclusively relies. There, the State gave "mandatory" and "objective" exemptions. *Id.* at 150. But the Policy here has no mandatory or objective criteria. Instead, it "invites" the School District "to consider the particular reasons for a person's conduct," *id.* at 145 (quoting *Fulton*, 593 U.S. at 533), expressly providing that "[s]tudent privacy concerns will be addressed individually and on a case-by-case basis" (Doc. 1-5 at 2; *see id.* at 1 ("The District will assess and address the specific needs of each student on a case-by-case basis.")). That sort of discretionary, individualized consideration makes government action "*not* generally applicable." *We The Patriots*, 76 F.4th at 145.

Additionally, the complaint's allegations don't permit the School District to dodge responsibility for concealing its social transition of Jane from Mrs. Vitsaxaki. (*See* MTD Br. 18, 20.) As alleged, "the Policy requires School District staff to determine, as part of developing a Gender Support Plan for a student, whether to inform that student's parents or seek their consent." (Compl. ¶ 203.) Indeed, after the School District finally revealed its actions to Mrs. Vitsaxaki, Ms. Powers emailed staff members to tell them Mr. Caraccio had revealed the social transition to Mrs. Vitsaxaki when the issue "came to a head" and the School District had "to balance [Jane's] readiness and privacy with [Mrs. Vitsaxaki's] right to know what has been going on here at school." (*Id.* ¶ 158.) And Mr. Caraccio called Mrs. Vitsaxaki "only after one of [Jane's] teachers"—not Jane—"had pressured him to inform her parents." (*Id.* ¶ 164.)

In other words, the School District's Policy gave employees the authority and discretion to make the initial decision to socially transition Jane. Then, they had discretion in deciding whether to notify Mrs. Vitsaxaki. They initially exercised that

12

discretion to conceal their social transition of Jane. And in their discretion, they eventually revealed it to Mrs. Vitsaxaki but only under pressure from one employee. Discretion pervades the Policy. It is thus not neutral and generally applicable.

The School District's actions also receive strict scrutiny for an independent reason: because they burden Mrs. Vitsaxaki's rights under "the Free Exercise Clause in conjunction with" her right "to direct the education" of her daughter, including her "'religious upbringing.'" *Emp. Div. v. Smith*, 494 U.S. 872, 881 & n.1 (1990) (quoting *Yoder*, 406 U.S. at 233). Despite *Smith*'s express carveout for such claims, the Second Circuit has described "this language [as] dictum" and refused to follow it. *We The Patriots*, 76 F.4th at 159. But *Smith*'s approach is consistent with this Nation's history and tradition of respecting parents' right to make decisions for their children—decisions related to their religious education most of all. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256–57 (2022).

In any event, the complaint's allegations show that the School District's employees had "discretion to decide" whether and when to notify Mrs. Vitsaxaki. *We The Patriots*, 76 F.4th at 150. It can't defeat the complaint's allegations simply by denying them. *Cf. M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 39 (2d Cir. 2022) (holding that "factual questions," which "pervade[d]" the "general applicability" analysis, made it improper for resolution at summary judgment). Regardless of whether the Policy is "substantially underinclusive" (*see* MTD Br. 20), that discretion makes the Policy not neutral or generally applicable and thus triggers strict scrutiny.

### C.    The School District fails strict scrutiny and even rational-basis review, particularly at the motion-to-dismiss stage.

Because the School District's actions trigger strict scrutiny, it must show—based on the facts alleged—that applying the Policy to Mrs. Vitsaxaki (1) "furthers a compelling governmental interest," and (2) "is narrowly tailored to that end." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). It fails on both fronts.

1.      As to the compelling interest, the School District cannot satisfy strict scrutiny by resting only on "broadly formulated interests." *Fulton*, 593 U.S. at 541 (cleaned up). It must be specific: How was its treatment of Mrs. Vitsaxaki in particular—as opposed to the Policy in general—narrowly tailored to a compelling interest? The School District makes no attempt to answer that question, so its application of its Policy to Mrs. Vitsaxaki fails strict scrutiny, particularly on a motion to dismiss.

