UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JENNIFER VITSAXAKI,

     Plaintiff,

    -v-       5:24-CV-155

SKANEATELES CENTRAL SCHOOL
DISTRICT; SKANEATELES CENTRAL
SCHOOLS' BOARD OF EDUCATION,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:     OF COUNSEL:

ALLIANCE DEFENDING   DAVID A. CORTMAN, ESQ.
 FREEDOM     KATHERINE L. ANDERSON, ESQ.
Attorneys for Plaintiff   LAURENCE J. WILKINSON, ESQ.
1000 Hurricane Shoals Road, NE VINCENT M. WAGNER, ESQ.
Suite D1100
Lawrenceville, GA 30078

DAGUE & MARTIN, P.C.   RAYMOND J. DAGUE, ESQ.
Attorneys for Plaintiff
4784 Onondaga Road
Syracuse, NY 13215

BOND, SCHOENECK    JEREMY M. SHER, ESQ.
 & KING, PLLC    KATE I. REID, ESQ.
Attorneys for Defendants   SUZZANE M. MESSER, ESQ.
One Lincoln Center
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## MEMORANDUM DECISION and ORDER

## I. INTRODUCTION

This case stems from a policy implemented by the Skaneateles Central School District and the Skaneateles Central School District's Board of Education (collectively, the "district") that permits students to use their preferred name and pronouns at school. Dkt. No. 1. Under the policy, the district permits students to determine when, how, and if to notify their parents of their decision to elect a chosen name and/or pronouns at school. *Id.*

One of plaintiff Jennifer Vitsaxaki's ("Mrs. Vitsaxaki") children, a seventh-grade student in the district, identified in this action as Jane Doe ("Doe"), sought support from the district and elected to use a preferred name and gender-neutral pronouns. Dkt. No. 1. The district obliged and set up an appointment with the school's counselor, psychologist, and social worker to discuss this decision with Doe. *Id.* After their meeting, the school counselor informed the district's faculty and staff that they were to address Doe by Doe's preferred name and pronouns in accordance with Doe's wishes. *Id.*

After a few months, the school's psychologist worked with Doe to complete a "Gender Support Plan." Dkt. No. 1. The central aim of the Plan was to document the support requested by the student. *Id.* When asked how the

district could best support them, Doe requested only that the district's faculty and staff refer to Doe by Doe's preferred name and pronouns. *Id*.

The Plan detailed not only Doe's preferred name and pronouns but indicated that Doe did not yet have a plan to reveal this decision to go by a preferred name and pronouns—and by extension Doe's gender identity—to family. Dkt. No. 1. Mrs. Vitsaxaki was thus unaware of Doe's decision. *Id*. The Plan further indicated that in order to avoid "outing," or revealing, Doe's decision regarding Doe's preferred name and pronouns to Doe's family against Doe's wishes, the district should refer to Doe by Doe's legal name when speaking with family. *Id*.

In May of that year, Mrs. Vitsaxaki learned of the Plan and of Doe's decision to use Doe's preferred name and pronouns at school. Dkt. No. 1. Mrs. Vitsaxaki strongly objected. *Id*. Doe was switched to online schooling for the remainder of the school year. *Id*. During that time, Doe continued to meet with school staff to discuss gender identity. *Id*. Mrs. Vitsaxaki was unaware of these meetings. *Id*.

After learning of these meetings, Mrs. Vitsaxaki requested that the district refrain from referring to Doe by Doe's preferred name or pronouns while she worked to better understand the situation with Doe herself. Dkt. No. 1. The district obliged. *Id*. Thereafter, Mrs. Vitsaxaki withdrew Doe

from the district and enrolled Doe in a private school for the following school year.  *Id.*

On January 31, 2024, Mrs. Vitsaxaki filed this 42 U.S.C. § 1983 action against the district.  Dkt. No. 1.  Mrs. Vitsaxaki's three-count verified complaint asserts claims for violations of the Free Exercise Clause as well as substantive and procedural Due Process Clause violations stemming from the districts actions under the Policy.  *Id.*  According to Mrs. Vitsaxaki, the district infringed upon her free exercise of her chosen religion and upon her fundamental right to control various aspects of Doe's upbringing, healthcare, and education when it took actions under the Policy without her knowledge or consent.  *Id.*  In addition to money damages, Mrs. Vitsaxaki has sought declaratory relief declaring the Policy unconstitutional on its face and as applied to her.  *Id.*

The district has moved to dismiss Mrs. Vitsaxaki's verified complaint pursuant to Federal Rules of Civil Procedure ("Rule(s)") 12(b)(1) and (6).  Dkt. No. 19.  Mrs. Vitsaxaki has opposed.  Dkt. No. 23.  The motion has been fully

briefed,[1] Dkt. Nos. 24–26, 28–31, and will be considered on the basis of the parties' submissions without oral argument.[2]

## II. __BACKGROUND__

Mrs. Vitsaxaki grew up in New Jersey and later moved to Greece with her husband, a Greek citizen, after finishing college. Ver. Compl. ¶¶ 28–29. While living in Greece, Mrs. Vitsaxaki and her husband began raising a family. *Id.* ¶ 29. Mrs. Vitsaxaki and her husband have three children including Doe. *Id.* ¶¶ 29–30. Doe lived in Greece until age nine. *Id.*

In 2017, after the Greek economy collapsed, Mrs. Vitsaxaki and her children relocated to live in Skaneateles, New York. Ver. Compl. ¶¶ 9–10, 31–33. The children were forced to quickly adapt to a new culture and to speaking primarily English instead of their native Greek. *Id.* ¶ 35. The children began attending public school in Skaneateles. *Id.* ¶ 39.