Both of the School District's asserted justifications resemble arguments *Fulton* rejected. There, the city argued it needed to exclude the plaintiff from a program to "ensur[e] equal treatment of prospective foster parents and foster children." 593 U.S. at 541. But an interest stated at such "a high level of generality" couldn't satisfy strict scrutiny. *Id.* So, too, here, where the School District asserts broad interests in "protecting the physical and emotional well-being of youth" and in preventing "discrimination" against "gender nonconforming students." (MTD Br. 21 (citation omitted).) It never explains how seeking Mrs. Vitsaxaki's consent to treating her daughter as a boy—or, for that matter, not concealing that information from her—bears any relationship to student safety or nondiscrimination against Jane or any other student.

The School District's other putative justification also invokes a broadly formulated interest, this time in student privacy. (*Id.*) In addition to this level-of-generality problem, this interest is incoherent. "A student who announces the desire to be publicly known in school by a new name, gender, or pronoun and is referred to by teachers and students and others by said new name, gender, or pronoun, can hardly be said to have a reasonable expectation of privacy or expect non-disclosure." *Mirabelli v. Olson*, No. 3:23-CV-00768, 2023 WL 5976992, at *10 (S.D. Cal. Sept. 14, 2023). Indeed, it seems the Vitsaxakis were the only people from whom the School District concealed this supposedly private information about Jane. (Compl. ¶ 143.) At the very least, the question whether the Policy advances any privacy interests depends on specific facts and is thus inappropriate to decide at this stage of the case.

14

The School District's citations to New York's statewide policy statements aren't relevant to its violations of Mrs. Vitsaxaki's constitutional rights. (*See* MTD Br. 1–3 (discussing the State's own policies, none of which it is alleged to have applied here).) For one thing, the School District nowhere argues that New York law required it to conceal information about Jane from Mrs. Vitsaxaki. Just the opposite: The School District admits that its own Policy 7552 "is central to" Mrs. Vitsaxaki's claims. (MTD Br. 13.) And the School District—not New York—decided to apply Policy 7552 to Mrs. Vitsaxaki. So New York's views on the matter are irrelevant. The School District must justify applying Policy 7552 to conceal important information about Jane from Mrs. Vitsaxaki, which it makes no effort to do. On this point, its argument doesn't mention Mrs. Vitsaxaki or Jane even once. (*Id.* at 21–22.)

2.    As to tailoring, the School District hasn't explained how its actions were narrowly tailored. Not only would it be inappropriate to include new facts, the District has never claimed that Mrs. Vitsaxaki "jeopardize[d]" Jane's "health or safety." *Yoder*, 406 U.S. at 234. Yet establishing "a particularized and substantiated concern of real harm" is necessary to show narrow tailoring in this context. *Ricard*, 2022 WL 1471372, at \*8; *see id.* at \*9 (ruling that a teacher was likely to succeed on her free-exercise challenge to a policy like the Policy here).

Far from protecting Jane's health, the allegations show that the School District's Policy in fact jeopardized it. The complaint—backed by scientific studies—alleges that social transition "is a powerful psychosocial intervention that greatly reduces the chances that the young person will cease experiencing gender dysphoria." (Compl. ¶ 226.) Evidence suggests "social transition 'locks' the child into discomfort with his or her biological sex (that is, entrenches rather than cures gender dysphoria), and greatly increases the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both." (*Id.* ¶ 227.) And medicalized transition carries the risk of "lifelong sterility, failure to develop and be able to enjoy healthy sexual

15

responses and relationships, impaired brain development, [and] weakened bones." (*Id.* ¶ 228.) As shown here, Jane suffered anxiety and depression and became withdrawn during the School District's social transition. (*Id.* ¶¶ 87–89.) But when Mrs. Vitsaxaki pulled her from the School District, she became comfortable in her biological sex and her anxiety abated. (*Id.* ¶¶ 186, 192–93.)