Doe began fourth grade in the district in August of 2017. Ver. Compl. ¶ 39. Doe had trouble both adapting to school and relating to new, English-speaking classmates. *Id.* ¶¶ 40–42. Doe's challenges worsened in fifth grade.

---

[1] The parties have each filed notices of supplemental authority with the Court. Dkt. Nos. 25, 28–31. The district argues that plaintiff's first notice of supplemental authority, Dkt. No. 25, is an improper surreply. Dkt No. 26. While the Local Rules of the Northern District of New York do not permit parties to file a surreply without leave, N.D.N.Y. L.R. 7.1(a)(1), there is no such requirement for notices of supplemental authority. "[I]t is fairly standard practice for parties to occasionally send letters or to otherwise file supplemental authority after briefing is complete." *Delgado v. Ocwen Loan Servicing, LLC,* 2016 WL 4617159, at *7 (E.D.N.Y. Sept. 2, 2016). Accordingly, the Court has reviewed the authorities the parties have brought to the Court's attention.

[2] The district's request for oral argument, Dkt. No. 19, is denied.

*Id.* ¶¶ 48–55.  Doe developed anxiety and began seeing the school counselor to work on coping mechanisms.  *Id.* ¶¶ 48–55.  These problems persisted as Doe continued along in school in the district.

In 2018, the district adopted policy 7552, titled "Student Gender Identity" (the "Policy").[3]  Ver. Compl. ¶ 197.  Under the Policy, school "staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school."  *Id.* ¶ 201.  The Policy further provides that:

> [t]ransgender and [gender non-conforming] students have the right to discuss and convey their gender identity and expression openly and to decide *when, with whom, and how much to share* this confidential information. The plan may therefore include when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others.

*Id.* ¶ 199.

In September 2020, Doe began seventh grade, and the district resumed in-person instruction.  Ver. Compl. ¶ 89.  During the school year, Doe began to have questions about gender identity.  *Id.* ¶¶ 93–97.  In early 2021, Doe informed the school guidance counselor, Christopher Viggiano ("Viggiano"), that Doe wanted to use a different name and pronouns to reflect Doe's gender identity.  *Id.* ¶ 98.  Doe also requested that school staff members use Doe's

---

[3] A copy of the policy is included as Exhibit 5 to the Verified Complaint.  Ex. 5 to Ver. Comp., Dkt. No. 1-5.

desired first name and gender-neutral pronouns. *Id.* In response to Doe's request, Viggiano and the school psychologist, Vicky Powers ("Powers"), along with the school social worker, Michele Rogala ("Rogala"), met with Doe to discuss Doe's "new" gender identity and preferences. *Id.* ¶ 99. After a counseling session, Viggiano emailed school staff members to inform them of Doe's desired name and to use the gender-neutral pronouns "they and them" to refer to Doe instead of traditional feminine or masculine pronouns. *Id.* ¶ 107. However, when speaking with Mrs. Vitsaxaki about Doe, school staff members referred to Doe by Doe's legal name and traditional feminine pronouns. *Id.* ¶ 110.

During this time, Doe's anxiety and depression continued, and Doe remained reluctant to go to school. Ver. Compl. ¶ 102. When Mrs. Vitsaxaki asked the school counselors if they believed there was anything happening at school that could be causing or contributing to Doe's struggles, she was told "no." *Id.* ¶ 104.

Meanwhile, Doe was attending meetings with Powers and Rogala during which they discussed Doe's gender identity. Ver. Compl. ¶ 112. At times, other students also experiencing changes in their gender identities would attend. *Id.* Rogala also began hosting an "LGBTQ club" during the students' lunch hour. *Id.* ¶ 116. During LGBTQ club meetings, Rogala discussed the concepts of socially and medically transitioning one's gender with students

and provided them with literature on the subjects including local resources such as counselors, pediatricians, surgeons, and a nearby gender clinic. *Id.* ¶¶ 116–18.

Doe's grades in several classes began to suffer. Ver. Compl. ¶ 125. According to Mrs. Vitsaxaki, Doe's attention was being diverted away from school and Doe was missing classes in order to attend weekly counseling sessions. *Id.* Mrs. Vitsaxaki discussed her concerns regarding Doe's grades with Viggiano and Powers, as well as several of Doe's teachers. *Id.* ¶¶ 128–38. But Mrs. Vitsaxaki's concerns were dismissed, and she was told that nothing out of the ordinary was happening at school that might be affecting Doe's academic performance or mental health. *Id.*