Finally, the School District could have chosen less restrictive means to address students' gender struggles. Many States have done just that.[2]

3.    Besides failing strict scrutiny, the School District can't satisfy even rational basis. *See Mirabelli*, 2023 WL 5976992, at *14 ("The reasons proffered by the defendants for the policy pass neither the strict scrutiny nor the rational basis tests."); *Ricard*, 2022 WL 1471372, at *8 n.12 (noting "real questions" whether a similar policy had a rational basis). It's irrational to have a policy that seeks "to engage the student and his or her parents" while simultaneously concealing information from parents. (Doc. 1-5 at 2.) As alleged in the complaint, the School District's Policy undermines the very interests that supposedly justify it.

---

[2] *See, e.g.*, Ala. Code § 26-26-5(2) (prohibiting "[w]ithhold[ing] from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex"); Idaho Code § 33-6001(2)(d) (requiring schools to adopt a policy regarding their "responsibility for notifying a student's parent or legal guardian regarding known changes in the student's mental, emotional, or physical health or well-being"); Ind. Code § 20-33-7.5-2 (requiring parental notice when a student requests "to change the student's … name" or "pronoun, title, or word to identify the student"); Iowa Code § 279.78(3) (requiring parental disclosure of student requests for "an accommodation that is intended to affirm the student's gender identity," expressly including a request to "us[e] a name or pronoun that is different than the name or pronoun" in official records); N.C. Gen. Stat. § 115C-76.45(a)(5) (mandating "notice to the parent" "[p]rior to any changes in the name or pronoun used for a student in school records or by school personnel"); N.D. Cent. Code § 15.1-06-21(4)(b) (prohibiting, as a general matter, "[w]ithhold[ing] or conceal[ing] information about a student's transgender status from the student's parent or legal guardian").

**III.    The complaint states a plausible claim that the School District violated Mrs. Vitsaxaki's fundamental right to direct her daughter's upbringing, education, and healthcare.**

The Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citation omitted). Its Due Process Clause protects the fundamental right "to direct the education and upbringing of one's children." *Id.*; *see Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (right to "establish a home and bring up children"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (right "to direct the upbringing and education of children"). This "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). Some scholars and jurists have also argued that a similar fundamental-rights analysis applies under the Privileges or Immunities Clause. *See Dobbs*, 597 U.S. at 240 n.22.

Under either clause, parental rights are fundamental. "Parents can and must make … judgments" for their children "concerning many decisions"—including education and healthcare—because "[m]ost children, even in adolescence, simply are not able to make sound judgments" for themselves. *Parham*, 442 U.S. at 603; *see id.* at 603–04 (giving examples of education and healthcare decisions); *see also Troxel*, 530 U.S. at 68 (plurality) (discussing mother's "fundamental right to make decisions"). Because the complaint alleges dozens of facts showing the School District has burdened Mrs. Vitsaxaki's fundamental right to make decisions on Jane's behalf, its actions must meet strict scrutiny. *See United States v. Myers*, 426 F.3d 117, 125–26 (2d Cir. 2005) (Sotomayor, J.) (strict scrutiny applies even to "special conditions of supervised release" when parents' fundamental rights are at stake). But the School District has offered only generic justifications for preventing Mrs. Vitsaxaki from helping her daughter—justifications that can't establish a rational basis, let alone satisfy strict scrutiny. The complaint thus states a plausible fundamental-rights claim.

**A.    Allegations that the School District made an important decision about Mrs. Vitsaxaki's daughter without parental consent and then concealed it state a fundamental-rights violation.**

The complaint sufficiently pleads that the School District violated Mrs. Vitsaxaki's fundamental rights to make educational and healthcare decisions in two distinct ways: (1) by *deciding* to treat and *participating* in treating her daughter as a boy at school without her consent; and, (2) by *concealing* that decision from her. These allegations "strike at the heart of parental decision-making authority on [a] matter[] of the greatest importance": Mrs. Vitsaxaki's ability to help her daughter in the midst of confusion about her identity as a young woman. *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005).