That April, Powers completed a "Gender Support Plan" in accordance with the Policy.[4] Ver. Compl. ¶ 141. The Gender Support Plan noted that while friends were supportive of Doe's gender identity and preferred name and pronouns, Doe's family was not. *Id.* ¶ 142. The Gender Support Plan further noted that there was a risk of accidentally "outing" Doe, *i.e.*, revealing Doe's gender identity before Doe was ready, to Doe's family. *Id.* Staff were asked to use Doe's preferred name and pronouns when speaking to Doe, but to use Doe's legal name and feminine pronouns when speaking to Mrs. Vitsaxaki

---

[4] Doe's Gender Support Plan is included as Exhibit 3 to the Verified Complaint. Ex. 3 to Ver. Compl., Dkt. No. 1-3.

about Doe. *Id.* The Gender Support Plan also noted that Doe's legal name, rather than Doe's preferred name, would appear in the school yearbook and that there was no "plan" for Doe to come out to family at that time. *Id.* This left Mrs. Vitsaxaki and her husband in the dark about Doe's gender identity, and, according to Mrs. Vitsaxaki, made her and her husband the "last to know." *Id.* ¶ 143.

But on May 11, 2021, Doe's school principal, Michael Caraccio ("Caraccio"), called Mrs. Vitsaxaki to discuss Doe. Ver. Compl. ¶ 144–45. Unbeknownst to Mrs. Vitsaxaki, Doe was sitting in the room with Caraccio. *Id.* ¶ 144. During the call, Caraccio informed Mrs. Vitsaxaki that the district had been referring to Doe by Doe's preferred name and pronouns and had created a Gender Support Plan for Doe. *Id.* ¶ 146–47. Caraccio underscored that each of the district's actions had been taken pursuant to the Policy. *Id.* ¶ 148. Mrs. Vitsaxaki objected to the terms of the Policy and to the districts actions concerning Doe's gender expression at school. *Id.* ¶ 149. When Mrs. Vitsaxaki realized that Doe had been listening to their conversation, she attempted to console Doe and requested a follow-up call with Caraccio without Doe present. *Id.* ¶¶ 151, 154. The following day, Powers emailed several school staff members at the district to inform them that Caraccio had

disclosed Doe's gender identity and Gender Support Plan to Mrs. Vitsaxaki .[5]
*Id*. ¶ 158.

On May 17, 2021, Doe was switched to online instruction for the
remainder of the school year.  Ver. Compl. ¶ 156.  The following day, Mrs.
Vitsaxaki and her husband met with the district's "gender support team" that
it had created for Doe.  *Id*. ¶ 161.  During the meeting, Mrs. Vitsaxaki and
her husband learned for the first time the total number of the meetings Doe
had attended during the school year to discuss gender identity.  *Id*. ¶ 162.
Mrs. Vitsaxaki and her husband instructed school staff members to cease
using Doe's preferred name and pronouns while they dealt with the situation
at home.  *Id*. ¶ 166.

Mrs. Vitsaxaki and her husband then set out to speak with Doe's teachers
to find out what had been happening at school while they were unaware of
Doe's apparent gender identity struggles.  Ver. Compl. ¶ 169.  But many of
Doe's teachers were hesitant to discuss the issue, while others did not
respond to Mrs. Vitsaxaki 's inquiries at all.  *Id*. ¶ 170.  Upon meeting with
the district's superintendent and its attorney, Mrs. Vitsaxaki was informed
that the district had merely followed the terms of the Policy in its treatment

---

[5]  Caraccio emailed plaintiff a copy of Doe's Gender Support Plan on May 13, 2021.  Ver. Compl.
¶ 159.

of Doe at school.  *Id*. ¶¶ 174–75.  School staff continued to use Doe's preferred name and pronouns during Doe's online instruction.  *Id*. ¶ 168.

Mrs. Vitsaxaki has since withdrawn Doe from the district and enrolled Doe in a private school for the 2021–22 school year.  Ver. Compl. ¶ 186.  According to Mrs. Vitsaxaki , she has observed noticeable improvement in Doe's demeanor, morale, health, and outlook.  *Id*. ¶¶ 187, 192.  In addition, Doe has not expressed a desire to be called by a preferred name or use gender-neutral pronouns.  *Id*. ¶193.

But enrolling Doe in private school was not without financial strain on Mrs. Vitsaxaki and her husband.  Ver. Compl. ¶ 188.  Tuition for the private school cost the family $12,660 annually, and is the private school located twenty-five (25) miles from the Vitsaxakis's home.  *Id*. ¶¶ 188–91.

## III.  LEGAL STANDARD

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 297–98 (N.D.N.Y. 2019) (cleaned up).  Rule 12(b)(1) motions may be either *facial* or *fact-based*.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

Facial Rule 12(b)(1) motions are "based solely on the allegations of the complaint . . . and exhibits attached to it[.]" *Id.* To resolve a facial motion, the district court must "determine whether the pleading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (cleaned up). In doing so, the district court "must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 623 (N.D.N.Y. 2021) (quoting *Nicholas v. Trump*, 433 F. Supp. 3d 581, 586 (S.D.N.Y. 2020)).