**1.    The complaint alleges that the School District treated Jane as a boy without Mrs. Vitsaxaki's consent.**

The complaint alleges that the School District burdened Mrs. Vitsaxaki's fundamental rights by substituting its own judgment for hers when it decided to treat her daughter as a boy without her consent. Our Nation has a deeply rooted tradition of vesting parents with the authority to make such important decisions for their children. *See Parham*, 442 U.S. at 602 ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children."). Parents' decisionmaking authority over their children "is derived from … their duty" to their children. 1 William Blackstone, *Commentaries on the Laws of England* *452, https://bit.ly/3leX7za; *see* 2 James Kent, *Commentaries on American Law* *226 (10th ed. 1860) (linking parents' duties with their "right to such authority" to exercise those duties), https://bit.ly/3ttTN79. But parental rights also rest on the recognition "that natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602.

Over the past century, the Supreme Court has applied parents' deeply rooted decisionmaking authority to a variety of topics. As to education, that includes

academics, like what subjects a child will study, *Meyer*, 262 U.S. at 402–03, and what school a child will attend, *Pierce*, 268 U.S. at 534–35. But it also sweeps more broadly, "to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. And as to healthcare, "[p]arents can and must make … judgments" about their children's "need for medical care or treatment," including appropriate mental-health treatment. *Parham*, 442 U.S. at 603; *see Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 420 (6th Cir. 2019) (reversing dismissal of complaint that alleged denial of "parents' fundamental right to direct the medical care of their children" by failing to obtain their consent). The complaint's many allegations show how the School District's actions violated all these aspects of Mrs. Vitsaxaki's fundamental rights. (*E.g.*, Compl. ¶¶ 278–301.)

     i.    *The School District needed to obtain Mrs. Vitsaxaki's consent but did not do so.*

As the complaint details, the School District made its own decisions about how to address Jane's struggles with gender without notifying Mrs. Vitsaxaki or seeking her consent. (Compl. ¶¶ 89–124.) By alleging that it made that morally fraught decision about Jane's identity, the complaint states a plausible claim that the School District infringed Mrs. Vitsaxaki's fundamental right to decide issues like the "moral standards" and "beliefs" to guide her education. *Yoder*, 406 U.S. at 233.

This decision also amounts to a healthcare decision that required Mrs. Vitsaxaki's consent. (*E.g.*, Compl. ¶¶ 98–143.) For over three months, School District staff socially transitioned Jane without Mrs. Vitsaxaki's knowing. (*Id.* ¶¶ 107, 155–56.) The complaint expressly alleges that "social transition" is a "powerful psychosocial intervention." (*Id.* ¶ 226.) By socially transitioning Jane, the School District risked "entrench[ing] rather than cur[ing] gender dysphoria," thereby "greatly increas[ing] the likelihood that [Jane] will continue on to puberty blockers, cross-sex hormones, or both." (*Id.* ¶ 227.) And the School District continued its social transition

even after Mrs. Vitsaxaki instructed it to stop. (*Id.* ¶¶ 166, 168.) Those actions strip Mrs. Vitsaxaki of her "significant decision-making role concerning medical procedures sought to be undertaken by state authority" upon her daughter. *Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 867 (2d Cir. 1990); *see Tenenbaum v. Williams*, 193 F.3d 581, 599 (2d Cir. 1999) ("The caseworkers were required under *van Emrik* either to notify the [parents] that [their daughter] was about to undergo a medical procedure and obtain the approval of either of them or to obtain judicial authorization."); *Kanuszewski*, 927 F.3d at 420 (holding that healthcare decisions taken "without informed parental consent … constitute a denial of the parents' fundamental right to direct the medical care of their children").

According to the complaint, Mrs. Vitsaxaki was "essential" to getting Jane the help she needed. (Compl. ¶ 219.) But the School District cut her out. Nothing about this case challenges "*how* a public school teaches [a parent's] child." (MTD Br. 23 (citation omitted).) Rather, Mrs. Vitsaxaki challenges decisions the School District made about handling her daughter's struggles with identity and its concealment of those decisions. These allegations "go[] far beyond mere counseling or exposure to an idea." *Jackson v. Peekskill City Sch. Dist.*, 106 F. Supp. 3d 420, 427 (S.D.N.Y. 2015).