By contrast, a defendant who makes a fact-based Rule 12(b)(1) motion submits extrinsic evidence. *Carter*, 822 F.3d at 57. If defendant's extrinsic evidence reveals a dispute of fact whether jurisdiction is proper, plaintiff must proffer evidence to controvert defendant's evidence. *Id.* To resolve a fact-based motion, the district court must then make findings of fact to determine whether plaintiff has standing to sue. *Id.*

**B.  Rule 12(b)(6)**

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. **DISCUSSION**

Mrs. Vitsaxaki's verified complaint sets forth three *Monell*[6] claims for violations of Mrs. Vitsaxaki's free exercise of religion, substantive due process rights, and procedural due process rights. Ver. Compl. ¶¶ 260–318. The district has moved to dismiss the verified complaint in its entirety. Defs.' Mem., Dkt. No. 19-1 at 7.[7] Briefly stated, the district argues that because

---

[6] Plaintiffs causes of action are pleaded as § 1983 claims. Ver. Compl. ¶¶ 260–318. But plaintiff has not named any individual defendants. Ordinarily, § 1983 liability may only attach to the actions of individual state actors acting under the color of state law. § 1983. However, under an exception identified by the United States Supreme Court, plaintiffs may bring claims for municipal liability predicated upon a "policy or custom" that inflicted the injury alleged. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Mrs. Vitsaxaki challenges the validity of a public school's school policy. Ver. Compl. ¶¶ 255–56. Accordingly, plaintiff has properly asserted a *Monell* claim. The Court will thus proceed to analyze the merits of the district's motion to dismiss plaintiff's *Monell* claims.

[7] Pagination corresponds to CM/ECF header.

Mrs. Vitsaxaki  has since withdrawn Doe from the district, Mrs. Vitsaxaki

lacks standing to seek declaratory relief.  *Id*.  The district further argues that

Mrs. Vitsaxaki has failed to plausibly allege Free Exercise Clause claim or

Due Process Clause claims on the basis of the Policy.  *Id*. at 7–9.

### A.  <u>Standing to Seek Declaratory Relief</u>

At the outset, the district challenges Mrs. Vitsaxaki's standing to seek

declaratory relief declaring the Policy unconstitutional.  Defs.' Mem. at 20–

21.  The district points out that prior to commencing her lawsuit, Mrs.

Vitsaxaki withdrew Doe from the district, thus, depriving Mrs. Vitsaxaki of

standing to sue for prospective relief.  *Id*.

Article III limits the Court's jurisdiction to "hear only 'cases or

controversies.'"  *N.C. ex rel. Chu v. Rosa*, 2024 WL 4870487, at *2 (N.D.N.Y.

Nov. 22, 2024) (quoting *Grinnell v. U.S. Env't Prot. Agency*, –F. Supp. 3d–,

2024 WL 2945718, at *5 (N.D.N.Y. June 6, 2024)).  There is a case or

controversy where the plaintiff can demonstrate—consistent with the degree

of evidence required at the stage of the litigation—an 'actual or imminent,

concrete and particularized injury-in-fact that is fairly traceable to the

challenged action of the defendant and is likely to be redressed by a favorable

judicial decision.'"  *Id*. at *2–3 (quoting *Grinnell*, –F. Supp. 3d–, 2024 WL

2945718, at *5).

But where *declaratory relief* is sought, the plaintiff may not "rely on past injury to satisfy the injury requirement but must show a likelihood that they will be injured in the future." *Dorce v. City of N.Y.*, 2 F.4th 82, 95 (2d Cir. 2021) (cleaned up). "Such an allegation of future injury will be sufficient only if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Upon review, Mrs. Vitsaxaki lacks standing to pursue the declaratory relief she seeks. Mrs. Vitsaxaki asserts that the district injured her via certain constitutional deprivations that occurred during the spring of 2021. Ver. Compl. ¶¶ 28–231. Mrs. Vitsaxaki further asserts that she removed Doe from the district following the 2020–21 school year. *Id.* ¶ 186. Notably, Mrs. Vitsaxaki does not allege that she intends to re-register Doe as a student in the district in the future. Thus, Mrs. Vitsaxaki has not alleged that she anticipates any future harm from the district. Accordingly, Mrs. Vitsaxaki 's claim for declaratory relief will be denied.

However, Mrs. Vitsaxaki has also sought money damages for her *Monell* claims. Accordingly, the Court will continue to analyze the merits of Mrs. Vitsaxaki's substantive claims.

**B.  Free Exercise Clause**

Mrs. Vitsaxaki has brought a *Monell* claim alleging that the school district violated the Free Exercise Clause of the First Amendment, both on its face and as-applied to Mrs. Vitsaxaki,[8] when it referred to Doe by Doe's preferred name and gender-neutral pronouns without her knowledge or consent.  Ver. Compl. ¶¶ 260–76.  Mrs. Vitsaxaki asserts that her free exercise of religion was substantially burdened when she was unable to direct the upbringing and education of her child to "counteract" the school district's implicit messaging that "people can change their sex."  *Id.* ¶ 265.

The district argues that Mrs. Vitsaxaki's Free Exercise Clause claim must be dismissed because she has not plausibly alleged how the Policy substantially burdened her free exercise of religion.  Def.'s Mem. at 21–22.  The district further argue that the Policy is a neutral, generally applicable, and rationally related to the state's legitimate interest of protecting the "physical and emotional well-being of youth, including students."  *Id.* at 21–27 (internal quotation marks omitted).