> ii. *None of the School District's arguments justify acting without Mrs. Vitsaxaki's consent.*

The School District offers only two counterarguments: that Mrs. Vitsaxaki's parental rights are coextensive with her free-exercise rights, and that social transition is not a treatment for gender dysphoria. The former argument is inconsistent with controlling precedent; the latter, with the allegations in the complaint.

The School District wrongly contends Mrs. Vitsaxaki's Fourteenth Amendment claim is "coextensive with [her] Free Exercise Clause" claim. (MTD Br. 22 (citation omitted).) To be sure, Jane's struggle with gender implicated Mrs. Vitsaxaki's right to direct her daughter's upbringing and education consistently with her moral and

religious views, including whether a person "is born with a fixed biological sex" or should embark "on a path that distances [her] from her biological sex." (Compl. ¶¶ 243, 250.) But the Fourteenth Amendment protects her right to "counsel[]" her children "on important decisions" like how to address her daughter's gender confusion—regardless of whether they implicate her sincere religious beliefs. *H.L. v. Matheson*, 450 U.S. 398, 410 (1981). So unlike the plaintiffs in the cases the School District cites, Mrs. Vitsaxaki asserts a "liberty interest … that is not encompassed in [her] free exercise claim." *We The Patriots*, 76 F.4th at 159.

Additionally, the School District infringed her right to direct Jane's healthcare. (*See* Compl. ¶¶ 205–31 (summarizing different therapeutic approaches for children like Jane).) By making healthcare decisions without "parental consent," the School District violated Mrs. Vitsaxaki's fundamental rights. *Van Emrik*, 911 F.2d at 867; *see Jackson*, 106 F. Supp. 3d at 427 ("provid[ing]" student "means to access birth control" without parental consent stated claim). And that sweeps beyond the right discussed in the School District's cited cases. (MTD Br. 23.)

It matters not whether Jane was ever diagnosed with gender dysphoria. (*See* MTD Br. 6.) The complaint alleges that social transition is "a psychosocial intervention *for gender dysphoria*." (Compl. ¶ 205 (emphasis added).) The School District can't prevail on a motion to dismiss by disputing that allegation via citations to nonbinding decisions stating that social transition lacks "clinical significance." (MTD Br. 25 (quoting *Foote v. Town of Ludlow*, No. 22-CV-30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022), *appeal filed*, No. 23-1069 (1st Cir. argued Sept. 13, 2023)).) This Court must consider only the allegations in this case. And Mrs. Vitsaxaki's complaint clearly alleges—citing relevant scientific literature—that the School District's actions implicated her daughter's mental healthcare. (Compl. ¶¶ 205–31 & nn.2–21.)

Regardless, the lack of a gender-dysphoria diagnosis would only intensify the School District's constitutional violation. It would be no different than if the School

21

District administered an ADHD treatment—even a non-medication treatment—to a student who didn't have ADHD. Forcing a child to undergo an unnecessary intervention behind her mother's back is an affront to fundamental parental rights.

Similarly, the Court shouldn't follow decisions like *Regino v. Staley*, which applied a rule inconsistent with the Second Circuit's consent requirement, particularly given the wealth of rulings contrary to *Regino. See* No. 2:23-CV-00032-JAM-DMC, 2023 WL 4464845, at *3 (E.D. Cal. July 11, 2023). For instance, a California federal court concluded, based on expert evidence supporting a preliminary injunction, that a "policy of confidentiality and non-disclosure to parents … is not conducive to the health of [the district's] gender incongruent students." *Mirabelli*, 2023 WL 5976992, at *7. And a Wisconsin trial court ruled on summary judgment (considering expert evidence) that this is "a medical and healthcare issue." *T.F. v. Kettle Moraine Sch. Dist.*, No. 2021CV1650, 2023 WL 6544917, at *5 (Wis. Cir. Ct. Oct. 3, 2023).