---

[8] "In facial challenges, the challenger must establish that no set of circumstances exists under which the Act would be valid. . .[i]n as-applied challenges, [p]laintiffs must simply prove that the statute is unconstitutional as applied to the litigant's actual conduct." *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 187 (D. Vt. 2024) (citations omitted).  But [w]here [p]laintiffs fail to state an as-applied challenge, any associated facial challenge necessarily fails as well." *Home for Aged of Little Sisters of the Poor v. McDonald*, 711 F. Supp. 3d 81, 101 (N.D.N.Y. 2024), *appeal withdrawn sub nom. Home for Aged of Little Sisters of Poor v. McDonald*, 2024 WL 3803195 (2d Cir. Mar. 22, 2024).  Thus, the Court will review the allegations of the Verified Complaint under the as-applied standard.

Taking the district's arguments in turn: first the district argues that Mrs. Vitsaxaki has not plausibly alleged *how* the Policy substantially burdened her free exercise of religion.  Defs.' Mem. at 21–22.  The district argues that Mrs. Vitsaxaki's assertions that her religious beliefs were burdened by her child's decisions to use a different name and pronouns at school without her knowledge cannot sustain a Free Exercise claim because she has not alleged that the Policy was either (1) directed to "impugn" her religious practices; or (2) depriving her of the ability to practice of her religion.  *Id*.  Rather, Mrs. Vitsaxaki "remained free to instruct" her child at home regarding her chosen religious beliefs.  *Id*. at 22 (internal quotations omitted).

This argument confuses the baseline "trigger" for the Free Exercise Clause—the sincerity of Mrs. Vitsaxaki's religious beliefs—with the type of intrusion that the government regulation itself poses on those beliefs.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) ("Under this Court's precedents, a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable.").  The Court is satisfied that Mrs. Vitsaxaki has plausibly alleged the existence of a sincerely held religious belief, namely her Greek Orthodox faith.  Ver. Compl. ¶¶ 232–53.  Mrs. Vitsaxaki asserts that the district's actions taken pursuant to the Policy—

permitting Doe to use a preferred names and pronouns and to receive school counseling regarding gender identity questions—were in direct contradiction of her religious views concerning gender and biological sex. *Id*.

But the Court's analysis does not stop here. While Mrs. Vitsaxaki has plausibly alleged that the Policy burdened the free exercise of her religious beliefs, "[n]ot all burdens on religion are unconstitutional." *Bowen v. Roy*, 106 S.Ct. 2147, 2153, 476 U.S. 693, 702 (1986) (citation omitted). That is, the Court must next determine the appropriate level of scrutiny under which the Policy must be analyzed to determine whether it is violative of the Free Exercise Clause.

When the government implements a regulation that is *both* neutral and generally applicable, the regulation is subjected to rational basis review. *See Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 217–18 (N.D.N.Y. 2020) (Suddaby, J.). Under this level of scrutiny, the regulation will be deemed constitutional where it is rationally related to a legitimate government interest. *See id*. However, where the government's regulation is not neutral and generally applicable, the regulation will be subjected to strict scrutiny. *See id*. That is, the government must demonstrate that the regulation is narrowly tailored to advance a *compelling* government interest. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

While the district argues that the Policy is neutral and generally applicable, Mrs. Vitsaxaki argues that the Policy must satisfy strict scrutiny—not rational basis scrutiny—for several reasons. Pl.'s Opp'n at 14–20. According to Mrs. Vitsaxaki, the Policy must meet strict scrutiny because it (1) *conditioned* the availability of an otherwise available public benefit; (2) is not neutral and generally applicable; and (3) it implicates Mrs. Vitsaxaki's substantive due process rights, thus presenting a *hybrid* First Amendment claim. *Id.* However, for the reasons discussed below, these arguments must be rejected.

First, Mrs. Vitsaxaki argues that by implementing the Policy, the school district has conditioned the availability of public schooling on her "willingness to allow it to install contrary 'moral standards' and 'beliefs'" in her child. Pl.'s Opp'n at 16. Mrs. Vitsaxaki argues in doing so, the district has "'effectively penalized the free exercise of religion' in a way demanding strict scrutiny." *Id.* (citing *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 780 (2022)). Mrs. Vitsaxaki relies on Supreme Court precedent reinforcing the notion that parents may not be compelled to educate their children in a secular environment or excluded from receiving public benefits on account of their religious beliefs. *See e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 235 (1972) (holding that Wisconsin's compulsory education law was violative of the Free Exercise Clause as applied to Amish parents); *Carson*, 596 U.S. at 789

(holding that Maine's exclusion of "non-sectarian" schools from its tuition assistance program violated the Free Exercise Clause).

However, Mrs. Vitsaxaki does not allege that she was compelled to educate her child in a secular environment. Nor does Mrs. Vitsaxaki allege that she was otherwise excluded from utilizing the benefits of public school on account of her religion. In fact, the verified complaint alleges that upon learning of the school district's Policy, she elected to send her child to a private, religious school that was more aligned with her religious beliefs. Unlike the law challenged in *Yoder*, Mrs. Vitsaxaki has challenged a school Policy that permits students to utilize chosen names and pronouns. At best, Mrs. Vitsaxaki's argument can be understood to present a sort of Establishment Clause issue: has the school established a religion or has it endorsed or promoted a religious message?