Because of the similarities between *Kettle Moraine* and this case, this Court should follow that court's reasoning. It ruled that a school district "can not change the pronoun of a student without parental consent without impinging on a fundamental liberty interest of the parents." *Id.* at *6. Like Mrs. Vitsaxaki, the parents there had a middle-school daughter who began to question her identity as a girl. *Id.* at *1. Unlike Mrs. Vitsaxaki, however, the *Kettle Moraine* parents learned about their daughter's struggles before her school district did, and they informed the district about the issue and instructed it to treat her as a girl. *Id.* But the district refused. *Id.* "[B]y disregarding the parents['] wishes," the district "violate[d] fundamental parental rights." *Id.* at *10. Relying heavily on federal precedent, *see id.* at *3–6, the court rendered summary judgment for the parents under the state constitution, *id.* at *10.

Other rulings support Mrs. Vitsaxaki. For example, a New York appellate court held that New York City's "distribution of condoms to high school students" violated parents' fundamental rights by "forc[ing]" a "judgment" on parents about

contraception access. *Alfonso v. Fernandez*, 606 N.Y.S.2d 259, 263, 266 (N.Y. App. Div. 1993); *see id.* at 265–67 (treating protections under U.S. and New York Constitutions as essentially coextensive). Similarly, a Texas federal court ruled that federal officials violated parents' fundamental rights by providing contraceptives to minors without parental consent. *Deanda v. Becerra,* 645 F. Supp. 3d 600, 627–29 (N.D. Tex. 2022), *aff'd in part, rev'd in part on other grounds*, 96 F.4th 750, 766 & n.15 (5th Cir. 2024). By making an "important life decision[]" about Jane without involving Mrs. Vitsaxaki, *id.* at 627, the School District likewise violated her fundamental rights. This Court should deny the motion to dismiss her parental-rights claim.

### 2. The complaint alleges the School District lied about its actions to Mrs. Vitsaxaki.

The School District's concealment also violates Mrs. Vitsaxaki's fundamental right to information she needs to make decisions for her daughter. A school's "failure to notify" a parent of important information about a child "violate[s] her constitutional right to manage the upbringing of her child." *Gruenke v. Seip*, 225 F.3d 290, 306 (3d Cir. 2000). Parents' right to make decisions for their children includes, at a minimum, the right "to be notified of their children's actions." *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring and dissenting). That entails access to accurate information—particularly when they have entrusted the government with temporary care of their children at school. Parents can't "make decisions concerning the care, custody, and control of their children" when the government conceals information about their children. *Troxel*, 530 U.S. at 66 (plurality); *see Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 332 (W.D. Pa. 2022) (denying qualified immunity based on failure to notify parents of important information).

Consider Mrs. Vitsaxaki's situation. The complaint describes how the School District initially burdened her fundamental rights by deciding to treat her daughter as a boy without notifying her or seeking her consent. (*E.g.*, Compl. ¶¶ 141–43.) The

School District then proceeded to conceal that decision from Mrs. Vitsaxaki. (*E.g.*, *id.* ¶ 110.) Its employees "all carefully referred to Jane by her given name and female pronouns whenever they spoke with Mrs. Vitsaxaki, while calling Jane by a masculine name and incorrect pronouns at school." (*Id.*) And Mrs. Vitsaxaki "repeatedly spoke with Jane's school counselors and teachers" about Jane's struggles. (*Id.* ¶ 104.) But they all said "that they saw no struggles at school." (*Id.* ¶ 106.)

Another district court partially enjoined a policy similar to the one in this case. *See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1275–78 (D. Wyo. 2023). Parents like Mrs. Vitsaxaki "have a right to direct their minor child's education which cannot be accomplished unless they are accurately informed in response to their inquiries." *Id.* at 1277. If parents "are unaware of circumstances that have a significant bearing on th[e] decision" about how to educate their child "because of the school's withholding of information or active deception, despite their inquiry," they can't make an informed decision. *Id.* at 1277–78. By concealing information from Mrs. Vitsaxaki despite her repeated inquiries, the complaint plausibly alleges that the School District violated her fundamental rights.