While Mrs. Vitsaxaki alleges that the policy inherently endorses a particular world view, a Policy that permits students to use preferred names and pronouns cannot be said to promote or endorse a religious message nor establish a particular religious practice. Nor does Mrs. Vitsaxaki allege that it does. Mrs. Vitsaxaki merely alleges that the choices available to students who choose to take advantage of the Policy runs afoul of her own religious beliefs. Thus, the Policy is unlike the laws at issue in *Yoder* or *Carson* and

Mrs. Vitsaxaki's verified complaint does not set forth a plausible Establishment Clause violation.

Next, Mrs. Vitsaxaki argues that the policy must be treated with strict scrutiny because it is not neutral and generally applicable. Mrs. Vitsaxaki asserts that the discretionary nature of the Policy renders it not generally applicable. *Id.*

In *Fulton v. City of Philadelphia*, the Supreme Court held that the city's use of discretion when determining whether to refer children in foster care to certain foster care agencies was not generally applicable and thus, subject to strict scrutiny. 593 U.S. 522, 535–41 (2021). In *Fulton*, the city utilized a standard foster care contract that included language prohibiting agencies from discriminating against prospective foster families on the basis of their sexual orientation. *Id.* at 535. However, the contract also included language that empowered the city's Commissioner of the Department of Human Services to make exceptions for certain non-compliant agencies. *Id.*

Importantly, the Commissioner retained sole discretion to grant or deny such an exception. *Id.* The Court explained that because the Commissioner retained discretion to decide whether to apply the restriction on certain agencies, and not others, rendered the contract not generally applicable and subject to strict scrutiny. *Id.* at 537 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable[.]").

Mrs. Vitsaxaki argues that like the contract at issue in *Fulton*, the Policy provides the school district with discretion to decide to conceal a student's decision to use a preferred name and/or pronouns from parents. *Id.* at 18. Mrs. Vitsaxaki alleges that the school district "determines" whether to notify parents of a student's decision on a "case-by-case" basis. Ver. Compl. ¶¶ 269–71. However, while Mrs. Vitsaxaki alleges that the Policy permits the *school district* to determine whether to inform parents of a student's decision under the policy on a case-by-case basis, the Policy itself—appended to the verified complaint—provides some clarity.

The Policy states that "[t]ransgender and [gender non-conforming] students have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information." Ex. 5 to the Ver. Compl. at 3. Instead of the district, it is the *student* who drives the decision-making process in each case to determine when and with whom to discuss whether they have elected to use a preferred name and/or pronouns at school—not the school district. *Id.* Thus, the Policy does not provide the school district with the kind of discretionary decision making that would otherwise render the Policy not generally applicable.

Finally, Mrs. Vitsaxaki argues that she has presented a "hybrid" claim that is subject to heightened scrutiny. Pl.'s Opp'n at 20. Upon review, this

argument must be rejected.  In support of this argument, Mrs. Vitsaxaki

relies on the Supreme Court's language in *Employment Division v. Smith*

that appears to carve out certain "hybrid" claims involving the "Free Exercise

Clause in conjunction with other constitutional protections" as requiring

heightened scrutiny.  494 U.S. 872, 881–81 (1990) (citations omitted).

However, the Second Circuit has expressly rejected this language as *dicta*.

*Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003) (citing *Knight v.*

*Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001)) ("*Smith*'s

'language relating to hybrid claims is dicta and not binding on this court.'").

Thus, in this Circuit heightened scrutiny is not applied to these so-called

hybrid rights claims.  *See We the Patriots USA, Inc. v. Conn. Office of Early*

*Childhood Dev.*, 76 F.4th 130, 159 (2d Cir. 2023) (citing *Leebaert*, 332 F.3d at

143).

In sum, Mrs. Vitsaxaki has not plausibly alleged that the Policy is subject

to strict scrutiny.  Therefore, the Policy must instead withstand rational

basis scrutiny to pass constitutional muster.  That means that the Court

must next determine whether Mrs. Vitsaxaki has plausibly alleged that the

Policy fails to meet rational basis scrutiny.

A review of the Policy itself reveals that it is aimed at "fostering a safe

learning environment for all students, free from discrimination and

harassment on the basis of sex, gender, gender identity, gender

nonconformity, and gender expression." Ex. 5 to the Ver. Compl. at 2. Thus, the Court is satisfied that the Policy, which enables students to use their preferred name and/or pronouns is rationally related to the school district's legitimate interest in promoting a safe learning environment for its students.

Therefore, the Policy satisfies rational basis review as-applied to Mrs. Vitsaxaki.[9] Accordingly, Mrs. Vitsaxaki's Free Exercise claim, brought both as-applied and on its face, will be dismissed.

## C. Substantive Due Process Clause Claims

Next, Mrs. Vitsaxaki has asserted a substantive due process claim against the district. Ver. Compl. ¶¶ 277–301. Mrs. Vitsaxaki asserts that the Policy, both as-applied to Mrs. Vitsaxaki and on its face, violated her fundamental liberty interest to direct the upbringing, education, and healthcare of her children when it referred to Doe by Doe's preferred name and gender-neutral pronouns without her knowledge or consent. *Id*. ¶¶ 290–96.