## B. The School District's infringement of Mrs. Vitsaxaki's fundamental rights fails any applicable level of review.

Because the complaint alleges the School District burdened Mrs. Vitsaxaki's *fundamental* right to direct the upbringing, education, and healthcare of her daughter, its actions receive strict scrutiny. *Glucksberg*, 521 U.S. at 721. Yet it makes no attempt to meet that burden. Citing only general policy statements, the School District can't defeat the "presumption that fit parents" like Mrs. Vitsaxaki have the right "to make the best decisions concerning the rearing of [their] children" without government interference. *Troxel*, 530 U.S. at 68–69 (plurality); *see Ramos v. Town of Vernon*, 353 F.3d 171, 183 (2d Cir. 2003) (discussing that presumption). The School District also fails strict scrutiny and even rational basis—particularly on a motion to

dismiss—for the same reasons already discussed. *See supra* pp. 13–16; *see also Kanuszewski*, 927 F.3d at 421 (reversing dismissal of parental-rights claim because strict scrutiny applied and remanding for discovery on whether it was satisfied).

## IV.    The complaint states a plausible procedural-due-process claim.

Distinct from their fundamental rights, parents can assert "a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012). The School District's cursory treatment of the procedural-due-process claim "fail[s] to fully appreciate this distinction." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Different standards apply to these claims. *See, e.g.*, *Southerland*, 680 F.3d at 151, 153 (vacating summary judgment granted against procedural claim, while simultaneously affirming summary judgment against substantive claim). And the School District cross-references its "reasons stated above" in its fundamental-rights argument but makes no distinct argument that the complaint fails to allege a plausible claim under the procedural-due-process test. (MTD Br. 25.)

At the very least, Mrs. Vitsaxaki has plausibly alleged a "constitutionally protected liberty interest in the care, custody and management of [her] children." *Southerland*, 680 F.3d at 152 (citation omitted). The School District deprived her of that interest by making important decisions about her daughter without her consent and concealing them. (*E.g.*, Compl. ¶ 309.) And the School District does not argue that it provided Mrs. Vitsaxaki with any procedural protections before depriving her of that interest. (*See* MTD Br. 25.) That's because it didn't. (Compl. ¶ 314.) The complaint states a plausible procedural-due-process violation.

## CONCLUSION

The complaint's allegations detail how the School District's concealment kept Mrs. Vitsaxaki from helping her daughter at a crucial moment. Because these allegations state plausible claims for relief, the Court should deny the motion to dismiss.

Dated: May 17, 2024                     Respectfully submitted,

                                        s/ *David A. Cortman*
Katherine L. Anderson*                  David A. Cortman
Arizona Bar No. 33104                   N.D.N.Y. Bar Roll No. 502661
**Alliance Defending Freedom**          **Alliance Defending Freedom**
15100 N. 90th Street                    1000 Hurricane Shoals Road N.E.,
Scottsdale, Arizona 85260                 Suite D1100
(480) 444-0020                          Lawrenceville, Georgia 30043
kanderson@ADFlegal.org                  (770) 339-0774
                                        dcortman@ADFlegal.org


Vincent M. Wagner*                      Raymond J. Dague
Virginia Bar No. 98663                  N.D.N.Y. Bar Roll No. 505622
**Alliance Defending Freedom**          **Dague & Martin, P.C.**
44180 Riverside Parkway                 4874 Onondaga Rd.
Lansdowne, Virginia 20176               Syracuse, New York 13215
(571) 707-4655                           (315) 422-2052
vwagner@ADFlegal.org                    raymond@daguelaw.com

* Admitted *pro hac vice*

                    *Counsel for Plaintiff*

26

## CERTIFICATE OF SERVICE

I certify that on May 17, 2024, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record for all parties.

s/ *David A. Cortman*
_____
David A. Cortman
N.D.N.Y. Bar Roll No. 502661
**Alliance Defending Freedom**
1000 Hurricane Shoals Road N.E.,
  Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Plaintiff*