The district offers two arguments in favor of dismissal. *First*, the district argues that Mrs. Vitsaxaki's substantive due process claim must be dismissed because it is coextensive with her free exercise claim and like her free exercise claim, must be dismissed. Def.'s Mem. at 28. The district

---

[9] As discussed above, "[w]here [p]laintiffs fail to state an as-applied challenge, any associated facial challenge necessarily fails as well[,]" and the Court has reviewed the sufficiency of the Verified Complaint on an as-applied basis. *Home for Aged of Little Sisters of the Poor*, 711 F. Supp. 3d at 101. Plaintiff has failed to state a plausible as-applied challenge to the Policy under the Free Exercise Clause, thus, the Court need not separately address the facial challenge.

argues that Mrs. Vitsaxaki is asserting her parental rights to raise Doe according to her *religious* beliefs, and that the dismissal of Mrs. Vitsaxaki's free exercise claim demands the dismissal of her related substantive due process claim. *Id.* *Second*, the district argues that Mrs. Vitsaxaki has not plausibly alleged that the Policy infringed upon her fundamental liberty interest in making healthcare decisions for her children because she has not plausibly alleged that the district's actions under the Policy constituted healthcare decisions. *Id.* at 30–31. The district argues that Mrs. Vitsaxaki has not alleged that the district diagnosed or treated Doe, or that the district's actions were taken as part of a "treatment plan" for Doe. *Id.*

To determine whether Mrs. Vitsaxaki has plausibly alleged that the Policy violated her fundamental rights, the Court must first determine whether Mrs. Vitsaxaki has identified a fundamental right. Mrs. Vitsaxaki cites broadly her fundamental liberty interest to direct the upbringing, education, and healthcare of her children. *Id.* ¶¶ 290–96.

"[T]he Supreme Court has repeatedly held that parents have a liberty interest 'in the care, custody, and control of their children.'" *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 159 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 2682 (2024) (quoting *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000)). These parental *rights* include the "high duty to recognize symptoms of illness and to seek and follow medical advice."

*Parham v. J. R.*, 442 U.S. 584, 602 (1979).  The Court has not, however, defined the bounds of parental rights.

However, within the Second Circuit, the scope of parental rights has been limited in the education context.  Most recently, in *We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, the Second Circuit held that "there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child.'"  76 F.4th 130, 159 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 2682 (2024) (quoting *Skoros v. City of N.Y.*, 437 F.3d 1, 41 (2d Cir. 2006)).

As discussed *supra*, Mrs. Vitsaxaki has not plausibly alleged that the Policy nor the district's actions taken in accordance with the Policy were violative of the Free Exercise Clause or the Establishment Clause.  Thus, under *We the Patriots*, Mrs. Vitsaxaki may not broadly assert her right to direct Doe's upbringing to challenge the manner of instruction employed by the district.  *See Skoros*, 437 F.3d at 41 (quoting *Leebaert v. Harrington*, 323 F.3d 134, 141 (2d Cir. 2003)) ("[A] parent cannot invoke a separate 'fundamental right . . . to tell a public school what his or her child will and will not be taught.'").

Mrs. Vitsaxaki takes issue with the implicit messaging behind the policy, that a person's gender identity can be "changed."  *See* Ver. Compl. ¶ 243.  She alleges that the Policy infringes upon her parental rights to counsel Doe on

important decisions such as identity. *Id.* ¶¶ 285–86. But Mrs. Vitsaxaki's verified complaint—and copies of the Policy annexed to the verified complaint—describe a Policy that operates more like a civility code that extends the kind of decency students should expect at school: such as being called the name they ask to be called.[10] This strikes at the heart of the subject and manner of instruction a school district is entitled to implement for its students. *See Skoros,* 437 F.3d at 41 (2d Cir. 2006) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)) ("[T]he broad spectrum of public education issues is generally 'committed to the control of state and local authorities.'").

Next, Mrs. Vitsaxaki has failed to plausibly allege that the district violated her fundamental right to make certain healthcare decisions for Doe when it referred to Doe by Doe's preferred name and gender-neutral pronouns. The Verified Complaint discusses at length the diagnosis of "gender dysphoria," Ver. Compl. ¶¶ 206–13, however, nowhere does Mrs. Vitsaxaki allege that the district attempted to diagnose or "treat" Doe. Rather, Mrs. Vitsaxaki alleges only that the district provided Doe with in-school resources such as counseling and access to a "gender support team." As the First Circuit recently opined in *Foote v. Ludlow Sch. Comm.*, where it considered nearly identical allegations at the pleading stage, merely *labeling*

---

[10] Mrs. Vitsaxaki also alleges that Doe received counseling and educational resources. Ver. Compl. ¶¶ 112–18.

the district's actions as medical treatment is not enough to transform the actions into treatment.  128 F.4th 336, 349–501 (1st Cir. 2025).  Mrs. Vitsaxaki's allegations merely attempt to cast the kind of mental health resources traditionally offered to adolescents in public schools as a special form of mental health "treatment" solely due to the nature of the discussions the district had with Doe: conversations pertaining to gender identity and expression.  In short, Mrs. Vitsaxaki does not plausibly allege that the district diagnosed or treated Doe or that the district violated her right to make healthcare decisions on Doe's behalf.

Finally, Mrs. Vitsaxaki asserts that by concealing its actions, the district violated her parental rights.  But this argument, too, fails.  Mrs. Vitsaxaki's theory is this: by concealing Doe's gender expression at school, the district effectively prevented Mrs. Vitsaxaki from exercising her parental rights to raise Doe and educate Doe at home the way she saw fit.  But Supreme Court precedent provides parents with no such right to information.  In fact, as the First Circuit observed in *Foote*, the Supreme Court has long held that there is "no affirmative right to governmental aid."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  In other words, there is no notice requirement imposed on the government to apprise parents of their rights—only a limitation on the ways it may intrude upon those rights.

Further, as other circuits have observed in this context, parents "remain free to strive to mold their child according to the [their] own beliefs, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 355 (1st Cir. 2025) (citing *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256 266 (3d Cir. 2007)). Thus, Mrs. Vitsaxaki has not plausibly alleged that the district violated her parental rights based on a "concealment" theory. Simply put, she remained free to exercise her parent rights at home.

After determining whether the government conduct alleged restricted a fundamental right, the Court must next apply the appropriate level of constitutional scrutiny. "[T]he level of scrutiny" to which a governmental regulation is subject turns on the nature of the right at issue." *Andre-Rodney v. Hochul*, 618 F. Supp. 3d 72, 82 (N.D.N.Y. 2022) (citation omitted). As relevant here, when the right allegedly infringed "is fundamental, we apply strict scrutiny, and the governmental regulation must be narrowly tailored to serve a compelling state interest." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022) (citation omitted). When the right allegedly infringed is "not fundamental, we apply rational basis review, and the governmental regulation need only be reasonably related to a legitimate state objective." *Id.* (citation omitted).

Mrs. Vitsaxaki has not plausibly alleged that the district's actions taken under the Policy restricted a fundamental right. As discussed, plaintiffs may not assert their parental rights broadly to curtail the manner of instruction of a school district. Mrs. Vitsaxaki also fails to plausibly allege that the district restricted her right to make medical decisions for Doe or that it violated her parental rights by concealing its support of Doe at school from her. *Supra.* Therefore, rational basis review will apply to the district's actions under the policy. That is, the Policy must be rationally related to some legitimate state interest. *Supra.* The text of the Policy states that the district is "committed to fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender nonconformity, and gender expression." Ex. 5 to the Ver. Compl. at 2. Therefore, the Policy satisfies rational basis review. To be sure, the district's desire to maintain a safe learning environment itself is a *compelling* justification for the Policy. *See Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."). Thus, Mrs. Vitsaxaki has not plausibly alleged that the Policy fails to satisfy rational basis review.[11]  Accordingly, this claim will be dismissed.

---

[11]  As discussed, where plaintiff has failed to state a plausible as-applied challenge to the Policy under the Due Process Clause, the Court need not separately address the facial challenge. *See Home for Aged of Little Sisters of the Poor*, 711 F. Supp. 3d at 101.

## C.  <u>Procedural Due Process Claim</u>

Finally, Mrs. Vitsaxaki has asserted a procedural due process claim against the district.  Ver. Compl. ¶¶ 302–18.  Mrs. Vitsaxaki alleges that the district failed to provide her with adequate procedural protections when it deprived her of her liberty interest to direct the care, custody, and control of her children.  *Id*.  The district argues that dismissal of this claim is required for the same reasons that Mrs. Vitsaxaki's substantive due process claim fails: she has failed to plausibly allege that she was deprived of a "liberty, or property interest protected by the Due Process Clause."  Def.'s Mem. at 31.

"A procedural due process claim requires proof of two elements: '(1) the existence of a property or liberty interest that was deprived; and (2) deprivation of that interest without due process.'" *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 619 (S.D.N.Y. 2016) (quoting *Bryant v. N.Y. State Educ. Dept.*, 692 F.3d 202, 218 (2d Cir. 2012)).  Thus, the first step in the analysis is to determine whether Mrs. Vitsaxaki has plausibly alleged a constitutional deprivation.  *Id*.

Again, Mrs. Vitsaxaki bases her procedural due process claim upon a deprivation of her parental rights to direct the care, custody, and control of Doe.  Ver. Compl. ¶¶ 306–07.  Mrs. Vitsaxaki alleges that she was deprived of her liberty interests when the district referred to Doe by Doe's preferred

name and gender-neutral pronouns without her knowledge or consent. *Id.* ¶ 308–09.

For the reasons discussed above, Mrs. Vitsaxaki has not identified plausible deprivations of her parental rights by the district. *Supra.* Therefore, Mrs. Vitsaxaki has not plausibly alleged a procedural due process claim based on the same theory of constitutional deprivation. Accordingly, this claim must also be dismissed.

## V. <u>CONCLUSION</u>

Therefore, it is

ORDERED that

1. The defendant's motion to dismiss the complaint (Dkt. No. 19) is GRANTED; and

2. The plaintiff's complaint (Dkt. No. 1) is DISMISSED.

The Clerk of the Court is directed to file a judgment accordingly and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  March 20, 2025
        Utica, New York.

- 32 -